**EXHIBIT B**

61273483.1

**Execution Version**

**ASSET PURCHASE AGREEMENT**

**by and among**

**BOOHOO F I LIMITED**

**as Purchaser,**

**and**

**NASTY GAL INC.**

**as Seller**

**DATED AS OF DECEMBER 27, 2016**

Active 30022962v2 250512.000001

# TABLE OF CONTENTS

Page No.

**ARTICLE I. PURCHASE AND SALE OF ASSETS** ...................................................2

    1.1    Purchase and Sale of Assets...................................................................2

    1.2    Excluded Assets .....................................................................................3

    1.3    No Assumption of Liabilities..................................................................3

    1.4    Updates to the Purchased Assets; Assumed and Assigned Contracts, Excluded Assets; and Seller Disclosure Schedule ...................................3

    1.5    Assumption and Assignment of Contracts; Cure Costs...........................4

    1.6    No Successors .........................................................................................5

**ARTICLE II. CONSIDERATION** ..............................................................................5

    2.1    Consideration .........................................................................................5

    2.2    Good Faith Deposit. ...............................................................................5

**ARTICLE III. CLOSING AND TERMINATION** .........................................................6

    3.1    Closing ...................................................................................................6

    3.2    Closing Deliveries by Seller ...................................................................6

    3.3    Closing Deliveries by the Purchaser .......................................................7

    3.4    Termination of Agreement......................................................................8

    3.5    Procedure Upon Termination..................................................................9

    3.6    Effect of Termination..............................................................................9

**ARTICLE IV. REPRESENTATIONS AND WARRANTIES OF SELLER** .......................10

    4.1    Corporate Organization and Qualification.............................................10

    4.2    Authority Relative to This Agreement....................................................10

    4.3    Conflicts; Consents of Third Parties ......................................................10

    4.4    Litigation ..............................................................................................11

    4.5    Intellectual Property..............................................................................11

4.6    Material Contracts ................................................................................. 12

4.7    Regulatory Matters; Permits ................................................................ 13

4.8    Brokers and Finders ............................................................................. 13

4.9    Title to Assets ...................................................................................... 13

4.10   Compliance with Law .......................................................................... 13

4.11   Taxes .................................................................................................... 13

4.12   Data Protection and Privacy ................................................................ 13

4.13   No Other Representations or Warranties ............................................. 14

**ARTICLE V. REPRESENTATIONS AND WARRANTIES OF THE PURCHASER** ........ 14

5.1    Organization and Qualification ............................................................ 15

5.2    Authority Relative to This Agreement ................................................. 15

5.3    Consents and Approvals; No Violation ............................................... 15

5.4    Brokers and Finders ............................................................................. 16

5.5    Adequate Assurances Regarding Assigned Contracts ......................... 16

5.6    Litigation .............................................................................................. 16

5.7    Financing .............................................................................................. 16

5.8    No Other Representations or Warranties ............................................. 16

**ARTICLE VI. EMPLOYEES** ................................................................................ 16

6.1    Employees ............................................................................................ 16

**ARTICLE VII. BANKRUPTCY COURT MATTERS** ............................................. 17

7.1    Bankruptcy Court Approval of the Sale Procedures Order and Sale Order .......... 17

**ARTICLE VIII. COVENANTS AND AGREEMENTS** ........................................... 20

8.1    Conduct of Business ............................................................................ 20

8.2    Access to Information .......................................................................... 21

8.3    Assignability of Certain Contracts, Etc. .............................................. 22

8.4    Rejected Contracts ............................................................................... 22

8.5    Further Agreements .................................................................22

8.6    Further Assurances ..................................................................23

8.7    Preservation of Records ..........................................................24

8.8    Publicity ...................................................................................24

8.9    Notification of Certain Matters ...............................................25

8.10   Notification of Additional Bids ..............................................25

**ARTICLE IX. CONDITIONS TO CLOSING** ........................................25

9.1    Conditions Precedent to the Obligations of Seller .................25

9.2    Conditions Precedent to the Obligations of the Purchaser ....26

9.3    Frustration of Closing Conditions ...........................................27

**ARTICLE X. ADDITIONAL DEFINITIONS** .........................................27

10.1   Certain Definitions ..................................................................27

**ARTICLE XI. TAXES** ..............................................................................33

11.1   Additional Tax Matters ...........................................................33

**ARTICLE XII. MISCELLANEOUS** .......................................................33

12.1   Payment of Expenses ...............................................................33

12.2   Survival of Representations and Warranties; Survival of Confidentiality............34

12.3   Entire Agreement; Amendments and Waivers .......................34

12.4   Counterparts .............................................................................34

12.5   Governing Law .........................................................................34

12.6   Jurisdiction, Waiver of Jury Trial ...........................................34

12.7   Notices .....................................................................................35

12.8   Binding Effect; Assignment.....................................................36

12.9   Severability ..............................................................................36

12.10  Injunctive Relief.......................................................................36

12.11  Non-Recourse ..........................................................................36

12.12   Time of the Essence ............................................................................................37

12.13   Certain Interpretations ........................................................................................37

## EXHIBITS

| | |
|---|---|
| Exhibit A | Form of Escrow Agreement |
| Exhibit B | Form of Bill of Sale |
| Exhibit C | Form of Assignment and Assumption Agreement |
| Exhibit D | Forms of Intellectual Property Assignment Agreements |
| Exhibit E | Form of Release of Intellectual Property Security Agreement |
| Exhibit F | Form of Sale Motion |
| Exhibit G | Form of Sale Procedures Order |
| Exhibit H | Form of Sale Order |

## SCHEDULES

Schedule 1.1(a) - Intellectual Property Rights

Schedule 1.1(c) - Assumed and Assigned Contracts

Schedule 1.2 - Excluded Assets

Seller Disclosure Schedule

Purchaser Disclosure Schedule

## ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement (this "Agreement"), dated as of December 27, 2016 (the "Execution Date"), is entered into by and among Nasty Gal Inc. ("Seller"), and Boohoo F I Limited, a company limited by shares registered in England, company number 10487954 (the "Purchaser"). Seller and the Purchaser are sometimes individually referred to in this Agreement as a "Party" and collectively as the "Parties." Certain capitalized terms used herein are defined in Article X.

## RECITALS

WHEREAS, Seller currently owns Intellectual Property Rights and Customer Databases in connection with its Business, and the Purchaser desires to purchase Seller's Intellectual Property Rights and Customer Databases;

WHEREAS, Seller is a debtor and debtor in possession in that certain bankruptcy case under chapter 11 of title 11 of the United States Code, 11 U.S.C. § 101 *et seq.* (the "Bankruptcy Code") filed on November 9, 2016 in the United States Bankruptcy Court for the Central District of California (the "Bankruptcy Court"), Case No 16-24862-BB (the "Bankruptcy Case");

WHEREAS, Seller acknowledges that it is integral to the process of arranging an orderly sale of the Purchased Assets to proceed by selecting the Purchaser as the "stalking horse" bidder, subject to (i) the Bankruptcy Courts' approval and (ii) any higher or better offers that may be obtained by Seller for all of the Purchased Assets. Seller acknowledges that the contributions of the Purchaser to the process have provided substantial benefit to the estate of Seller and that the Purchaser would not have invested the effort in negotiating and documenting the transaction provided for herein and incurring obligations to pay its outside advisers if the Purchaser were not entitled, subject to the terms of this Agreement, to payment of the Break-up Fee and Expense Reimbursement. Seller acknowledges that the Purchaser's agreement to act as the "stalking horse" bidder has conferred a direct and substantial benefit on Seller's estate, that the Break-up Fee and Expense Reimbursement are likely to enhance the ultimate sale price for the Purchased Assets, and that the Break-up Fee and Expense Reimbursement are reasonable. Seller believes that it is therefore warranted that the Break-up Fee and Expense Reimbursement, if required to be paid pursuant to this Agreement, constitute super-priority administrative expenses of Seller under Sections 503(b) and 507 of the Bankruptcy Code, and that the foregoing should be approved by the Sale Procedures Order; and

WHEREAS, in connection with the Bankruptcy Case and subject to the terms and conditions contained herein and following the entry of the Sale Order confirming the Purchaser as the Successful Bidder and subject to the terms and conditions thereof, Seller desires to sell, transfer and assign to the Purchaser, and the Purchaser desires to purchase and acquire from Seller, the Purchased Assets free and clear of all Encumbrances and Liabilities as more specifically provided herein and in the Sale Order.

NOW, THEREFORE, in consideration of the foregoing and the mutual representations, warranties, covenants and agreements set forth herein, and for other good and valuable

consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound hereby, the Purchaser and Seller hereby agree as follows:

## ARTICLE I.

## PURCHASE AND SALE OF ASSETS

1.1    <u>Purchase and Sale of Assets</u>.   Pursuant to Sections 105, 363 and 365 of the Bankruptcy Code and on the terms and subject to the conditions set forth in this Agreement and the Sale Order, the Purchaser shall purchase, acquire and accept from Seller, and Seller shall sell, transfer, assign, convey and deliver to the Purchaser, on the Closing Date, free and clear of all Encumbrances and Liabilities, all of the Intellectual Property Rights and Customer Databases owned, used or held for use by Seller in, or in connection with, Seller's Business, which shall include, without limitation, the following (collectively, the "<u>Purchased Assets</u>"):

(a)    all those Intellectual Property Rights listed in <u>Schedule 1.1(a)</u> attached hereto and all documents and materials embodying such Intellectual Property Rights;

(b)    the social media accounts used by Seller in relation to Seller's Business including those listed in Schedule 1.1(a) attached hereto (the "<u>Social Media Accounts</u>");

(c)    all of Seller's rights in and to the Intellectual Property Licenses and Contracts listed on <u>Schedule 1.1(c)</u> (the "<u>Assumed and Assigned Contracts Schedule</u>" and any Intellectual Property License or Contract listed thereon being the "<u>Assumed and Assigned Contracts</u>");

(d)    all Documents used in connection with or relating to the Purchased Assets, including without limitation: (i) all current and historic data and information of Seller relating to the domain names listed in Schedule 1.1(a), including in respect of paid media accounts (such as but not limited to adwords, bing Ads, Facebook business manager); Google Analytics; Google Merchant Center; Search Console; affiliate accounts and arrangements; and retargeting, (ii) all contact history with existing and lapsed customers whose details are contained on the Customer Databases, including order history, correspondence with such customers, and any marketing preferences of such customers including details of any customers who have opted out of receiving marketing communications, and (iii) details of, and the design, content, look and feel of, all marketing messages and campaigns used or sent by the Seller, including those sent by email and push messages, to customers during the twelve (12) months prior to Closing;

(e)    all rights, claims, credits, causes of action or rights of set off against any third Person relating to the Purchased Assets, whether accruing before, on, or after the Execution Date (including, for the avoidance of doubt, those arising under, or otherwise relating, to the Assumed and Assigned Contracts), including without limitation (i) all rights to and claims for damages, restitution, and injunctive and other legal and equitable relief for past, present, and future infringement, dilution, misappropriation, violation, misuse, breach, or default, with the right but no obligation to sue for such legal and equitable relief and to collect, or otherwise recover, any such damages, and (ii) rights and avoidance claims and causes of action of Seller arising under the Bankruptcy Code or applicable state Law as to the Purchased Assets; and

2

(f)      any counterclaims, setoffs or defenses that Seller may have with respect to any Purchased Assets.

1.2      <u>Excluded Assets</u>.  Seller shall not be deemed to sell, transfer, assign or convey, and Seller shall retain all right, title and interest to, in and under all of its assets, properties, interests and rights of Seller not otherwise included in the Purchased Assets, any Contract or Intellectual Property License not included on the Assumed and Assigned Contracts Schedule, and the assets listed in <u>Schedule 1.2</u> attached hereto (collectively, the "<u>Excluded Assets</u>").

1.3      <u>No Assumption of Liabilities</u>.  Except as expressly set forth in this Agreement, the Purchaser shall not assume, or become liable for the payment or performance of, any Liabilities of any nature whatsoever of the Seller or related to the Purchased Assets, whether accrued or unaccrued, which shall remain Liabilities of Seller.

1.4      <u>Updates to the Purchased Assets; Assumed and Assigned Contracts, Excluded Assets; and Seller Disclosure Schedule</u>.

(a)      Notwithstanding anything in this Agreement to the contrary, upon written notice to Seller, the Purchaser may (in its sole discretion) amend the definition of the terms Purchased Assets, Assumed and Assigned Contracts, or Excluded Assets by:

(i)      including on <u>Schedule 1.1(a)</u> any Intellectual Property Rights, Customer Databases, or other asset, property, interest, or right of Seller related to the Purchased Assets (other than Seller's inventory and physical goods) not previously included in <u>Schedule 1.1(a)</u> or the definition of Purchased Assets, at any time prior to Closing;

(ii)     including on the Assumed and Assigned Contracts Schedule any Intellectual Property Licenses or other Contracts related to the Purchased Assets not previously included thereon, at any time prior to entry of the Sale Order, in which case Seller shall give notice to the non-debtor parties to any such Intellectual Property License or Contract included on the Assumed and Assigned Contracts Schedule;

(iii)    removing from the Assumed and Assigned Contracts Schedule any Intellectual Property Licenses or other Contracts previously included thereon, at any time prior to the Closing, in which case Seller shall give notice to the non-debtor parties to any such Intellectual Property License or Contract excluded from the Assumed and Assigned Contracts Schedule; and

(iv)     including in the definition of Excluded Assets any asset, property, interest, or right of Seller not previously excluded from the definition of Purchased Assets, at any time prior to the Closing;

*provided* that no such change of the definition of the Purchased Assets, Assumed and Assigned Contracts, or Excluded Assets shall increase or decrease the amount of the Purchase Price.

(b)      If any change made by the Purchaser pursuant to <u>Section 1.4(a)</u> results in the Seller Disclosure Schedule being incorrect or incomplete, then, within three (3) Business

3

Days of such change, Seller shall be permitted to update, in writing to the Purchaser, the Seller Disclosure Schedule as necessary to correct or complete the Seller Disclosure Schedule.

    1.5    <u>Assumption and Assignment of Contracts; Cure Costs.</u>

    (a)    Seller represents and warrants that there are no Cure Costs associated with any of the Assumed and Assigned Contracts listed on the Assumed and Assigned Contracts Schedule as of the Execution Date.  In the event that any such Assumed and Assigned Contracts are determined to have any Cure Costs associated therewith, whether by agreement, order of the Bankruptcy Court, or otherwise, Seller shall have sole responsibility for paying and satisfying any such Cure Costs from the Purchase Price, without any increase to the Purchase Price.  In the event the Purchaser adds any Contract or Intellectual Property License to the Assumed and Assigned Contracts Schedule after the Execution Date as permitted by <u>Section 1.4</u>, the Purchaser shall be responsible to pay, satisfy, or discharge the Cure Costs, if any, for all such Assumed and Assigned Contracts added after the Execution Date and actually assumed by Seller and assigned to Purchaser.

    (b)    If any Contract or Intellectual Property License is added to the Assumed and Assigned Contracts Schedule (or excluded therefrom) as permitted by <u>Section 1.4</u>, Seller shall, as applicable, (i) deliver to the Purchaser Seller's good faith best estimate of the Cure Costs with respect to any Intellectual Property License or Contract added to the Assumed and Assigned Contracts Schedule within five (5) business days of such addition, and (ii) promptly take such steps as are necessary, including promptly providing notice to the non-debtor counterparty, to cause such Assumed and Assigned Contracts to be assumed by Seller, and assigned to the Purchaser, on the Closing Date (or excluded under the Sale Order and this Agreement).  Automatically upon the inclusion of any Contract or Intellectual Property License to the Assumed and Assigned Contracts Schedule as permitted by <u>Section 1.4</u>, such Contract or Intellectual Property License shall be deemed an Assumed and Assigned Contract for all purposes of this Agreement.  Automatically upon the removal of any Contract or Intellectual Property License from the Assumed and Assigned Contracts Schedule as permitted by <u>Section 1.4</u>, such Contract or Intellectual Property License shall be deemed an Excluded Asset for all purposes of this Agreement.

    (c)    Seller shall, promptly after the Execution Date (and in any event no later than the date on which Seller serves notice of the Sale Motion), send a notice in writing to each counterparty to an Assumed and Assigned Contract setting forth the proposed Cure Cost or other remedy for such Assumed and Assigned Contract and the applicable period for response or objection.  If any Contract or Intellectual Property License is added to the Assumed and Assigned Contracts Schedule pursuant to <u>Section 1.4</u>, within five (5) business days Seller shall send a notice in writing to each counterparty to such Assumed and Assigned Contract setting forth the proposed Cure Cost or other remedy for such Assumed and Assigned Contract and the applicable period for response or objection.  Seller shall promptly notify the Purchaser of any responses received from any counterparties.

    (d)    Seller shall use its best efforts to assume and assign the Assumed and Assigned Contracts to Purchaser, including using its best efforts to facilitate any negotiations with the counterparties to such Assumed and Assigned Contracts and to obtain an order or orders

4

(which may be the Sale Order) (i) containing a finding that the proposed assignment and assumption of the Assumed and Assigned Contracts by Purchaser satisfies all applicable requirements of Section 365 of the Bankruptcy Code and (ii) conclusively determining the maximum Cure Costs associated with each Assumed and Assigned Contract.

(e)    All Assumed and Assigned Contracts shall be assumed by Seller and assigned to Purchaser at the Closing or such other dates as specified in the Sale Order (or other order approving such assignment and assumption) or this Agreement, as applicable.    The Purchaser shall assume all of Seller's rights and obligations arising on or after the Closing Date under the Assumed and Assigned Contracts.

(f)    Without limiting any of the Purchaser's rights pursuant to Section 1.4 or this Section 1.5, if (i) the Sale Order does not approve the assignment or transfer of one or more of the Assumed and Assigned Contracts or does not conclusively determine the maximum Cure Costs with respect to one or more Assumed and Assigned Contracts, or (ii) a non-debtor counterparty to any Assumed and Assigned Contract objects to the assignment of such Assumed and Assigned Contract, then the Purchaser may, in its sole discretion, prior to the assumption and assignment of such Contract or Intellectual Property License, exclude such Contract or Intellectual Property License from the definition of Assumed and Assigned Contracts.  If, after reasonable efforts by Seller, the Bankruptcy Court does not approve the assignment or transfer of any of the Assumed and Assigned Contracts, then such contract shall be excluded from the definition of Assumed and Assigned Contracts.

1.6    No Successors.  The Purchaser shall not be deemed, as a result of any action taken in connection with the purchase of the Purchased Assets or the operation of the Purchased Assets from and after the Closing, (A) to be a successor to, or subject to successor liability for, Seller; (B) to have *de facto*, or otherwise, merged with or into Seller; (C) to be an alter ego or a continuation of Seller; and/or (D) to have any responsibility for any obligations of Seller based on any theory of successor or similar theories of liability.

## ARTICLE II.

## CONSIDERATION

2.1    Consideration.  The consideration to be paid for the purchase of the Purchased Assets shall be cash in an amount equal to Twenty Million Dollars ($20,000,000.00) (the "Purchase Price").  The Purchase Price shall be paid as contemplated by Section 3.3.

2.2    Good Faith Deposit.

(a)    Upon the first Business Day in England after the execution of this Agreement by each Party, the Purchaser shall deposit with an Escrow Agent acceptable to the Purchaser and Seller (the "Escrow Agent") cash in immediately available federal funds by wire transfer to an account designated by Escrow Agent, in an amount equal to Three Million Dollars ($3,000,000.00) (the "Good Faith Deposit"), to be applied as provided in Section 2.2(b).  The Good Faith Deposit shall be held in escrow by Escrow Agent in an interest bearing account (the "Good Faith Deposit Escrow Account") and shall not be property of the estate in the Bankruptcy

5

Case except to the extent of Seller's rights with respect thereto pursuant to <u>Section 2.2(b)</u>. All interest accruing on such Good Faith Deposit Escrow Account shall be credited to the Purchaser. The Purchaser and Seller shall each pay one-half of the costs and expenses of Escrow Agent. In connection with Purchaser's deposit of the Good Faith Deposit, Seller, Purchaser and Escrow Agent shall enter into that certain Good Faith Deposit Escrow Agreement in the form attached hereto as <u>Exhibit A</u>.

(b)     The Good Faith Deposit shall be applied to the Purchase Price at Closing. If this Agreement is terminated pursuant to <u>Section 3.4(i)</u>, the Good Faith Deposit shall be paid to Seller as liquidated damages. If this Agreement is terminated for any reason other than pursuant to <u>Section 3.4(i)</u>, the Good Faith Deposit shall be returned to the Purchaser within five (5) Business Days of such termination.

(c)     The Good Faith Deposit is deemed liquidated damages in favor of Seller and not as a penalty; it being agreed that Seller's actual damages are impossible to estimate and that the amount of liquidated damages is a good faith estimate of the actual damages that would be suffered by Seller as a result of a termination of this Agreement pursuant to <u>Section 3.4(i)</u>, and, notwithstanding any other provision of this Agreement, that such liquidated damages shall be in lieu of any other right or remedy of Seller and shall constitute the sole and exclusive remedy of Seller.

## ARTICLE III.

## CLOSING AND TERMINATION

3.1     <u>Closing</u>. Subject to the satisfaction of the conditions set forth in <u>Sections 9.1</u> and <u>9.2</u> hereof or the waiver thereof by the Party entitled to waive the applicable condition, the closing of the purchase and sale of the Purchased Assets, the delivery of the Purchase Price, and the consummation of the other transactions contemplated by this Agreement (the "Closing") shall take place at the offices of Robins Kaplan LLP, 2049 Century Park East, Suite 3400, Los Angeles California 90067 (or at such other place as the Parties may designate in writing), on February 28, 2017, unless another time or date, or both, are agreed to in writing by the Parties hereto. The date on which the Closing shall be held is referred to in this Agreement as the "Closing Date." Unless otherwise agreed by the Parties in writing, the Closing shall be deemed effective and all right, title and interest of each Seller in the Purchased Assets to be acquired by the Purchaser hereunder shall be considered to have passed to the Purchaser as of 12:01 a.m. Pacific Time on the Closing Date.

3.2     <u>Closing Deliveries by Seller</u>. At the Closing, Seller shall deliver to the Purchaser:

(a)     a duly executed bill of sale with respect to the Purchased Assets, substantially in the form attached hereto as <u>Exhibit B</u>;

(b)     a duly executed assignment and assumption agreement with respect to the Assumed and Assigned Contracts, substantially in the form attached hereto as <u>Exhibit C</u>;

(c)     a true and correct copy of the Sale Order, entered by the Bankruptcy Court;

6

(d)        the officer's certificates required to be delivered pursuant to <u>Sections</u> <u>9.2(e)</u> and <u>9.2(f)</u>;

(e)        physical possession of all of the Purchased Assets capable of passing by delivery with the intent that title in such Purchased Assets shall pass by and upon such delivery, including in respect of the domain names listed in Schedule 1.1(a) by completing all formalities required by the relevant domain name registries and registrars to perfect the transfer of the domain names to the Purchaser, including changing the registrant and administrative contact details within the relevant domain name accounts to contact details provided by the Purchaser and ensuring that the Purchaser has administrative and technical access to all the domain names and sole control over where the domain names point, and Seller shall provide confirmation that such transfers have been completed;

(f)        the Customer Databases in XML or CSV format, together with a document describing each field of use;

(g)        in respect of Social Media Accounts, the relevant account log in details for all such accounts, including user name, email address, password, and any other information required to log in to the accounts;

(h)        in respect of the domain names listed in Schedule 1.1(a), the relevant account log in details and any other information required in order for the domain names to be transferred to the Purchaser;

(i)        the account log in details and any other information required in order for the Purchaser to have admin access to:  any paid media accounts (such as but not limited to adwords, bing Ads, Facebook business manager); Google Analytics; Google Merchant Center; Search Console; affiliate accounts; and accounts relating to retargeting, in each case wich are held by Seller relating to the domain names listed in Schedule 1.1.(a);

(j)        duly executed assignments of the Intellectual Property Rights, each in recordable form to the extent necessary to assign such rights, substantially in the forms attached hereto as <u>Exhibit D</u>;

(k)        such other documents or instruments that Purchaser requests at or prior to Closing to effect (or evidence of record) the transactions contemplated hereby; and

(l)        a duly executed lien release(s), each in recordable form, evidencing the release of all monetary liens on the Purchased Assets as of the Closing Date, substantially in the form attached hereto as <u>Exhibit E</u>.

3.3    <u>Closing Deliveries by the Purchaser</u>.  At the Closing, the Purchaser shall deliver to (or at the direction of) Seller,

(a)        the Purchase Price less the Good Faith Deposit, net of any fees of the Escrow Agent payable by the Purchaser;

7

(b)    a duly executed assignment and assumption agreement with respect to the Assumed and Assigned Contracts, substantially in the forms attached hereto as Exhibit C;

(c)    duly executed assignments of the Intellectual Property Rights substantially in the form attached hereto as Exhibit D; and

(d)    the officer's certificates required to be delivered pursuant to Sections 9.1(c) and 9.1(d).

3.4    Termination of Agreement.  This Agreement may be terminated as follows:

(a)    by the mutual written consent of Seller and the Purchaser at any time prior to the Closing, and, after the entry of the Sale Procedures Order, only with the approval of the Bankruptcy Court after notice and a hearing;

(b)    by either the Purchaser or Seller, if the Closing shall not have been consummated on or prior to the close of business on March 15, 2017 (the "Outside Date"); provided, however, that the Purchaser and Seller shall have the right to extend the Outside Date upon such Parties' mutual written agreement on or prior to the Outside Date; provided, further, that the right to terminate this Agreement under this Section 3.4(b) shall not be available to any Party that has committed a material breach of this Agreement, which material breach has resulted in the failure of the Closing to occur on or before such date;

(c)    by either the Purchaser or Seller, if there shall be any Law that makes consummation of the transactions contemplated hereby illegal or otherwise prohibited, or there shall be in effect a final non-appealable order of a Governmental Body of competent jurisdiction restraining, enjoining or otherwise prohibiting the consummation of the transactions contemplated hereby; it being agreed that Seller shall promptly appeal any adverse determination which is appealable (and pursue such appeal with reasonable diligence);

(d)    by the Purchaser, if the Bankruptcy Case is dismissed or converted to a case under Chapter 7 of the Bankruptcy Code, or if an examiner with expanded powers or a trustee is appointed for Seller;

(e)    by the Purchaser, if (i) the Sale Motion shall not have been filed with the Bankruptcy Court by Seller and, with respect to the entry of the Sale Procedures Order, set for hearing to be held on or before January 5, 2017, (ii) the Sale Procedures Order shall not have been entered by the Bankruptcy Court in the form attached hereto as Exhibit G by the close of business on January 5, 2017, or (iii) following its entry, the Sale Procedures Order shall fail to be in full force and effect or shall have been vacated, stayed, reversed, modified or amended in any respect without the prior written consent of the Purchaser;

(f)    by the Purchaser, if (i) the Sale Order shall not have been entered by the Bankruptcy Court in the form attached hereto as Exhibit H by the close of business on February 8, 2017 or (ii) following its entry the Sale Order (y) shall fail to be in full force and effect or shall have been vacated, stayed or reversed and the Sale Order is not reinstated or such stay has not been lifted prior to the Outside Date, or (z) shall have been modified or amended in any respect without the prior written consent of the Purchaser;

8

(g)       by Purchaser if Seller (i) executes a definitive agreement providing for the consummation of an Alternative Transaction, or (ii) files a plan of reorganization or liquidation that provides for the consummation of an Alternative Transaction;

(h)       automatically upon consummation of an Alternative Transaction;

(i)       by Seller, if the Purchaser has breached any representation, warranty, covenant or agreement contained in this Agreement and as a result of such breach the conditions set forth in Section 9.1(c) and Section 9.1(d) hereof, as the case may be, would not then be satisfied at the time of such breach; provided, however, that if such breach is curable by the Purchaser within seven (7) days through the exercise of its commercially reasonable efforts, then for so long as the Purchaser continues to exercise such commercially reasonable efforts Seller may not terminate this Agreement under this Section 3.4(i) unless such breach is not cured within seven (7) days from written notice to the Purchaser of such breach; provided, further, that Seller is not then in material breach of the terms of this Agreement; and provided, further, that no cure period shall be required for a breach which by its nature cannot be cured or a failure to pay the Purchase Price at Closing; or

(j)       by the Purchaser, if Seller has breached any representation, warranty, covenant or agreement contained in this Agreement and as a result of such breach the conditions set forth in Section 9.2(e) and Section 9.2(f) hereof, as the case may be, would not then be satisfied at the time of such breach; provided, however, that if such breach is curable by Seller within seven (7) days through the exercise of its commercially reasonable efforts, then for so long as Seller continues to exercise such commercially reasonable efforts the Purchaser may not terminate this Agreement under this Section 3.4(j) unless such breach is not cured within seven (7) days from written notice to Sellers of such breach; provided, further, that the Purchaser is not then in material breach of the terms of this Agreement; and provided, further, that no cure period shall be required for a breach which by its nature cannot be cured; and provided further, that there shall be no cure period and the Purchaser may terminate this Agreement immediately if Seller breaches any covenant set forth in Section 8.1(a) of this Agreement.

3.5       Procedure Upon Termination.  In the event of a termination of this Agreement pursuant to Section 3.4, (a) if such termination is by the Purchaser or Seller, or both, written notice thereof shall be given promptly by the terminating Party to the other Party hereto, specifying the provision hereof pursuant to which such termination is made, (b) except as contemplated by Section 3.6, this Agreement shall thereupon terminate and become void and of no further force and effect, and (c) the consummation of the transactions contemplated by this Agreement shall be abandoned without further action of the Parties hereto.

3.6       Effect of Termination.  In the event this Agreement is validly terminated as provided herein, then each of the Parties shall be relieved of its duties and obligations arising under this Agreement effective as of the date of such termination and such termination shall be without Liability to the Purchaser or Seller; provided, however, that Section 2.2, Section 3.4, Section 3.5, this Section 3.6, Article XII, the Sale Procedures Order (if entered) and, if applicable pursuant to Section 7.1, the Seller's obligation to pay the Break-up Fee and Expense Reimbursement shall survive any such termination and shall be enforceable hereunder.

9

## ARTICLE IV.

## REPRESENTATIONS AND WARRANTIES OF SELLER

Seller hereby makes the representations and warranties in this <u>Article IV</u> to the Purchaser as of the Execution Date and as of the Closing Date (except with respect to representations and warranties made as of a particular date, which shall be deemed to be made only as of such date), except as qualified or supplemented by Sections in the Seller's Disclosure Schedule attached to and delivered pursuant to this Agreement; <u>provided</u>, <u>however</u>, that information furnished in any particular section of the Seller Disclosure Schedule shall not be deemed to be included in any other sections of the Seller's Disclosure Schedule unless such information is specifically listed or cross-referenced in such other sections of the Seller Disclosure Schedule), as the same may be amended or modified in accordance with <u>Section 1.4</u> hereof (the "<u>Seller Disclosure Schedule</u>"). Each such Section of the Seller Disclosure Schedule is numbered by reference to representations and warranties in a specific Section of this <u>Article IV</u>.

4.1    <u>Corporate Organization and Qualification</u>.    Seller is a corporation duly incorporated, validly existing and in good standing under the Laws of the State of California. Except as a result of the commencement of the Bankruptcy Case, Seller is qualified and in good standing as a foreign corporation in each jurisdiction where the properties owned, leased or operated or the conduct of its Business require such qualification.    Seller has all requisite corporate, limited liability company or other organizational power and authority to own, lease and operate its properties and to carry on the Business as it is now being conducted, subject to the provisions of the Bankruptcy Code.

4.2    <u>Authority Relative to This Agreement</u>.    Except for such authorization as is required by the Bankruptcy Court and receipt of any Regulatory Approvals, Seller has all requisite corporate, limited liability company or other organizational power and authority to (a) execute and deliver this Agreement, (b) execute and deliver each other agreement, document, instrument or certificate contemplated by this Agreement or to be executed by Seller in connection with the consummation of the transactions contemplated by this Agreement (collectively, the "<u>Seller's Documents</u>"), and (c) perform its obligations hereunder and thereunder and consummate the transactions contemplated hereby and thereby.    The execution and delivery of this Agreement and the Seller's Documents, and the consummation of the transactions contemplated hereby and thereby, have been duly authorized by all requisite corporate, limited liability company or other organizational action on the part of Seller.    This Agreement has been, and at or prior to the Closing, each of the Seller's Documents will be, duly and validly executed and delivered by Seller and (assuming the due authorization, execution and delivery by the other Parties hereto and thereto) this Agreement constitutes, and each of the Seller's Documents when so executed and delivered will constitute, legal, valid and binding obligations of Seller, enforceable against Seller in accordance with its respective terms.

4.3    <u>Conflicts; Consents of Third Parties</u>.

(a)    Except as set forth on <u>Section 4.3(a)</u> of the Seller Disclosure Schedule, except for such consents, approvals, waivers, authorizations or notices that can be overridden or canceled by the Sale Order or other related orders of the Bankruptcy Court and subject to entry

10

of the Sale Order, none of the execution and delivery by Seller of this Agreement or any Seller's Document, the consummation of the transactions contemplated hereby or thereby, or compliance by Seller with any of the provisions hereof or thereof will conflict with, or result in any violation of or constitute a breach or default (with or without notice or lapse of time, or both) under, or give rise to a right of acceleration, payment, amendment, termination or cancellation under any provision of (i) Seller's certificate of incorporation or bylaws (or other comparable organizational documents); (ii) any Contract or Permit that constitutes a Purchased Asset; (iii) any order of any Governmental Body applicable to Seller or any of the properties or assets of the Seller, including the Purchased Assets, or the Business as of the Execution Date; or (iv) any applicable Law.

(b)     Except as set forth on Section 4.3(b) of the Seller Disclosure Schedule, no order, Permit or declaration or filing with, or notification to, any Governmental Body is required on the part of Seller in connection with the execution and delivery of this Agreement or the Seller's Documents, the compliance by Seller with any of the provisions hereof or thereof, the consummation of the transactions contemplated hereby or thereby or the taking by Seller of any other action contemplated hereby or thereby, except for the entry of the Sale Order.

4.4     Litigation.  Except in connection with the Bankruptcy Case and except as set forth in Section 4.4 of the Seller Disclosure Schedule, there is no litigation, action, claim, suit, proceeding, or, to the Knowledge of Seller, investigation (collectively, "Actions"), pending, or, to the Knowledge of Seller, threatened against Seller relating to the Purchased Assets.  Except in connection with the Bankruptcy Case and as set forth in Section 4.4 of the Seller Disclosure Schedule, neither Seller nor the Purchased Assets are subject to any judgment, decree, injunction, or order of any court, arbitration panel or other Governmental Body that creates any continuing obligations or Liabilities in connection with the Purchased Assets.

4.5     Intellectual Property.

(a)     Section 4.5(a) of the Seller Disclosure Schedule sets forth a true, complete and correct list of all (i) patents, registered trademarks, registered copyrights, registered designs, Internet domain names, and applications for any of the foregoing in which Seller holds an interest and (ii) all unregistered trademarks, service marks, trade names, logos, brand names, computer software or computer programs, and other Intellectual Property Rights owned, used, or held for use by Seller in connection with the operation of the Business, and (iii) Licensed Intellectual Property used in connection with the operation of the Business.

(b)     Section 4.5(b) of the Seller Disclosure Schedule sets forth a true, complete and correct list of all software, databases, licenses, Intellectual Property Licenses, and Contracts that are included in, comprise, or are related to the items set forth in Section 4.5(a) of the Seller Disclosure Schedule.

(c)     Except as set forth on Section 4.5(c) of the Seller Disclosure Schedule, (i) Seller owns the Seller Intellectual Property Rights and Customer Databases, free from any requirement of any present or future royalty payments or license fees; and (ii) no action is pending, or to the Knowledge of Seller, threatened, challenging the validity, enforceability,

Active 30022962v2 250512.000001

registration, ownership or use of any of the Seller Intellectual Property Rights or Customer Databases.

(d)     Neither Seller nor any of its respective products or services nor any of the Seller Intellectual Property Rights nor the use of the Customer Databases is infringing upon, misappropriating, diluting or otherwise violating, the Intellectual Property Rights or any other rights of any third party and, to the Knowledge of Seller, no Person is infringing upon, misappropriating, diluting or otherwise violating, any Seller Intellectual Property Rights.  Except as set forth on Section 4.5(d) of the Seller Disclosure Schedule, there is no pending claim, action or proceeding alleging that Seller, or any of the Seller Intellectual Property Rights, or the use of the Customer Databases, is infringing, misappropriating, diluting or otherwise violating the Intellectual Property Rights or any other rights of any Person, and to the Knowledge of Seller, no such claims are threatened.

(e)     Except as set forth on Section 4.5(e) of the Seller Disclosure Schedule, Seller owns the Seller Intellectual Property Rights, including without limitation the Nasty Gal Grotesque font and all of the content of and which is contained on the website located at the domain names listed in Schedule 1.1(a), and Customer Databases free and clear from any Encumbrances.

(f)     The domain names listed in Schedule 1.1(a) are registered in the name of Seller.

(g)     In respect of US trade mark number 85964637 for NASTY GAL in classes 3, 9, and 14, an extension of time for the filing of a Statement of Use has been filed with the United States Patent and Trademark Office by December 16, 2016.

(h)     Except as set forth on Section 4.5(h) of the Seller Disclosure Schedule, none of the registered Intellectual Property Rights (including the registered trademarks, domain names and copyright) set out in Schedule 1.1(a) will be due for renewal during the period between the Execution Date and the Closing Date. In the event that any of such registered Intellectual Property Rights are due for renewal during such period, or any action is required to be taken in respect of any application to register any of the Intellectual Property Rights listed in Schedule 1.1(a) during such period, the Seller will complete all necessary formalities, including payment of all relevant fees, by or before the relevant deadline.

4.6     Material Contracts.

(a)     Section 4.6(a) of the Seller Disclosure Schedule sets forth a true and complete list of all Contracts related to the Purchased Assets, including all Intellectual Property Licenses, that are unexpired as of the Execution Date to which Seller is a party or is otherwise bound or by which any of the Purchased Assets are bound as of the Execution Date (the "Material Contracts"):

(b)     Except as set forth on Section 4.6(b) of the Seller Disclosure Schedule or as a result of the Bankruptcy Case, Seller has not received any written notice of any outstanding or uncured default by Seller under any Material Contract.

12

(c)    Except as set forth on Section 4.6(c) of the Seller Disclosure Schedule, Seller has heretofore delivered or made available to the Purchaser true, correct and complete copies of all Material Contracts that are in writing, including all amendments, modifications, schedules and supplements thereto and all waivers with respect thereto.  Assuming (i) the entry of the Sale Order, and (ii) the payment of all applicable Cure Costs, as of the Closing Date, to the Knowledge of Sellers, each Material Contract will be in full force and effect and enforceable in accordance with its terms.

4.7    Regulatory Matters; Permits.  Section 4.7 of the Seller Disclosure Schedule sets forth all of the Permits that are necessary for the use or ownership of any Purchased Assets (the "Material Permits"), such Permits are held by Seller and are in full force and effect, Seller is in compliance with its obligations under each such Permit, except as a result of the Bankruptcy Case, and there is no proceeding, notice of violation, order of forfeiture or complaint or investigation against Seller relating to any such Permits pending or, to the Knowledge of Seller, threatened, before any Governmental Body, in each case except as a result of the Bankruptcy Case.

4.8    Brokers and Finders.  Except as set forth in Section 4.8 of the Seller Disclosure Schedule, Seller has not employed, and to the Knowledge of Seller, no other Person has made any arrangement by or on behalf of Seller with any investment banker, broker, finder, consultant or intermediary in connection with the transactions contemplated by this Agreement which would be entitled to any investment banking, brokerage, finder's or similar fee or commission in connection with this Agreement or the transactions contemplated hereby.

4.9    Title to Assets.  At Closing, Seller will have, and shall convey to the Purchaser at the time of the transfer of the Purchased Assets to the Purchaser, good and marketable title or a valid interest in and to each of the Purchased Assets free and clear of all Encumbrances and Liabilities.

4.10    Compliance with Law.  Seller is in compliance in all respects with all applicable Laws.  Seller has not received any written notice of any alleged violation of any Law applicable to it or the Purchased Assets.   Seller is not in default in any respect of any order of any Governmental Body applicable to the Purchased Assets or the transactions contemplated under this Agreement.

4.11    Taxes.  Except as set forth in Section 4.11 of the Seller Disclosure Schedule, all Taxes due and payable with respect to the Purchased Assets have been paid in full as of Closing, and there are no Liens for Taxes on the Purchased Assets.

4.12    Data Protection and Privacy.

(a)    Except as set forth in Section 4.12 of the Seller Disclosure Schedule, Seller has taken commercially reasonable security measures in accordance with normal industry practices to protect the IT Systems against intrusions.  Since January 1, 2016, (i) the IT Systems have not suffered any material failure, and (ii) there have not been any security breaches relating to the IT Systems that have resulted in a third Person obtaining access to any material confidential or proprietary information relating to the Business or the Purchased Assets or

13

personal identifiable information of the customers of the Business.  Seller is in material compliance with any posted privacy policies and any Laws relating to personal data or other information, including the U.S. – E.U. Safe Harbor framework and the U.S. – Swiss Safe Harbor framework.  Seller has no policies and is not a party to any agreement prohibiting the transfer of personally identifiable information about individuals, including any information in the Customer Databases, to persons that are not affiliated with Seller.  Seller has a privacy policy regarding the collection, use, and disclosure of personal information in Seller's possession, custody, or control, or otherwise held or processed on its behalf and is and has been in compliance with such privacy policy. True and complete copies of all privacy policies that have been used by Seller have been provided to the Buyer. Seller has posted a privacy policy in a clear and conspicuous location on all websites and any mobile applications owned or operated by the Seller.

(b)     The execution, delivery, and performance of this Agreement and the consummation of the contemplated transactions, including any transfer of personal information resulting from such transactions, will not violate any applicable Law, the privacy policy of the Seller as it currently exists or as it existed at any time during which any personal information was collected or obtained by or on behalf of Seller or other privacy and **data** security requirements imposed on Seller.  Upon the Closing, the Purchaser will continue to have the right to use such personal information on the terms and conditions as the Seller enjoyed immediately prior to the Closing.

(c)     No Person (including any Governmental Body) has commenced any Action relating to the Seller's information privacy or **data** security practices, including with respect to the collection, use, transfer, storage, or disposal of personal information maintained by or on behalf of the Seller, or threatened any such Action, or made any complaint, investigation, or inquiry relating to such practices.

(d)     The Seller has kept a record of any customers who have opted out of receiving marketing communications and all such records are accurate and up to date.

4.13     <u>No Other Representations or Warranties</u>.  Notwithstanding anything contained in this Agreement to the contrary, Seller acknowledges and agrees that the Purchaser is not making any representations or warranties whatsoever, express or implied, beyond those expressly given by the Purchaser in <u>Article V</u> (as modified by the Purchaser Disclosure Schedule).  Seller further represent that neither the Purchaser nor any of its Affiliates or any other Person has made any representation or warranty, express or implied, as to the accuracy or completeness of any information regarding the Purchaser or any of its Affiliates or the transactions contemplated by this Agreement not expressly set forth in this Agreement.

## ARTICLE V.

## REPRESENTATIONS AND WARRANTIES OF THE PURCHASER

The Purchaser hereby makes the representations and warranties in this <u>Article V</u> to Seller as of the Execution Date (except with respect to representations and warranties made as of a particular date, which shall be deemed to be made only as of such date), except as qualified or

14

supplemented by Sections in the Purchaser's disclosure schedule attached hereto (the "<u>Purchaser Disclosure Schedule</u>"):

5.1    <u>Organization and Qualification</u>.  The Purchaser is a company limited by shares duly organized, validly existing and in good standing under the Laws of its jurisdiction of formation.  The Purchaser is qualified and in good standing as a foreign entity in each jurisdiction where the properties owned, leased or operated, or the business conducted by it require such qualification except as would not have or reasonably be expected to have a material adverse effect on the Purchaser's ability to consummate the transactions contemplated by this Agreement.  The Purchaser has all requisite corporate power and authority to own its properties and to carry on its business as it is now being conducted except as would not have or reasonably be expected to have a material adverse effect on the Purchaser's ability to consummate the transactions contemplated by this Agreement.

5.2    <u>Authority Relative to This Agreement</u>.  The Purchaser has the requisite corporate power and authority to (a) execute and deliver this Agreement, (b) execute and deliver each other agreement, document, instrument or certificate contemplated by this Agreement or to be executed by the Purchaser in connection with the consummation of the transactions contemplated hereby and thereby (collectively, the "<u>Purchaser's Documents</u>"), and (c) perform its obligations hereunder and thereunder and consummate the transactions contemplated hereby and thereby.  The execution, delivery and performance by the Purchaser of this Agreement and each applicable Purchaser's Document have been duly authorized by all necessary corporate action on behalf of the Purchaser.  This Agreement has been, and at or prior to the Closing each applicable Purchaser's Document will be, duly and validly executed and delivered by the Purchaser and (assuming the due authorization, execution and delivery by the other parties hereto and thereto) this Agreement constitutes, and each the Purchaser's Document when so executed and delivered will constitute, legal, valid and binding obligations of the Purchaser, enforceable against the Purchaser in accordance with their respective terms.

5.3    <u>Consents and Approvals; No Violation</u>.

(a)    Except as set forth on <u>Section 5.3(a)</u> of the Purchaser Disclosure Schedule, none of the execution and delivery by the Purchaser of this Agreement or the Purchaser's Documents, the consummation of the transactions contemplated hereby or thereby, or the compliance by the Purchaser with any of the provisions hereof or thereof will conflict with, or result in any violation of or default (with or without notice or lapse of time, or both) under, or give rise to a right of acceleration, payment, amendment, termination or cancellation under any provision of (i) the governing documents of the Purchaser, (ii) any Contract (including any Contracts related to financing) or Permit to which the Purchaser is a party or by which the Purchaser or its properties or assets are bound, (iii) any order of any Governmental Body applicable to the Purchaser or by which any of the properties or assets of the Purchaser are bound, or (iv) any applicable Law, except as would not have or reasonably be expected to have a material adverse effect on the Purchaser's ability to consummate the transactions contemplated by this Agreement.

(b)    Except as set forth on <u>Section 5.3(b)</u> of the Purchaser Disclosure Schedule, no consent, waiver, approval, order, Permit or authorization of, or declaration or filing

15

with, or notification to, any Governmental Body or other Person nor any other Regulatory Approval is required on the part of the Purchaser in connection with the execution and delivery of this Agreement or the Purchaser's Documents, the compliance by the Purchaser with any of the provisions hereof or thereof, the consummation of the transactions contemplated hereby or thereby or the taking by the Purchaser of any other action contemplated hereby or thereby, except for such orders, Permits, declarations, filings and notifications, the failure of which to obtain or make would not have or reasonably be expected to have a material adverse effect on the Purchaser's ability to consummate the transactions contemplated by this Agreement.

     5.4   <u>Brokers and Finders</u>.  The Purchaser has not employed, and to the knowledge of the Purchaser, no other Person has made any arrangement by or on behalf of the Purchaser with, any investment banker, broker, finder, consultant or intermediary in connection with the transactions contemplated by this Agreement which would be entitled to any investment banking, brokerage, finder's or similar fee or commission in connection with this Agreement or the transactions contemplated hereby.

     5.5   <u>Adequate Assurances Regarding Assigned Contracts</u>.  As of the Closing, the Purchaser will be capable of satisfying any Cure Costs it is obligated to pay or satisfy pursuant to the terms of this Agreement, if any, and conditions contained in Sections 365(b)(1)(C) and 365(f) of the Bankruptcy Code with respect to the Assumed and Assigned Contracts.

     5.6   <u>Litigation</u>.  Except as set forth on <u>Section 5.6</u> of the Purchaser Disclosure Schedule, there is no Action pending against the Purchaser or any of its Affiliates that challenges or seeks to prevent, enjoin or otherwise delay the transactions contemplated by this Agreement.

     5.7   <u>Financing</u>.  The Purchaser will have at the Closing sufficient cash or other sources of immediately available funds to enable it to pay all amounts to be paid in cash by it hereunder and shall provide evidence of such available funds no later than the hearing on the Sale Procedures Order.

     5.8   <u>No Other Representations or Warranties</u>.  Notwithstanding anything contained in this Agreement to the contrary, the Purchaser acknowledges and agrees that Seller is not making any representations or warranties whatsoever, express or implied, beyond those expressly given by Sellers in <u>Article IV</u> (as modified by the Seller Disclosure Schedule), and the Purchaser acknowledges and agrees that, except for the representations and warranties contained therein, the Purchased Assets are being transferred on an "as is" and "where is" basis.  The Purchaser further represents that neither Seller nor any other Person has made any representation or warranty, express or implied, as to the accuracy or completeness of any information regarding Seller, the Purchased Assets, or the transactions contemplated by this Agreement not expressly set forth in this Agreement.

## ARTICLE VI.

## EMPLOYEES

     6.1   <u>Employees</u>.  Effective as of the Execution Date, Purchaser shall have the option, but no obligation, to make arrangements with Seller to discuss with any Employees the potential

Active 30022962v2 250512.000001

                                                             

employment of such Employees by Purchaser after Closing on such terms and conditions of employment as the Purchaser shall determine in its sole discretion, and Seller shall provide the Purchaser with reasonable access to Employees for the purpose of discussing potential employment.  Effective upon Closing, the Purchaser shall have the option, but no obligation, to offer employment to any Employees on such terms and conditions of employment as the Purchaser shall determine in its sole discretion.  Purchaser shall have no obligation or liability to Seller or any of its Employees in connection with any agreements, benefits, or compensation of any kind between Seller and any Employees.  No Person, including any Employees of Seller shall, be a third-party beneficiary or have any third-party rights in connection with this Article or this Agreement.

## ARTICLE VII.

## BANKRUPTCY COURT MATTERS

7.1    <u>Bankruptcy Court Approval of the Sale Procedures Order and Sale Order</u>.

(a)    Seller hereby confirms that it is integral to the process of arranging an orderly sale of the Purchased Assets to proceed by selecting the Purchaser as the "stalking horse" bidder, subject to (i) approval from the Bankruptcy Court and (ii) any higher or better offers that may be obtained by Seller for all or substantially all of the Purchased Assets owned by them. Seller acknowledges that the contributions of the Purchaser to the process have provided substantial benefit to the estate of Seller and that the Purchaser would not have invested the effort in negotiating and documenting the transaction provided for herein and incurring obligations to pay its outside advisers if the Purchaser were not entitled to payment of the Break-up Fee and Expense Reimbursement on the terms set forth in this <u>Section 7.1(a)</u>.  Seller further acknowledges that the Break-up Fee and Expense Reimbursement are likely to enhance the ultimate sale price for the Purchased Assets and are reasonable.  Subject to  Bankruptcy Court entry of the Sale Procedures Order, the Break-up Fee and Expense Reimbursement shall be payable by Seller to the Purchaser in the event that this Agreement is terminated by Purchaser pursuant to <u>Section 3.4(b)</u> or is terminated pursuant to <u>Section 3.4(d)</u>, <u>Section 3.4(f)</u>, <u>Section 3.4(g)</u>, <u>Section 3.4(h)</u> or <u>Section 3.4(j)</u>.  The Break-up Fee and Expense Reimbursement, if payable in accordance with the foregoing, shall be paid directly to the Purchaser upon the closing or "effective date" (as applicable) of any Alternative Transaction (or in the case of a termination pursuant to <u>Section 3.4(b)</u>, <u>Section 3.4(d)</u>, <u>Section 3.4(f)</u>, or <u>Section 3.4(j)</u>, promptly upon written demand) and the Sale Procedures Order shall provide that payment of the Break-up Fee and Expense Reimbursement shall be a condition precedent to the closing or "effective date" (as applicable) of such Alternative Transaction.  The Sale Procedures Order shall provide that (i) the Break-up Fee and Expense Reimbursement shall constitute super-priority administrative expenses of Seller under Sections 503(b) and 507 of the Bankruptcy Code, and (ii) the Break-up Fee and Expense Reimbursement shall be paid to Purchaser prior to the payment of the proceeds of any Alternative Transaction to any third party asserting a lien or other Encumbrance on the Purchased Assets (and no lien or other Encumbrance of any third party shall attach to the portion of the proceeds representing the Break-up Fee and Expense Reimbursement).  The provisions of this <u>Section 7.1</u> shall survive any termination of this Agreement pursuant to <u>Section 3.4</u>.

17

(b)      Within two (2) business days of the execution of this Agreement, Seller shall file and serve the Sale Motion with the Bankruptcy Court in the form attached hereto as Exhibit F, seeking:

(i)      Entry of the Sale Procedures Order in the form attached hereto as Exhibit G, which shall:

(1)      approve the Break-up Fee and Expense Reimbursement in accordance with Section 7.1(a);

(2)      approving procedures to notify counterparties to the Assumed and Assigned Contracts and determine the Cure Costs in accordance with Section 1.5 of this Agreement;

(3)      set 5:00 p.m. prevailing Pacific Time on February 2, 2017 as the deadline for submission of any competing bid for the Purchased Assets (the "Bid Deadline");

(4)      set the date of any auction for the Purchased Assets on or before February 7, 2017;

(5)      set the date of the Sale Hearing on or before February 8, 2017, and set January 30, 2017 as the deadline to object to (A) entry of the Sale Order and (B) the assumption and assignment of the Assumed and Assigned Contracts (including any objection to Cure Costs); and

(6)      approve the bidding procedures attached to the form of Sale Procedures Order (the "Bidding Procedures"), which shall provide, among other things, the following: (A) that any "Qualified Bid" must be submitted prior to the Bid Deadline and (v) include a good faith deposit of no less than 15% of the minimum cash portion of the consideration required by clause (x) below, (w) include an executed definitive asset purchase agreement having substantially identical terms and conditions as this Agreement (together with a copy of the executed agreement that is marked to show changes from this Agreement, together with all schedules and exhibits), provided that any such signed agreement shall provide for higher and better consideration and shall not provide for the payment of any break-up fee, expense reimbursement, topping fee, or other similar arrangement, (x) provide for a purchase price with a minimum cash portion of not less than $21,150,000 (i.e., the sum of the Purchase Price, Break-up Fee, Expense Reimbursement, and $200,000); (y) not be subject to any financing contingency, due diligence contingency; internal board or other approvals, or any other conditions other than those contained in this Agreement; and (z) include evidence satisfactory to Seller that the bidder is willing, authorized, capable, and qualified financially, legally, and otherwise, of unconditionally performing all obligations under the Agreement (or its equivalent) in the event that it is declared the Successful

18

Bidder; (B) minimum increments for each round of bidding at the Auction shall be $200,000; (C) when bidding at the Auction, the Purchaser shall receive a credit in the amount of the Break-Up Fee and Expense Reimbursement; (D) any lender or Person holding a lien on any of the Purchased Assets shall comply with all requirements of a Qualified Bidder set forth in the Bidding Procedures; and (E) after the conclusion of the Auction, there shall be no further bidding for the Purchased Assets; and

(ii)    Entry of the Sale Order in the form attached hereto as <u>Exhibit H</u> (unless there is a higher and better offer accepted at an auction, if necessary, scheduled pursuant to the Sale Procedures Order), which shall, among other things:

(1)    grant the Sale Motion;

(2)    find that the Purchaser is the Successful Bidder;

(3)    authorize Seller to enter into this Agreement (or any amended version of such agreement agreed upon by the Parties in writing) and consummate the transactions contemplated hereby;

(4)    find that the Purchaser is a "good faith" purchaser within the meaning of Section 363(m) of the Bankruptcy Code and grant the Purchaser the full benefits and protections of Section 363(m) of the Bankruptcy Code.

(5)    find that this Agreement was negotiated, proposed and entered into by Seller and the Purchaser without collusion, in good faith and from arms' length bargaining positions;

(6)    find that due and adequate notice and an opportunity to be heard in accordance with all applicable Laws were given to the necessary parties in the Bankruptcy Case;

(7)    determine that the Purchased Assets may be sold free and clear of all Encumbrances and Liabilities in full compliance with Section 363(f) of the Bankruptcy Code;

(8)    authorize and direct Seller to sell the Purchased Assets to Buyer pursuant to this Agreement (or any amended version of such agreement agreed upon by the Parties in writing) and all applicable provisions of the Bankruptcy Code, free and clear of all liens (including any and all "interests" in the Purchased Assets within the meaning of Section 363(f) of the Bankruptcy Code);

(9)    approve the assumption and assignment of the Assumed and Assigned Contracts in accordance with this Agreement and conclusively determine the maximum potential amount of the Cure Costs required to assume and assign each Assumed and Assigned Contract;

19

(10)    contain findings of fact and conclusions of law that the Purchaser (A) is not a successor to, or subject to successor liability for, Seller; (B) has not, *de facto* or otherwise, merged with or into Seller; (C) is not an alter ego or a continuation of Seller; and/or (D) does not have any responsibility for any obligations of Seller based on any theory of successor or similar theories of liability;

(11)    waive any stay of the Sale Order that may be applicable pursuant to Bankruptcy Rules 6004 and 6006 or otherwise; and

(12)    find that the Bankruptcy Court retains jurisdiction to resolve any claim or dispute arising out of or related to this Agreement and the Sale Order.

(c)    In the event an appeal is taken or a stay pending appeal is requested with respect to the Sale Procedures Order or Sale Order, (i) Seller shall promptly notify the Purchaser of such appeal or stay request and shall promptly provide to the Purchaser a copy of the related notice of appeal or order of stay, and (ii) the Seller shall promptly defend such appeal with reasonable diligence. Seller shall also provide the Purchaser with written notice of any motion or application filed in connection with any appeal from either of such orders.

(d)    Seller agrees that it will use reasonable best efforts to take such actions as are reasonably requested by the Purchaser to assist, cooperate, and consult with the Purchaser in order to secure entry by the Bankruptcy Court of the Sale Procedures Order and the Sale Order.

## ARTICLE VIII.

## COVENANTS AND AGREEMENTS

8.1    <u>Conduct of Business</u>.

(a)    During the period from the Execution Date and continuing until the earlier of the termination of this Agreement in accordance with <u>Section 3.4</u> or the Closing, except as contemplated in this Agreement, Seller shall (i) conduct the Business and operate and maintain the Purchased Assets in the Ordinary Course of Business, including keeping all websites fully operational; (ii) use its best efforts to preserve the goodwill of and relationships with Governmental Bodies, customers, suppliers, licensors, licensees, contractors, distributors, agents, Employees and others having business dealings with the Business; and (iii) comply with all applicable Laws and, to the extent consistent therewith, preserve its assets (tangible and intangible).

(b)    Promptly after the Closing Date, Seller will (i) revoke any filing that it may have made prior to the Closing Date with any Governmental Body relating to its use of its name and of any like names or combinations of words or derivations thereof; (ii) at its expense, prepare and file with the appropriate Governmental Body appropriate documents, including articles of amendment, changing its name so as to effectuate the same and promptly deliver evidence of such name changes to the Purchaser; (iii) except to the limited extent provided for in <u>Section 8.1(d)</u>, cease using its name and any derivations thereof, including in the Bankruptcy

20

Case; and (iv) file all necessary and appropriate pleadings in the Bankruptcy Case to change or otherwise modify the case captions in the Bankruptcy Case to remove all references to Seller's name.

(c)    During the period from the Execution Date and continuing until the earlier of the termination of this Agreement in accordance with Section 3.4 or the Closing, Seller shall not sell, transfer, convey, or assign any of the Purchased Assets or amend, modify, or terminate any of the Assumed and Assigned Contracts.

(d)    In respect of the inventory of products of the Business existing as at the Closing Date and where such products are branded with any of the trademarks listed in Schedule 1.1(a), the Seller shall have a limited right and license to sell such inventory of products bearing the trademarks, but not to otherwise use the trademarks in connection with the sale of such products, during the period commencing from the Closing Date until the date on which the last of the products has been sold, or March 31, 2017, whichever is earlier. The right and license in this Section 8.1(d) shall be non-exclusive, non-assignable, non-transferable and non sub-licensable.

8.2    Access to Information.

(a)    Seller agrees that, during the period from the Execution Date and continuing until the earlier of the termination of this Agreement in accordance with Section 3.4 or the Closing, the Purchaser shall be entitled, through its Representatives, and its Representatives shall be entitled to have such reasonable access to and make such reasonable investigation and examination of the books and records, financial information, properties, businesses, assets, data, Employees, accountants, auditors, counsel and operations of the Seller as the Purchaser's Representatives may reasonably request.    Any such investigations and examinations shall be conducted during regular business hours upon reasonable advance notice and under reasonable circumstances and shall be subject to restrictions under applicable Law. Seller shall cause its Representatives to reasonably cooperate with the Purchaser and the Purchaser's Representatives in connection with such investigations and examinations, and the Purchaser shall, and shall use its commercially reasonably efforts to cause its Representatives to, reasonably cooperate with Seller and its respective Representatives and shall use their commercially reasonable efforts to minimize any disruption to the Business.

(b)    From and after the Closing Date, Seller shall give the Purchaser and the Purchaser's Representatives reasonable access during normal business hours to the offices, facilities, plants, properties, assets, Employees, Documents, personnel files and books and records of Seller pertaining to the Purchased Assets.    In connection with the foregoing, Seller shall cause its Representatives to make available to the Purchaser such financial, technical, operating and other information pertaining to the Purchased Assets, as the Purchaser's Representatives shall from time to time reasonably request and to discuss such information with such Representatives.

(c)    From and after the entry by the Bankruptcy Court of the Sale Procedures Order, Seller will provide the Purchaser and the Purchaser's Representatives with reasonable access to Seller's vendors and/or suppliers to the extent that such reasonable access does not

21

negatively affect the Seller's ongoing business operations or the operation of the Seller's bankruptcy estate.

(d)    No information received pursuant to an investigation made under this Section 8.2 shall be deemed to (i) qualify, modify, amend or otherwise affect any representations, warranties, covenants or other agreements of Seller set forth in this Agreement or any certificate or other instrument delivered to the Purchaser in connection with the transactions contemplated hereby, (ii) amend or otherwise supplement the information set forth in the Seller Disclosure Schedule, (iii) limit or restrict the remedies available to the Parties under applicable Law arising out of a breach of this Agreement or otherwise available at Law or in equity, or (iv) limit or restrict the ability of any Party to invoke or rely on the conditions to the obligations of the Parties to consummate the transactions contemplated by this Agreement set forth in Article IX.

8.3    Assignability of Certain Contracts, Etc.    To the extent that the assignment to the Purchaser of any Assumed and Assigned Contract pursuant to this Agreement is not permitted without the consent of a third party and such restriction cannot be effectively overridden or canceled by the Sale Order or other related order of the Bankruptcy Court, then this Agreement will not be deemed to constitute an assignment of or an undertaking or attempt to assign such Assumed and Assigned Contract or any right or interest therein unless and until such consent is obtained; provided, however, that the Parties hereto will use their commercially reasonable efforts, before the Closing, to obtain all consents of such third parties that cannot be effectively overridden or canceled by the Sale Order or other related order of the Bankruptcy Courts; provided, further, that if any such consents are not obtained prior to the Closing Date, Seller and the Purchaser will reasonably cooperate with each other in any lawful and feasible arrangement designed to provide the Purchaser (such arrangement to be at the sole cost and expense of the Purchaser) with the benefits and obligations of any such Assumed and Assigned Contract.

8.4    Rejected Contracts.    Seller shall not reject or file any motion to reject any Assumed and Assigned Contract in the Bankruptcy Case during the period from the Execution Date and continuing until the earlier of the termination of this Agreement in accordance with Section 3.4 or the Closing without the prior written consent of the Purchaser.

8.5    Further Agreements.    The Purchaser authorizes and empowers Seller from and after the Closing Date to receive and to open all mail received by Seller relating to the Purchased Assets and to deal with the contents of such communications in accordance with the provisions of this Section 8.5.    Seller shall promptly (i) deliver to the Purchaser any mail or other communication received by it after the Closing Date and relating to the Purchased Assets, (ii) transfer in immediately available funds to the Purchaser any cash, electronic credit or deposit received by Seller but solely to the extent that such cash, electronic credit or deposit are proceeds of Assumed and Assigned Contracts, and (iii) forward to the Purchaser any checks or other instruments of payment that it receives but solely to the extent that such checks or other instruments are proceeds of Assumed and Assigned Contracts.    The Purchaser shall (x) promptly deliver to Seller any mail or other communication received by it after the Closing Date and relating to the Excluded Assets, (y) promptly transfer in immediately available funds to Seller, any cash, electronic credit or deposit received by the Purchaser but solely to the extent that such cash, electronic credit or deposit are, or are proceeds of, Excluded Assets and (z) promptly

22

forward to Seller any checks or other instruments of payment that it receives but solely to the extent that such checks or other instruments are, or are proceeds of, Excluded Assets.  From and after the Closing Date, Seller shall refer all inquiries with respect to the Purchased Assets to the Purchaser, and the Purchaser shall refer all inquiries with respect to the Excluded Assets to Seller.

8.6    Further Assurances.

(a)    Subject to the terms and conditions of this Agreement and applicable Law, Seller and the Purchaser shall use their respective commercially reasonable efforts to take, or cause to be taken, all actions, and to do, or cause to be done, all things necessary, proper or advisable to consummate and make effective the transactions contemplated by this Agreement as soon as practicable, and shall coordinate and cooperate with each other in exchanging information, keeping the other Party reasonably informed with respect to the status of the matters contemplated by this Section 8.6 and supplying such reasonable assistance as may be reasonably requested by the other Party in connection with the matters contemplated by this Section 8.6. Without limiting the foregoing, during the period from the Execution Date and continuing until the termination of this Agreement in accordance with Section 3.4, the Parties shall use their commercially reasonable efforts to take the following actions but solely to the extent that such actions relate to the transactions contemplated by this Agreement:

(i)    obtain any required consents, approvals (including Regulatory Approvals), waivers, Permits, authorizations, registrations, qualifications or other permissions or actions by, and give all necessary notices to, and make all filings with, and applications and submissions to, any Governmental Body or third party and provide all such information concerning such Party as may be necessary or reasonably requested in connection with the foregoing (other than any consents, approvals, waivers, authorizations or notices that can be overridden or canceled by the Sale Order or other related order of the Bankruptcy Court);

(ii)    avoid the entry of, or have vacated or terminated, any injunction, decree, order, or judgment that would restrain, prevent, or delay the consummation of the transactions contemplated hereby;

(iii)    take any and all reasonably necessary steps to avoid or eliminate every impediment under any applicable Law that is asserted by any Governmental Body with respect to the transactions contemplated hereby so as to enable the consummation of such transactions to occur as expeditiously as possible; and

(iv)    at or following the Closing, execute, acknowledge and deliver all such further conveyances, notices, assumptions, releases and other instruments, and cooperate and take such further actions, as may be reasonably necessary or appropriate to transfer and assign fully to the Purchaser and its successors and assigns, all of the Purchased Assets, and to otherwise make effective the transactions contemplated hereby and thereby.

23

Subject to the terms and conditions of this Agreement the Parties shall not take any action or refrain from taking any action the effect of which would be to delay or impede the ability of Seller and the Purchaser to consummate the transactions contemplated by this Agreement, unless in such Party's reasonable judgment, taking such action or refraining from taking such action is consistent with achieving the ultimate objective of consummating the transactions contemplated hereby or is required by applicable Law.

(b)    During the period from the Execution Date and continuing until the earlier of the termination of this Agreement in accordance with Section 3.4 or the Closing:  (i) Seller, on the one hand, and the Purchaser, on the other hand, shall keep each other reasonably informed as to the status of matters relating to the completion of the transactions contemplated hereby, including promptly furnishing the other with copies of notices or other communications received by Seller or the Purchaser (as the case may be) from any Governmental Body with respect to the transactions contemplated by this Agreement; and (ii) Seller shall, to the extent permitted by applicable Law, (y) provide to the Purchaser substantially final drafts of all of Seller's pleadings, orders and notices to be filed in the Bankruptcy Case in connection with this Agreement at least two (2) Business Days before the filing to the extent reasonably practicable and, if not reasonable practicable, as soon as possible, and consider in good faith Purchaser's reasonable comments related to such pleadings, orders and notices, and (z) Seller shall cooperate and coordinate with the Purchaser's reasonable requests concerning court hearings, pleadings, orders and notices.

(c)    The obligations of the Purchaser and Seller pursuant to this Section 8.6 shall be subject to any orders entered, or approvals or authorizations granted or required, by or under the Bankruptcy Court or the Bankruptcy Code (including in connection with the Bankruptcy Case), and Seller's obligations as a debtor in possession to comply with any order of the Bankruptcy Courts (including the Sale Procedures Order and the Sale Order) and Seller's duty to seek and obtain the highest or otherwise best price for the Business as required by the Bankruptcy Code.

8.7    Preservation of Records.  Seller and the Purchaser agree that each of them shall preserve and keep the records held by them or their Affiliates relating to the Purchased Assets for a period of twelve (12) months from the Closing Date, in the case of the Purchaser, and until the closing of the Bankruptcy Case or the liquidation and winding up of Seller's estate, in the case of Seller, and shall make such records available to the other Party as may be reasonably required by such other Party in connection with, among other things, any insurance claims by, actions or tax audits against or governmental investigations of Seller or the Purchaser or any of their respective Affiliates or in order to enable Seller or the Purchaser to comply with their respective obligations under this Agreement and each other agreement, document or instrument contemplated hereby or thereby.  In the event Seller or the Purchaser wishes to destroy such records prior to or following the end of such applicable period, such Party shall first give sixty (60) days' prior written notice to the other Party and such other Party shall have the right at its option and expense, upon prior written notice given to such Party within such sixty (60) day period, to take possession of the records within one hundred and twenty (120) days after the date of such notice, or such shorter period as the liquidation and winding up of Seller's estate shall permit.

8.8    Publicity.    Seller or the Purchaser may issue a press release or public announcement concerning this Agreement or the transactions contemplated hereby only with the

24

prior written approval of the other Parties hereto, unless, in the reasonable judgment of the disclosing Party, such disclosure is otherwise required by applicable Law or by the Bankruptcy Court with respect to filings to be made with the Bankruptcy Courts in connection with this Agreement, provided, however, that the Purchaser or its Affiliates may make any public announcements or press releases that may be required by any Law, rule, or regulation arising as a consequence of the Purchaser's or its Affiliates' stock being listed on   a   stock   exchange. Without limiting the generality of the foregoing sentence, the Party intending to make such release shall use its commercially reasonable efforts, consistent with such applicable Law or Bankruptcy Court requirement, to consult with the other Parties with respect to the text thereof.

8.9     <u>Notification of Certain Matters</u>.  Seller shall give prompt notice to the Purchaser, and the Purchaser shall give prompt notice to Seller, of (i) any notice or other communication from any Person alleging that the consent of such Person which is or may be required in connection with the transactions contemplated by this Agreement is not likely to be obtained prior to Closing and (ii) any written objection or proceeding that challenges the transactions contemplated hereby or the entry of the Sale Order by the Bankruptcy Court.  To the extent permitted by applicable Law, Seller shall give prompt notice to the Purchaser of (i) any written notice from any Governmental Body of any alleged violation of Law applicable to Seller, (ii) the commencement of any investigation, inquiry or review by any Governmental Body with respect to the Business or that any such investigation, inquiry or review, to the Knowledge of Seller, is contemplated, and (iii) the execution of any Material Contract (and Seller shall deliver or make available a copy thereof to the Purchaser).

8.10    <u>Notification of Additional Bids</u>.  Seller shall give prompt notice to the Purchaser of, and shall provide the Purchaser with copies of, any offer or bid received by Seller from any other prospective buyer for the sale of the Purchased Assets.

**ARTICLE IX.**

**CONDITIONS TO CLOSING**

9.1     <u>Conditions Precedent to the Obligations of Seller</u>.  The obligations of Seller to consummate the transactions contemplated by this Agreement are subject to the fulfillment, on or prior to the Closing Date, of each of the following conditions (any or all of which may be waived in writing by Seller in whole or in part to the extent permitted by applicable Law):

(a)     there shall not be in effect any statute, rule, regulation, or order enacted, issued, entered or promulgated by a Governmental Body of competent jurisdiction restraining, enjoining or otherwise prohibiting the consummation of the transactions contemplated hereby;

(b)     the Bankruptcy Court shall have entered the Sale Order substantially in the form set forth as <u>Exhibit H</u> hereto;

(c)     the representations and warranties of the Purchaser set forth in <u>Article V</u> hereof shall be true and correct in all material respects as of the Closing Date as though made on and as of the Closing Date (except for such representations and warranties made as of a certain date, which shall be true and correct in all material respects as of such date as though made on

25

and as of such date), and Seller shall have received a certificate signed by an authorized officer of the Purchaser, dated the Closing Date, to the foregoing effect;

(d)    the Purchaser shall have performed and complied in all material respects with all obligations and agreements required by this Agreement to be performed or complied with by the Purchaser on or prior to the Closing Date, and Seller shall have received a certificate signed by an authorized officer of the Purchaser, dated the Closing Date, to the foregoing effect;

(e)    the Purchaser shall have delivered, or caused to be delivered, to Seller all of the items set forth in Section 3.3; and

(f)    the Purchaser shall have delivered to Seller appropriate evidence of all necessary corporate action by the Purchaser in connection with the transactions contemplated hereby, including:  (i) certified copies of resolutions duly adopted by the Purchaser's board of directors or similar governing body approving the transactions contemplated by this Agreement and authorizing the execution, delivery, and performance by the Purchaser of this Agreement; and (ii) a certificate as to the incumbency of officers of the Purchaser executing this Agreement and any instrument or other document delivered in connection with the transactions contemplated by this Agreement.

9.2    Conditions Precedent to the Obligations of the Purchaser.  The obligations of the Purchaser to consummate the transactions contemplated by this Agreement are subject to the fulfillment, on or prior to the Closing Date, of each of the following conditions (any or all of which may be waived in writing by the Purchaser in whole or in part to the extent permitted by applicable Law):

(a)    there shall not be in effect any statute, rule, regulation, or order enacted, issued, entered or promulgated by a Governmental Body of competent jurisdiction restraining, enjoining or otherwise prohibiting the consummation of the transactions contemplated hereby;

(b)    (i) the Bankruptcy Court shall have entered the Sale Procedures Order and the Sale Order in the forms set forth as Exhibit G and Exhibit H hereto and containing the provisions set forth in Section 7.1(b)(i) and Section 7.1(b)(ii), respectively, with any changes satisfactory to the Purchaser in its sole discretion, and (ii) as of the Closing Date, such orders shall be in full force and effect, shall not then be stayed, and shall not have been vacated, reversed, modified or amended without Purchaser's prior written consent;

(c)    the Bankruptcy Court shall have entered one or more orders (which may include the Sale Order) approving the assumption and assignment of each of the Assumed and Assigned Contracts and conclusively determining the maximum potential amount of the Cure Costs required to assume and assign each Assumed and Assigned Contract, and as of the Closing Date, such order(s) shall be in full force and effect, shall not then be stayed, and shall not have been vacated, reversed, modified or amended without Purchaser's prior written consent;

(d)    Seller shall have delivered to the Purchaser (i) a certified copy of the Sale Order, and (ii) copies of all affidavits of service of the Sale Motion or notice of such motion filed by or on behalf of Seller;

Active 30022962v2 250512.000001

(e)    each of the representations and warranties of Seller set forth in <u>Article IV</u> shall be true and correct in all material respects as of the Execution Date and the Closing Date as if made at and as of the Closing Date (except to the extent such representations and warranties expressly relate to an earlier date, then as of such earlier date); and the Purchaser shall have received a certificate signed by an authorized officer of Seller, dated the Closing Date, to the foregoing effect;

(f)    Seller shall have performed and complied in all material respects with all obligations, covenants, and agreements required by this Agreement to be performed or complied with by Seller on or prior to the Closing Date, including without limitation Seller's obligations pursuant to <u>Section 8.1(a)</u>, and the Purchaser shall have received a certificate signed by an authorized officer of Seller, dated the Closing Date, to the foregoing effect;

(g)    Seller shall have delivered, or caused to be delivered, to the Purchaser all of the items set forth in <u>Section 3.2</u>;

(h)    all of the Material Permits shall have been (i) transferred to the Purchaser or (ii) obtained by the Purchaser, and all of the Material Permits shall be in full force and effect as necessary for the Purchaser to use the Purchased Assets in the Ordinary Course of Business immediately after the Closing Date; and

(i)    All terminations or expirations of waiting periods imposed (and any extension thereof) by a Government Body necessary for consummation of the transactions contemplated by this Agreement shall have occurred.

9.3    <u>Frustration of Closing Conditions</u>.  Neither Sellers nor the Purchaser may rely on the failure of any condition set forth in <u>Section 9.1</u> or <u>Section 9.2</u>, as the case may be, if such failure was caused directly by such Party's material breach of any provision of this Agreement.

## ARTICLE X.

## ADDITIONAL DEFINITIONS

10.1    <u>Certain Definitions</u>.  As used herein:

"<u>Actions</u>" has the meaning set forth in <u>Section 4.4</u>.

"<u>Affiliate</u>" means, with respect to any Person, any other Person that, directly or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such Person, and the term "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through ownership of voting securities, by contract or otherwise.

"<u>Agreement</u>" has the meaning set forth in the Preamble.

"<u>Allocation</u>" has the meaning set forth in <u>Section 11.1(b)</u>.

27

"Alternative Transaction" means (i) a sale or sales of a material portion of the Purchased Assets to a third party other than the Purchaser or any of its Affiliates conducted through the Bankruptcy Case which is approved by the Bankruptcy Court or (ii) the filing of a plan of reorganization or liquidation that does not contemplate the sale of the Purchased Assets to the Purchaser in accordance with the terms hereof.

"Assumed and Assigned Contracts" has the meaning set forth in Section 1.1(c).

"Assumed and Assigned Contracts Schedule" has the meaning set forth in Section 1.1(c).

"Auction" means an auction in respect of the Purchased Assets in accordance with the Sale Procedures Order.

"Bankruptcy Case" has the meaning set forth in the Recitals.

"Bankruptcy Code" has the meaning set forth in the Recitals.

"Bankruptcy Court" has the meaning set forth in the Recitals.

"Bid Deadline" has the meaning set forth in Section 7.1(b)(i)(3)

"Bidding Procedures" means the procedures to govern the submission of bids and the auction, if any, for the Purchased Assets, attached as an exhibit to the Sale Procedures Order.

"Break-up Fee" means cash in an amount equal to $700,000.

"Business" means the online business carried on by the Seller in connection with the retail of clothing, footwear, jewellery, accessories, and other related products, under or in connection with the NASTY GAL brand and other related brands.

"Business Day" means any day other than a Saturday, Sunday or other day on which commercial banks in New York City, New York are authorized or required by Law to be closed.

"Closing" has the meaning set forth in Section 3.1.

"Closing Date" has the meaning set forth in Section 3.1.

"Contract" means any written or oral contract, purchase order, service order, sales order, indenture, note, bond, lease, license, commitment or instrument or other agreement, arrangement or commitment that is legally binding upon a Person or its property.

"Cure Costs" means the amounts necessary to cure all defaults, if any, and to pay all actual pecuniary losses, if any, that have resulted from such defaults, under the Assumed and Assigned Contracts, in each case as of the Closing Date and to the extent required by Section 365 of the Bankruptcy Code and any order of the Bankruptcy Court.

"Customer Databases" means all databases and data owned, used, or held for use by Seller relating to customers of Seller's Business.

Active 30022962v2 250512.000001

Exh. B-34

"<u>Documents</u>" means all of Seller's written files, information, documents, instruments, papers, books, reports, records, tapes, microfilms, photographs, correspondence (including emails and letters), budgets, forecasts, plans, operating records, safety and environmental reports, data, studies and documents, ledgers, journals, title policies, customer lists, regulatory filings, operating data and plans, research material, technical documentation (design specifications, engineering information, test results, maintenance schedules, functional requirements, operating instructions, logic manuals, processes, flow charts, etc.), user documentation (installation guides, user manuals, training materials, release notes, working papers, etc.), marketing documentation (sales brochures, flyers, pamphlets, web pages, etc.), and other similar materials, in each case whether or not in electronic form.

"<u>Employee</u>" means an individual who, as of the applicable date, is employed by Seller in connection with the Business (including officers, directors, contractors, consultants, and those who may be on a leave of absence as of the Closing Date).

"<u>Encumbrance</u>" means any lien (statutory or otherwise), encumbrance, claim (as defined in Section 101(5) of the Bankruptcy Code), Indebtedness, obligation, right, demand, charge, right of setoff, mortgage, deed of trust, pledge, security interest, preference, option, lease, license, Tax, right of first refusal or similar interests, title defects, hypothecations, easements, rights of way, restrictive covenants, encroachments, judgments, conditional sales or other title retention agreements and other impositions, imperfections or defects of title or restrictions on transfer or use of any nature whatsoever, or any other interest (as used in any applicable section of the Bankruptcy Code, including Section 363(f)) (including (i) any conditional sale or other title retention agreement and any lease having substantially the same effect as any of the foregoing, (ii) any assignment or deposit arrangement in the nature of a security devise, and (iii) any claim based on any theory that the Purchaser is a successor or continuation of Seller or the Business), whether secured or unsecured, choate or inchoate, filed or unfiled, scheduled or unscheduled, noticed or unnoticed, recorded or unrecorded, contingent or liquidated, material or non-material, known or unknown.

"<u>Escrow Agent</u>" has the meaning set forth in <u>Section 2.2(a)</u>.

"<u>Excluded Assets</u>" has the meaning set forth in <u>Section 1.2</u>.

"<u>Execution Date</u>" has the meaning set forth in the Recitals.

"<u>Expense Reimbursement</u>" shall mean the actual and documented fees and expenses incurred by Purchaser and its Affiliates (including fees and expenses for legal, accounting, and financial advisors) in connection with this Agreement and the transactions contemplated hereby in an amount not to exceed $250,000.

"<u>GAAP</u>" means United States generally accepted accounting principles as in effect from time to time.

"<u>Good Faith Deposit</u>" has the meaning set forth in <u>Section 2.2(a)</u>.

"<u>Good Faith Deposit Escrow Account</u>" has the meaning set forth in <u>Section 2.2(a)</u>.

29

"<u>Governmental Body</u>" means any government, quasi-governmental entity, or other governmental or regulatory body, agency or political subdivision thereof of any nature, whether foreign, federal, state, provincial or local, or any agency, branch, department, official, entity, instrumentality or authority thereof, or any court or arbitrator (public or private) of applicable jurisdiction.

"<u>Indebtedness</u>" of any Person means, without duplication: (i) the interest in respect of, principal of and premium (if any) in respect of (x) indebtedness of such Person for money borrowed and (y) indebtedness evidenced by notes, debentures, bonds or other similar instruments for the payment of which such Person is responsible or liable; (ii) all obligations of such Person for the deferred purchase price of property or services; (iii) all obligations of such Person under leases required to be capitalized in accordance with GAAP; (iv) all obligations of such Person for the reimbursement of any obligor on any letter of credit, banker's acceptance or similar credit transaction; (v) all obligations of the type referred to in clauses (i) through (iv) of any Persons for the payment of which such Person is responsible or liable, directly or indirectly, as obligor, guarantor, surety or otherwise, including guarantees of such obligations; or (vi) all obligations of the type referred to in clauses (i) through (v) of other Persons secured by any Encumbrance, on any property, asset, interest or right of such Person (whether or not such obligation is assumed by such Person).

"<u>Intellectual Property Licenses</u>" means all Contracts pursuant to which Seller is granted a license to, or any rights under, any Intellectual Property Rights or Customer Databases of any third Person and all Contracts pursuant to which Seller grants to a third Person a license to, or any rights under, any Intellectual Property Rights or Customer Databases of Seller.

"<u>Intellectual Property Rights</u>" means all patents, rights to inventions, copyright and neighbouring and related rights, moral rights, trademarks and service marks, business names and domain names, rights in get-up and trade dress, goodwill and the right to sue for passing off or unfair competition, rights in designs, rights in computer software, database rights, rights to use, and protect the confidentiality of, confidential information (including know-how and trade secrets), all rights to sue for past, present and future infringement, misappropriation, dilution or other violation of any of the foregoing and all remedies at law or equity associated therewith, and all other intellectual property rights, in each case whether registered or unregistered and including all applications and rights to apply for and be granted, renewals or extensions of, and rights to claim priority from, such rights and all similar or equivalent rights or forms of protection which subsist or will subsist now or in the future in any part of the world.

"<u>IT Systems</u>" means the information technology systems (included related hardware and software) as used in the operation of the Business.

"<u>Knowledge</u>" An individual shall be deemed to have "Knowledge" of a particular fact or other matter if such individual is, or with reasonable diligence within the scope of reasonable fulfillment of such individual's duties, would be, aware of such fact or other matter.

"<u>Laws</u>" means all federal, state, provincial, local or foreign laws, statutes, common law, rules, codes, regulations, restrictions, ordinances, orders, decrees, approvals, directives, judgments, rulings, injunctions, writs and awards of, or issued, promulgated, enforced or entered

30

by, any and all Governmental Bodies, or court of competent jurisdiction, or other requirement or rule of law.

"<u>Liability</u>" means, as to any Person, any claim (as defined in Section 101(5) of the Bankruptcy Code), debt, adverse claim, liability, obligation, commitment, assessment, cost, expense, loss, expenditure, charge, fee, penalty, fine, contribution or premium of any kind or nature whatsoever, whether known or unknown, asserted or unasserted, absolute or contingent, direct or indirect, accrued or unaccrued, liquidated or unliquidated, or due or to become due, and regardless of when sustained, incurred or asserted or when the relevant events occurred or circumstances existed, including all costs and expenses relating thereto.

"<u>Licensed Intellectual Property</u>" means any Intellectual Property that is licensed to Seller, including such Intellectual Property used, or held for use, in connection with the operation of the Business.

"<u>Material Contracts</u>" has the meaning set forth in <u>Section 4.6</u>.

"<u>Material Permits</u>" has the meaning set forth in <u>Section 4.7</u>.

"<u>Ordinary Course of Business</u>" means the ordinary and usual course of normal day to day operations of the Business consistent with past practice; except that the Debtor may, in its sole and absolute discretion (i) close either or both of its physical store locations and/or (ii) discontinue the purchase of new inventory.

"<u>Outside Date</u>" has the meaning set forth in <u>Section 3.4(b)</u>.

"<u>Party</u>" and "<u>Parties</u>" have the meanings set forth in the Preamble.

"<u>Permits</u>" means all notifications, licenses, permits (including environmental, construction and operation permits), franchises, certificates, approvals, consents, waivers, clearances, exemptions, classifications, registrations, variances, orders, tariffs, rate schedules and other similar documents and authorizations issued by any Governmental Body to Seller and used, or held for use, in connection with the operation of the Business or applicable to ownership of the Purchased Assets.

"<u>Person</u>" means an individual, corporation, partnership, limited liability company, joint venture, association, trust, unincorporated organization, labor union, estate, Governmental Body or other entity or group.

"<u>Purchase Price</u>" has the meaning set forth in <u>Section 2.1</u>.

"<u>Purchased Assets</u>" has the meaning set forth in <u>Section 1.1</u>.

"<u>Purchaser</u>" has the meaning set forth in the Preamble.

"<u>Purchaser Disclosure Schedule</u>" has the meaning set forth in <u>Article V</u>.

"<u>Purchaser's Documents</u>" has the meaning set forth in <u>Section 5.2</u>.

31

"Regulatory Approvals" means any consents, waivers, approvals, orders, Permits or authorizations of any Governmental Body required in connection with the execution, delivery and performance of this Agreement and the consummation of the transactions contemplated hereunder.

"Representatives" means a Person's officers, employees, counsel, accountants, investment bankers, lenders (and such lenders' counsel), potential lenders (and such potential lenders' counsel) and other authorized representatives, agents and contractors.

"Sale Hearing" means the hearing in front of the Bankruptcy Court to consider approval of the sale transaction contemplated by this Agreement.

"Sale Motion" means the motion to be filed by Seller in the form attached hereto as Exhibit F with such changes as are reasonably acceptable to Seller, and with such changes that adversely affect the Purchaser as are acceptable to the Purchaser in its sole discretion.

"Sale Order" means the order of the Bankruptcy Court in the form attached hereto as Exhibit H, with such changes as are reasonably acceptable to Seller, and with such changes that adversely affect the Purchaser as are acceptable to the Purchaser in its sole discretion.

"Sale Procedures Order" means an order entered by the Bankruptcy Court in the form attached hereto as Exhibit G, with such changes that are acceptable to the Purchaser in its sole discretion.

"Seller" has the meaning set forth in the Preamble.

"Seller Disclosure Schedule" has the meaning set forth in Article IV.

"Seller Intellectual Property Rights" means any Intellectual Property Rights that are owned by or licensed to Seller, and used, or held for use, in connection with the operation of the Business, including without limitation the Intellectual Property Rights listed in Schedule 1.1(a).

"Seller's Documents" has the meaning set forth in Section 4.2.

"Social Media Accounts" has the meaning set forth in Section 1.1(b).

"Successful Bidder" means the Person selected by Seller at the Auction and approved by the Bankruptcy Court as the winning bidder at the Auction for the Purchased Assets.

"Tax" and "Taxes" mean any and all taxes, charges, fees, tariffs, duties, impositions, levies or other assessments, imposed by any Governmental Body, and include any interest, penalties or additional amounts attributable to, or imposed upon, or with respect to, Taxes.

"Transfer Taxes" has the meaning set forth in Section 11.1(a).

"Wholly-Owned Subsidiaries" means any Person all of the equity interests in which are held as of the Closing directly or indirectly by the Purchaser.

32

## ARTICLE XI.

## TAXES

11.1    <u>Additional Tax Matters</u>.

(a)    Any sales, use, excise, consumption, purchase, transfer, franchise, deed, fixed asset, stamp, documentary, or other similar Taxes ("<u>Transfer Taxes</u>") which may be payable by reason of the sale of the Purchased Assets under this Agreement or the transactions contemplated herein shall be borne and timely paid by Seller, and to the extent Purchaser is required by applicable law to pay Transfer Taxes, such Transfer Taxes shall be paid by Seller to Buyer at Closing.  Seller shall indemnify, defend (with counsel reasonably satisfactory to the other Party), protect, and save Purchaser from and against any and all claims, charges, interest or penalties assessed, imposed or asserted in relation to any such Transfer Taxes that Seller is obligated to bear and pay pursuant to the preceding sentence of this <u>Section 11.1(a)</u>.  Seller shall prepare or cause to be prepared and timely file or cause to be timely filed all Tax Returns required to be filed in respect of the Transfer Taxes required to be borne and paid pursuant to this <u>Section 11.1(a)</u>.

(b)    The Purchaser shall, within the later of (i) ninety (90) days after the Closing Date, or (ii) forty-five (45) days prior to the date by which Seller's federal Income Tax Returns for the year in which the transactions contemplated hereunder are consummated must be filed, prepare and deliver to Seller a schedule allocating (in the Purchaser's sole discretion) the Purchase Price (and any other items that are required for federal Income Tax to be treated as Purchase Price) among the Purchased Assets (such schedule, the "<u>Allocation</u>").  The Purchaser and Seller shall report and file all Tax Returns (including amended Tax Returns and claims for refund) consistent with the Allocation, and shall take no position contrary thereto or inconsistent therewith (including in any audits or examinations by any Governmental Body or any other proceeding).  In the event that any part of the Allocation is disputed by any Governmental Body, the Party receiving notice of such dispute shall use reasonable efforts to notify the other Party, and the Purchaser and Seller shall cooperate in good faith in responding to such challenge to preserve the effectiveness of such Allocation.  The Purchaser and Seller shall cooperate in the filing of any forms (including Form 8594 under Section 1060 of the Code) with respect to such Allocation, including any amendments to such forms required pursuant to this Agreement with respect to any adjustment to the Purchase Price.  Notwithstanding any other provision of this Agreement, the terms and provisions of this <u>Section 11.1(b)</u> shall survive the Closing without limitation as to time.

## ARTICLE XII.

## MISCELLANEOUS

12.1    <u>Payment of Expenses</u>.  Except as otherwise provided in <u>Section 7.1(a)</u>, Seller and the Purchaser shall bear their own expenses incurred or to be incurred in connection with the negotiation and execution of this Agreement and each other agreement, document and instrument contemplated by this Agreement and the consummation of the transactions contemplated hereby and thereby.

33

12.2    Survival of Representations and Warranties; Survival of Confidentiality.    The Parties hereto agree that the representations and warranties contained in this Agreement shall expire upon the Closing Date.    The Parties hereto agree that the covenants contained in this Agreement to be performed after the Closing shall survive in accordance with the terms of the particular covenant.

12.3    Entire Agreement; Amendments and Waivers.    This Agreement (including the schedules and Exhibits hereto), the Seller's Documents, the Purchaser's Documents, the Seller Disclosure Schedule and the Purchaser Disclosure Schedule represent the entire understanding and agreement between the parties hereto with respect to the subject matter hereof.    Except as otherwise provided herein, this Agreement may be amended, supplemented or changed, and any provision hereof may be waived, only by written instrument making specific reference to this Agreement signed by the Parties.    No action taken pursuant to this Agreement, including any investigation by or on behalf of any Party shall be deemed to constitute a waiver by the Party taking such action of compliance with any representation, warranty, covenant or agreement contained herein.    The waiver by any Party hereto of a breach of any provision of this Agreement shall not operate or be construed as a further or continuing waiver of such breach or as a waiver of any other or subsequent breach.    No failure on the part of any Party to exercise, and no delay in exercising, any right, power or remedy hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of such right, power or remedy by such Party preclude any other or further exercise thereof or the exercise of any other right, power or remedy.    Except as expressly provided in this Agreement, all remedies hereunder are cumulative and are not exclusive of any other remedies provided by applicable Law.

12.4    Counterparts.    For the convenience of the parties hereto, this Agreement may be executed (by facsimile or PDF signature) in any number of counterparts, each such counterpart being deemed to be an original instrument, and all such counterparts shall together constitute the same agreement.

12.5    Governing Law.    THIS AGREEMENT IS TO BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH FEDERAL BANKRUPTCY LAW, TO THE EXTENT APPLICABLE, AND WHERE STATE LAW IS IMPLICATED, THE LAWS OF THE STATE OF CALIFORNIA SHALL GOVERN, WITHOUT GIVING EFFECT TO THE CHOICE OF LAW PRINCIPLES THEREOF, INCLUDING ALL MATTERS OF CONSTRUCTION, VALIDITY AND PERFORMANCE.

12.6    Jurisdiction, Waiver of Jury Trial.

(a)    THE BANKRUPTCY COURT WILL HAVE JURISDICTION OVER ANY AND ALL DISPUTES BETWEEN OR AMONG THE PARTIES, WHETHER IN LAW OR EQUITY, ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY AGREEMENT CONTEMPLATED HEREBY; PROVIDED, HOWEVER, THAT IF THE BANKRUPTCY COURT IS UNWILLING OR UNABLE TO HEAR ANY SUCH DISPUTE, THE COURTS OF THE STATE OF CALIFORNIA AND THE FEDERAL COURTS OF THE UNITED STATES OF AMERICA LOCATED IN THE CENTRAL DISTRICT OF CALIFORNIA WILL HAVE SOLE JURISDICTION OVER ANY AND ALL DISPUTES BETWEEN OR AMONG THE PARTIES, WHETHER IN LAW OR EQUITY, ARISING OUT

34

OF OR RELATING TO THIS AGREEMENT OR ANY AGREEMENT CONTEMPLATED HEREBY.

(b)    EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATED TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

12.7    <u>Notices</u>.    Unless otherwise set forth herein, any notice, request, instruction or other document to be given hereunder by any Party to the other Parties shall be in writing and shall be deemed duly given (i) upon delivery, when delivered personally, (ii) one (1) Business Day after being sent by overnight courier or when sent by facsimile transmission (with a confirming copy sent by overnight courier), and (iii) three (3) Business Days after being sent by registered or certified mail, postage prepaid, as follows:

If to Seller:

> Nasty Gal, Inc.
> c/o Joe Scirocco
> 523 West Sixth Stree, Suite 330
> Los Angeles, CA 90014
> Email: <u>Joe.scirocco@shopnastygal.com</u>

> With a copy to (which copy shall not constitute notice):

> Robins Kaplan LLP
> c/o Scott Gautier
> 2049 Century Park East, Suite 3400
> Los Angeles, CA 90067
> Email: <u>Sgautier@robinskaplan.com</u>

> And

> Peter J Solomon Company
> c/o Derek Pitts
> 1345 Avenue of the Americas, 31st floor
> New York, NY 10105
> Email: <u>Dpitts@pjsc.com</u>

If to the Purchaser:

> Boohoo F I Limited
> 910 Imperial Point
> Manchester, United Kingdom
> M50 3RB

> With a mandatory copy to (which copy shall not constitute notice):

35

Troutman Sanders LLP
600 Peachtree Street, N.E., Suite 5200
Atlanta, GA  30308
Attention:  Harris B. Winsberg
Attention:  Stephen S. Roach
Email:  harris.winsberg@troutmansanders.com
Email:  stephen.roach@troutmsanders.com

or to such other Persons or addresses as may be designated in writing by the Party to receive such notice.

12.8    Binding Effect; Assignment.

(a)    This Agreement shall inure to the benefit of the Parties and their respective successors and permitted assigns, including any trustee or estate representative appointed in the Bankruptcy Case or any successor Chapter 7 case.  Nothing in this Agreement shall create or be deemed to create any third party beneficiary rights in any Person or entity not a party to this Agreement.  No assignment of this Agreement or of any rights or obligations hereunder may be made by Seller or the Purchaser (by operation of law or otherwise) without the prior written consent of the other Parties hereto and any attempted assignment without the required consents shall be void; provided, however, that Purchaser may collaterally assign its rights under the Agreement to any of its current or future lenders or financing sources or any of their agents.

12.9    Severability.  If any term or other provision of this Agreement is invalid, illegal or incapable of being enforced by any rule of Law or public policy, all other conditions and provisions of this Agreement shall nevertheless remain in full force and effect so long as the economic or legal substance of the transactions contemplated hereby is not affected in a manner adverse to any party.  Upon such determination that any term or other provision is invalid, illegal or incapable of being enforced, the Parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in an acceptable manner to the end that the transactions contemplated hereby are fulfilled to the fullest extent possible.

12.10    Injunctive Relief.  The Parties agree that damages at Law may be an inadequate remedy for the breach of any of the covenants, promises and agreements contained in this Agreement by the other Parties hereto and, accordingly, each Party shall be entitled to injunctive relief with respect to any breach by any other Party hereto, including specific performance of such covenants, promises or agreements or an order enjoining such Party from any threatened, or from the continuation of any actual, breach of the covenants, promises or agreements contained in this Agreement by such Party.  The rights set forth in this Section 12.10 shall be in addition to any other rights which the Purchaser may have at Law or in equity pursuant to this Agreement.

12.11    Non-Recourse.  Except as expressly contemplated by this Agreement, no past, present or future director, officer, employee, incorporator, member, partner or equity holder of Seller or the Purchaser shall have any liability for any obligations or liabilities of Seller or the Purchaser under this Agreement or the Seller's Documents or the Purchaser's Documents of or

36

for any claim based on, in respect of, or by reason of, the transactions contemplated hereby and thereby.

12.12    Time of the Essence.  Time is of the essence in the performance of each of the obligations of the Parties and with respect to all covenants and conditions to be satisfied by the Parties in this Agreement and all documents, acknowledgments and instruments delivered in connection herewith.

12.13    Certain Interpretations.

(a)    Unless otherwise expressly provided, for purposes of this Agreement, the following rules of interpretation shall apply:

(i)    All references in this Agreement to Articles, Sections, Schedules and Exhibits shall be deemed to refer to Articles, Sections, Schedules and Exhibits to this Agreement.

(ii)    All Exhibits and Schedules annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein. Any capitalized terms used in any Schedule or Exhibit but not otherwise defined therein shall be defined as set forth in this Agreement.

(iii)    The Article, Section and paragraph captions herein are for convenience of reference only, do not constitute part of this Agreement and shall not be deemed to limit or otherwise affect any of the provisions hereof.

(iv)    The words "include," "includes" and "including," when used herein shall be deemed in each case to be followed by the words "without limitation" (regardless of whether such words or similar words actually appear).

(v)    When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period shall be excluded.  If the last day of such period is not a Business Day, the period in question shall end on the next succeeding Business Day.

(vi)    Any reference in this Agreement to $ shall mean U.S. dollars.

(vii)    Any reference in this Agreement to gender shall include all genders, and words imparting the singular number only shall include the plural and vice versa.

(viii)    The words such as "herein," "hereinafter," "hereof," and "hereunder" refer to this Agreement as a whole and not merely to a subdivision in which such words appear unless the context otherwise requires.

(b)    The Parties hereto agree that they have been represented by legal counsel during the negotiation and execution of this Agreement and, therefore, waive the application of

37

any Law, regulation, holding or rule of construction providing that ambiguities in an agreement or other document shall be construed against the Party drafting such agreement or document.

(c)    The Purchaser acknowledges and agrees hereby that Seller shall not be required to comply with the provisions of any bulk transfer laws of any jurisdiction in connection with the transactions contemplated by this Agreement.

*[Remainder of page intentionally left blank]*

38

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be executed by their respective duly authorized officers as of the date first above written.

PURCHASER:

**BOOHOO F I LIMITED**

By: _____

Name: _NEIL  CATTO_____

Title: _DIRECTOR_____

Signature Page to Asset Purchase Agreement Between Nasty Gal, Inc. and Boohoo F I Limited

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be executed by their respective duly authorized officers as of the date first above written.

**SELLER:**

**NASTY GAL INC.**

By: _____  ____
   Name: Joe Scirocco
   Title: President/Chief Restructuring Officer

Active 29777408v7 250512.000001

Signature Page to Asset Purchase Agreement Between Nasty Gal, Inc. and Boohoo F I Limited

**Exhibit A**

## EXHIBIT A

## FORM OF EARNEST MONEY ESCROW AGREEMENT

**THIS EARNEST MONEY ESCROW AGREEMENT** (this "Agreement") is made and entered into as of this __ day of December, 2016 (the "Effective Date"), by and among Nasty Gal, Inc. a California corporation ("Seller"), Boohoo F I Limited, a company limited by shares registered in England, company number 10487954 ("Purchaser"), and Commonwealth Land Title Company, a California corporation ("Escrow Agent"). (Seller, Purchaser and Escrow Agent are sometimes referred to herein individually as a "Party", and collectively as the "Parties").

WHEREAS, Seller and Purchaser are parties to that certain Asset Purchase Agreement of even date herewith (the "Purchase Agreement"), for the sale and purchase of substantially all of Seller's Intellectual Property Rights and Customer Databases. (All capitalized terms used, but not defined, in this Agreement shall have the meaning set forth in the Purchase Agreement.)

WHEREAS, Purchaser is required to deposit certain monies into escrow with Escrow Agent to be held as earnest money for the benefit of Seller pursuant to the Purchase Agreement in connection with the purchase of the Purchased Assets, provided that none of the monies to be deposited with Escrow Agent shall be considered property of Seller's bankruptcy estate except to the extent set forth in the Purchase Agreement.

WHEREAS, Escrow Agent is willing to hold such earnest money in escrow, and invest and disburse such earnest money, on the terms set forth in this Agreement.

NOW, THEREFORE, in consideration of the mutual covenants set forth in this Agreement and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereby agree as follows:

1.   Deposit and Investment of Earnest Money

(a)   Deposit and Acceptance of Earnest Money. By its execution and delivery of this Agreement to Seller and Purchaser, Escrow Agent hereby acknowledges that it has received from Purchaser the amount of Three Million Dollars ($3,000,000) (the "Earnest Money"). If Purchaser delivers to Escrow Agent any additional amounts pursuant to the Purchase Agreement, then the term "Earnest Money" shall include all such additional amounts. Escrow Agent shall provide written confirmation to Seller and Purchaser of its receipt of such additional amounts immediately upon its deposit with Escrow Agent. Upon request by Seller or Purchaser at any time, Escrow Agent shall confirm to Seller or Purchaser (as the case may be) the amount of Earnest Money then on deposit with Escrow Agent pursuant to this Agreement.

(b)   Escrow Account. Escrow Agent shall hold the Earnest Money in a separate money market escrow account identified as account no. _____ (the "Escrow Account") for the benefit of Seller or Purchaser pursuant to this Agreement and the Purchase Agreement, and shall not commingle the Earnest Money with any other third-party deposits or its own funds.

(c)   Investment of Earnest Money. The Earnest Money or any portion thereof shall be invested in a money market savings account with Bank of America, N.A., upon Purchaser's delivery to Escrow Agent of a completed Form W-8 and Escrow Agent's form of Investment Instructions; provided, however, that Escrow Agent shall not be obligated to invest the Earnest Money or any portion thereof pursuant to this Section 1(c) until both Seller and Purchaser (i) provide their respective federal tax

identification number to Escrow Agent, as applicable, and (ii) execute and deliver to Escrow Agent any investment forms or direction letters reasonably requested by Escrow Agent. All interest and other amounts earned on the Earnest Money shall constitute additional Earnest Money for all purposes in this Agreement. Purchaser shall bear the risk of loss of the Earnest Money, except to the extent resulting from the negligence, willful default, intentional misconduct or breach of trust by Escrow Agent, its managers, officers, employees or agents.

2.    Disbursement of Earnest Money.

(a)    Disbursement at Closing. At Closing on February 28, 2017 or as agreed to by the Parties in writing pursuant to the Purchase Agreement, Escrow Agent shall disburse the Earnest Money to Seller in accordance with delivery of closing instructions or disbursement notice less all costs and fees charged by Escrow Holder.

(b)    Disbursement if Closing Not Consummated

(i)    If the Purchase Agreement is terminated for any reason or if Seller or Purchaser otherwise is entitled to receive the Earnest Money pursuant to the Purchase Agreement, either Seller or Purchaser (as the case may be) (the "Requesting Party") may provide written notice to Escrow Agent that the Purchase Agreement has been terminated or that Seller or Purchaser (as the case may be) otherwise is entitled to receive the Earnest Money pursuant to the Purchase Agreement and that the Earnest Money is to be distributed in accordance with the instructions given in such notice (a "Disbursement Request"). Escrow Agent shall provide written notice (the "Receipt Notice") to the other Party (the "Confirming Party") of its receipt of such Disbursement Request (together with a copy of the Disbursement Request) no later than four (4) Business Days after its receipt of such Disbursement Request.)

(ii)    In addition, at any time Purchaser (which shall be the Requesting Party for purposes of Section 2(b)(iii) below) may provide written notice including a written Assignment of Funds executed by both Purchaser and Seller to Escrow Agent that the Earnest Money is to be distributed to a replacement Escrow Agent (a "Transfer") in accordance with the instructions given in such notice (a "Transfer Request"). Escrow Agent shall provide a Receipt Notice to the Confirming Party as provided in Section 2(b)(i) above less all costs and fees chaged by Escrow Holder.

(iii)    If the Confirming Party disputes that the Requesting Party is entitled to receive the Earnest Money, or Transfer the Earnest Money, as the case may be, the Confirming Party shall provide written notice to Escrow Agent within five (5) Business Days after its receipt of the Receipt Notice disputing that the Requesting Party is entitled to receive the Earnest Money (a "Dispute Notice"). If Escrow Agent has not received a Dispute Notice from the Confirming Party within such five (5) Business Day period, the Confirming Party shall be deemed to have authorized the disbursement set forth in the Disbursement Request. After the notice period, Escrow Agent shall receive written, mutual instructions from the Purchaser and Seller for any disbursement or transfer, and Escrow Agent shall disburse the Earnest Money pursuant to the instructions set forth in such written, mutual instructions. If Escrow Agent receives a Dispute Notice within such five (5) Business Day period, Escrow Agent shall retain the Earnest Money in the Escrow Account pending receipt of separate written direction from each Seller and Purchaser authorizing the disbursement of the Earnest Money to the same Person as provided in Section 2, or a final unappealable order of a court of competent jurisdiction with respect to distribution of the Earnest Money. Notwithstanding the foregoing, if Escrow Agent receives contrary written directions from Seller and Purchaser or no written directions within six (6) months after the Effective Date, Escrow Agent shall have the right but not the obligation to deposit the Earnest Money with any court of competent jurisdiction in the state of California and interplead Seller and Purchaser. Upon

depositing the Earnest Money and filing its complaint in interpleader, Escrow Agent shall be released from all liability under this Agreement regarding the Earnest Money, except as otherwise expressly provided in this Agreement.

3.    Escrow Fees. All fees, costs and expenses of the Escrow Agent with respect to the escrow established pursuant to this Agreement (the "Escrow Fees") shall be shared equally between Seller and Purchaser. All such Escrow Fees shall be due and payable upon the deposit of the Earnest Money. Compliance with Court Orders. Seller and Purchaser hereby acknowledge that Escrow Agent may accept, obey and comply with any and all writs, orders, judgments or decrees issued or entered by any court with competent jurisdiction (a "Court Order"), in which case, notwithstanding anything to the contrary in this Agreement, Escrow Agent shall not be liable to Seller or Purchaser by reason of such acceptance, obedience or compliance, regardless of whether such Court Order is subsequently reversed, modified, annulled, set aside or vacated.

4.    Release and Indemnification. Seller and Purchaser hereby release Escrow Agent and its officers, managers, employees and agents (each, an "Escrow Agent Party"), for any liability, damage, loss, cost or expense incurred by Seller or Purchaser to the extent resulting from (i) any action taken or not taken in good faith upon advice of Escrow Agent's counsel given with respect to any questions relating to its obligations under this Agreement, or (ii) any action taken or not taken in reliance upon any document, including any written notice provided to Escrow Agent pursuant to this Agreement, as to the due execution and the validity and effectiveness of such document, and the truth and accuracy of any information contained therein, which such Escrow Agent Party in good faith believes to be genuine, to have been signed or presented by a duly authorized person or persons and to comply with the terms of the Purchase Agreement and this Agreement, except to the extent resulting from the negligence, willful default, intentional misconduct or breach of trust by such Escrow Agent Party. Seller and Purchaser, jointly and severally, shall indemnify and hold harmless any Escrow Agent Party against any liability, damage, loss, cost or expense, including, without limitation, reasonable attorney's fees and court costs, incurred by such Escrow Agent Party to the extent resulting from the performance by any Escrow Agent Party of Escrow Agent's obligations under this Agreement, except to the extent resulting from the negligence, willful default, intentional misconduct or breach of trust by such Escrow Agent Party.

5.    Relationship of Parties. Seller and Purchaser acknowledge and agree that Escrow Agent is acting solely as a stakeholder at their request, and that Escrow Agent shall not be deemed to be the agent of either Seller or Purchaser.

6.    Notices

(a)    Method of Delivery. All notices, requests, demands and other communications (each, a "Notice") required to be provided by any Party to any other Party pursuant to this Agreement shall be in writing and shall be delivered (i) in person, (ii) by certified U.S. mail, with postage prepaid and return receipt requested, (iii) by overnight courier service, or (iv) by facsimile transmittal, with a verification copy sent on the same day by any of the methods set forth in clauses (i), (ii) and (iii), to the other Party to this Agreement at the following address or facsimile number (or to such other address or facsimile number as the Parties may designate from time to time pursuant to Section 7(c)):

If to Seller:

Nasty Gal, Inc.
c/o Joe Scirocco
523 West Sixth Street, Suite 330

Active 30022962v2 250512.000001

Exhibit A – Form of Escrow Agreement

Los Angeles, CA 90014
Email: Joe.scirocco@shopnastygal.com

With a copy to (which copy shall not constitute notice):

Robins Kaplan LLP
c/o Scott Gautier
2049 Century Park East, Suite 3400
Los Angeles, CA 90067
Email: Sgautier@robinskaplan.com

And

Peter J Solomon Company
c/o Derek Pitts
1345 Avenue of the Americas, 31st floor
New York, NY 10105
Email: Dpitts@pjsc.com

If to the Purchaser:

Boohoo F I Limited
910 Imperial Point
Manchester, United Kingdom
M50 3RB

With a mandatory copy to (which copy shall not constitute notice):

Troutman Sanders LLP
600 Peachtree Street, N.E., Suite 5200
Atlanta, GA  30308
Attention:  Harris B. Winsberg
Attention:  Stephen S. Roach
Email:  harris.winsberg@troutmansanders.com
Email:  stephen.roach@troutmsanders.com

If to Escrow Agent:

Commonwealth Land Title Company
888 S. Figueroa Street, Suite 2100
Los Angeles, CA 90017
Attn: Barbara Laffler
Facsimile No.: (213) 947-4778
Telephone No.: (213) 330-3032

(b) Receipt of Notices. All Notices sent by any Party (or their respective counsel pursuant to Section 7(d)) under this Agreement shall be deemed to have been received by the Party to whom such Notice is sent upon (i) delivery to the address or facsimile number of the recipient Party,

Exhibit A – Form of Escrow Agreement

provided that such delivery is made prior to 5:00 p.m. (local time for the recipient Party) on a Business Day, otherwise the following Business Day, or (ii) the attempted delivery of such Notice if (A) such recipient Party refuses delivery of such Notice, or (B) such recipient Party is no longer at such address or facsimile number, and such recipient Party failed to provide the sending Party with its current address or facsimile number pursuant to this Section 7(c).

(c) <u>Change of Address</u>. The Parties (and the Persons to whom copies of Notices are to be delivered pursuant to Section 7(a)) shall have the right to change their respective address and/or facsimile number for the purposes of this Section 7 by providing a Notice of such change in address and/or facsimile as required under this Section 7.

(d) <u>Delivery by Party's Counsel</u>. The Parties agree that the attorney for such Party shall have the authority to deliver Notices on such Party's behalf to the other Parties hereto.

7. <u>Assignment</u>. Neither Seller nor Purchaser shall assign any of its rights, or delegate any of its obligations, in this Agreement, without the prior written consent of the other Party, except that Purchaser shall have the right to assign this Agreement to any permitted assignee under the Purchase Agreement. Escrow Agent shall not, directly or indirectly, assign any of its rights, or delegate any of its obligations, in this Agreement, without the prior written consent of Seller and Purchaser.

8. <u>Successors and Assigns; Third Party Beneficiaries</u>. This Agreement shall be binding upon and inure to the benefit of the Parties and their respective successors and permitted assigns pursuant to Section 8. This Agreement shall not confer any rights or remedies upon any Person other than the Parties and their respective successors and permitted assigns pursuant to this Section 8.

9. <u>Conflict with Purchase Agreement</u>. If any of the terms or provisions of this Agreement conflict with, or are inconsistent with, any terms or provisions of the Purchase Agreement, the terms and provisions of this Agreement shall control.

10. <u>Governing Law; Severability</u>. This Agreement shall be governed by the laws of the State of California. If any term or provision of this Agreement is held to be or rendered invalid or unenforceable at any time in any jurisdiction, such term or provision shall not affect the validity or enforceability of any other terms or provisions of this Agreement, or the validity or enforceability of such affected terms or provisions at any other time or in any other jurisdiction.

11. <u>Jurisdiction; Venue</u>. Any litigation or other court action regarding this Agreement shall be conducted in the Bankruptcy Court for the United States District Court for the Central District of California, and the each Party hereby submits to jurisdiction and consents to venue in such courts.

12. <u>Waiver of Trial by Jury</u>. Each Party hereby waives its right to a trial by jury in any action or proceeding by any Party against any other Party with respect to any matter arising from or in connection with this Agreement.

13. <u>Prevailing Party</u>. If any litigation or other court action, arbitration or similar adjudicatory proceeding is undertaken by any Party to enforce its rights under this Agreement, all fees, costs and expenses, including, without limitation, reasonable attorneys' fees and court costs, of the prevailing Party in such action, suit or proceeding shall be reimbursed or paid by the Party against whose interest the judgment or decision is rendered. This Section 13 shall survive the termination of this Agreement.

14. <u>Recitals</u>. The recitals to this Agreement are incorporated herein by such reference and made a part of this Agreement.

Active 30022962v2 250512.000001

Exhibit A – Form of Escrow Agreement

15. <u>Entire Agreement; Amendments to Agreement</u>. This Agreement sets forth the entire understanding and agreement of the Parties hereto, and shall supersede any other agreements and understandings (written or oral) between or among the Parties on or prior to the date of this Agreement with respect to the transaction contemplated in this Agreement. No amendment or modification to any terms of this Agreement, waiver of any covenant, obligation, breach or default under this Agreement or termination of this Agreement (other than as expressly provided in this Agreement), shall be valid unless in writing and executed and delivered by each of the Parties.

16. <u>Counterparts</u>. A Party may deliver executed signature pages to this Agreement by electronic transmission to any other Parties, which electronic copy shall be deemed to be an original executed signature page. This Agreement may be executed in any number of counterparts, each of which shall be deemed an original and all of which counterparts together shall constitute one agreement with the same effect as if the Parties had signed the same signature page.

[Remainder of page intentionally left blank;
Signatures on following pages]

IN WITNESS WHEREOF, Seller, Purchaser and Escrow Agent have caused this Agreement to be executed and delivered in their names by their respective duly authorized officers or representatives as of the Effective Date.


SELLER:

**NASTY GAL, INC.**


_____

By:
Its:

PURCHASER:

**BooHoo F I Limited**


_____

By:
Title:


ESCROW AGENT:

**COMMONWEALTH LAND TITLE COMPANY**


_____

By:
Its:

**Exhibit B**

## EXHIBIT B

## FORM OF BILL OF SALE

**THIS BILL OF SALE** dated as of _____, 2017 by Nasty Gal Inc., a California corporation ("Seller"), in favor of Boohoo F I Limited, a company limited by shares registered in England, company number 10487954 (the "Purchaser").

**WHEREAS**, the parties hereto have entered into an Asset Purchase Agreement dated as of December 27, 2016 (the "Purchase Agreement") providing for, among other things, the purchase by, and transfer to, the Purchaser of certain assets of Seller, and the parties now desire to carry out such purchase and transfer by Seller's execution and delivery to the Purchaser of this instrument evidencing the vesting in the Purchaser of all of the assets and rights of Seller hereinafter described. Capitalized terms used but not defined herein have the meanings given them in the Purchase Agreement.

**NOW, THEREFORE**, in consideration of the premises and of other valuable consideration to Seller in hand paid by the Purchaser, at or before the execution and delivery hereof, the receipt and sufficiency of which by Seller are hereby acknowledged, subject to the terms and conditions set forth in the Purchase Agreement, Seller hereby conveys, grants, bargains, sells, transfers, sets over, assigns, remises, releases, delivers and confirms unto the Purchaser, its successors and assigns forever, effective as of 12:01 a.m. EDT on the date hereof (the "Effective Time"), all of Seller's right, title and interest in and to the Purchased Assets, free and clear of all Encumbrances and Liabilities.

Seller hereby covenant that, from time to time after the delivery of this instrument, at the Purchaser's request and without further consideration, Seller will do, execute, acknowledge, and deliver, or will cause to be done, executed, acknowledged and delivered, all and every such further acts, deeds, conveyances, transfers, assignments, powers of attorney and assurances as reasonably may be required to more effectively convey, transfer to and vest in the Purchaser, and to put the Purchaser in possession of, any of the Purchased Assets.

The Purchaser acknowledges that Seller make no representation or warranty with respect to the Purchased Assets being conveyed hereby except as specifically set forth in the Purchase Agreement.

Nothing in this instrument, express or implied, is intended or shall be construed to confer upon, or give to, any person, firm or corporation other than the Purchaser and its successors and assigns, any remedy or claim under or by reason of this instrument or any terms, covenants or condition hereof, and all of the terms, covenants and conditions, promises and agreements in this instrument contained shall be for the sole and exclusive benefit of the Purchaser and its successors and assigns.

This instrument is executed by, and shall be binding upon, Seller and its successors and assigns for the uses and purposes referred to and set forth above, effective as of the Effective Time.

This instrument shall be governed by, interpreted under, and construed and enforceable in accordance with, the laws of the State of California, without regard to its conflict of law principle provisions.

This instrument is executed and delivered under and pursuant to the Purchase Agreement. Notwithstanding any other provision of this Agreement, nothing contained herein shall in any way supersede, modify, replace, amend, change, rescind, waive or otherwise affect any of the provisions of the Purchase Agreement, including, without limitation, the representations, warranties, covenants and agreements of any of the parties thereto.  To the extent this Bill of Sale is inconsistent with any terms or conditions of the Purchase Agreement, the terms and conditions of the Purchase Agreement shall control.

This instrument may be executed in counterpart signature pages, all of which when so executed and attached hereto shall constitute one and the same original.

**IN WITNESS WHEREOF**, Seller has executed this Bill of Sale or caused this Bill of Sale to be executed on their behalf by a duly authorized officer of Seller as of_____, 2017.

**SELLER**:

NASTY GAL INC.

By: _____
       Name:
       Title:

**Exhibit C**

## EXHIBIT C

## FORM OF ASSIGNMENT AND ASSUMPTION AGREEMENT

This ASSIGNMENT AND ASSUMPTION AGREEMENT (the "Agreement") is entered into as of _____, 2017 by and among Nasty Gal Inc. a California corporation ("Assignor") and Boohoo F I Limited, a company limited by shares registered in England, company number 10487954 (the "Assignee").

## W I T N E S S E T H :

WHEREAS, Assignor and Assignee entered into that certain Asset Purchase Agreement dated as of December 27, 2016 (the "Purchase Agreement" capitalized terms used but not otherwise defined herein have the meanings given them in the Purchase Agreement); and

WHEREAS, pursuant to the Purchase Agreement, Assignor hase agreed to assign certain rights and agreements to Assignee, and Assignee has agreed to assume certain obligations of Assignor, as set forth herein and therein.

NOW, THEREFORE, in consideration of the premises, the mutual covenants set forth herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto mutually covenant and agree as follows:

1.      Effective as of 12:01 a.m. EDT on the date hereof (the "Effective Time"), subject to the terms of the Purchase Agreement, Assignor hereby sells, transfers and assigns (collectively, the "Assignment") to Assignee the Assumed and Assigned Contracts, and Assignee hereby assumes and agrees to pay, perform and discharge, as and when due, all obligations arising after the Effective Time arising from the Assumed and Assigned Contracts in accordance with the Purchase Agreement.

2.      This Agreement shall be binding upon and inure to the benefit of the parties hereto and their successors and assigns.

3.      This Agreement shall be governed by, interpreted under, and construed and enforceable in accordance with, the laws of the State of California, without regard to its conflict of law principle provisions.

4.      This Agreement is executed and delivered under and pursuant to the Purchase Agreement.  Notwithstanding any other provision of this Agreement, nothing contained herein shall in any way supersede, modify, replace, amend, change, rescind, waive or otherwise affect any of the provisions of the Purchase Agreement, including, without limitation, the representations, warranties, covenants and agreements of any of the parties thereto.  To the extent this Agreement is inconsistent with any terms or conditions in the Purchase Agreement, the Purchase Agreement shall control.

5.      This Agreement may be executed in counterpart signature pages, all of which when so executed and attached hereto shall constitute one and the same original.

IN WITNESS WHEREOF, the parties hereto have executed this Assignment and Assumption Agreement as of the date first set forth above.

**ASSIGNOR:**

NASTY GAL INC.,

By: _____
   Name:
   Title:

**ASSIGNEE:**

BOOHOO F I LIMITED

By: _____
   Name:
   Title:

# EXHIBIT D

## INTELLECTUAL PROPERTY ASSIGNMENT AGREEMENTS

### (attached)

## COPYRIGHT ASSIGNMENT AGREEMENT

This COPYRIGHT ASSIGNMENT AGREEMENT ("**Copyright Assignment**"), dated as of [DATE], is made between Nasty Gal Inc. ("**Seller**"), a California corporation located at 523 W. 6th Street, Suite 330, Los Angeles, California 90014, and Boohoo F I Limited ("**Buyer**"), a company limited by shares registered in England, company number 10487954, located at 910 Imperial Point, Manchester, United Kingdom, M50 3RB, the purchaser of certain assets of Seller pursuant to an Asset Purchase Agreement between Buyer and Seller, dated as of December 27, 2016 (the "**Asset Purchase Agreement**").

WHEREAS, under the terms of the Asset Purchase Agreement, Seller has conveyed, transferred, and assigned to Buyer, among other assets, certain intellectual property of Seller, and has agreed to execute and deliver this Copyright Assignment, for recording with the United States Copyright Office, and corresponding entities or agencies in any applicable jurisdictions;

NOW THEREFORE, the parties agree as follows:

**1       Assignment.**

1.1     For good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Seller hereby irrevocably conveys, transfers, and assigns to Buyer, and Buyer hereby accepts, all of Seller's right, title, and interest in and to the copyright registrations and applications for registration set forth on Schedule 1 hereto and all issuances, extensions, and renewals thereof (the "**Copyrights**");

1.2     all rights of any kind whatsoever of Seller accruing under any of the foregoing provided by applicable law of any jurisdiction, by international treaties and conventions, and otherwise throughout the world;

1.3     any and all royalties, fees, income, payments, and other proceeds now or hereafter due or payable with respect to any and all of the foregoing; and

1.4     any and all claims and causes of action, with respect to any of the foregoing, whether accruing before, on, or after the date hereof, including all rights to and claims for damages, restitution, and injunctive and other legal and equitable relief for past, present, and future infringement, dilution, misappropriation, violation, misuse, breach, or default, with the right but no obligation to sue for such legal and equitable relief and to collect, or otherwise recover, any such damages.

**2       Recordation and Further Actions.**

  Seller hereby authorizes the Register of Copyrights in the United States Copyright Office, and the officials of corresponding entities or agencies in any applicable jurisdictions to record and register this Copyright Assignment upon request by Buyer. Following the date hereof, upon Buyer's reasonable request, Seller shall take such steps and actions, and provide such cooperation and assistance to Buyer and its successors, assigns, and legal representatives, including the execution and delivery of any affidavits,

declarations, oaths, exhibits, assignments, powers of attorney, or other documents, as may be necessary to effect, evidence, or perfect the assignment of the Copyrights to Buyer, or any assignee or successor thereto.

**3      Terms of the Asset Purchase Agreement.**

The parties hereto acknowledge and agree that this Copyright Assignment is entered into pursuant to the Asset Purchase Agreement, to which reference is made for a further statement of the rights and obligations of Seller and Buyer with respect to the Copyrights. The representations, warranties, covenants, agreements, and indemnities contained in the Asset Purchase Agreement shall not be superseded hereby but shall remain in full force and effect to the full extent provided therein. In the event of any conflict or inconsistency between the terms of the Asset Purchase Agreement and the terms hereof, the terms of the Asset Purchase Agreement shall govern.

**4      Counterparts.**

This Copyright Assignment may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed one and the same agreement. A signed copy of this Copyright Assignment delivered by facsimile, e-mail, or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Copyright Assignment.

**5      Successors and Assigns.**

This Copyright Assignment shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and assigns.

IN WITNESS WHEREOF, Seller has duly executed and delivered this Copyright Assignment as of the date first above written.

**NASTY GAL INC.**

By: _____

Name:

Title:

ACKNOWLEDGEMENT

STATE OF _____                )
                                                            )SS.
COUNTY OF _____                )

On the [ORDINAL NUMBER] day of [MONTH], [YEAR], before me personally appeared [SIGNATORY NAME], personally known to me (or proved to me on the basis of satisfactory evidence) to be the persons whose names is subscribed to the foregoing instrument, who, being duly sworn, did depose and say that he/she executed the same in his/her authorized capacity, and acknowledged the instrument to be the free act and deed of Nasty Gal Inc. for the uses and purposes mentioned in the instrument.

_____
Notary Public
Printed Name:_____

My Commission Expires: _____

AGREED TO AND ACCEPTED:

BOOHOO F I LIMITED

By: _____

Name:

Title:

# DOMAIN NAMES ASSIGNMENT AGREEMENT

This DOMAIN NAMES ASSIGNMENT AGREEMENT ("**Domain Assignment**"), dated as of [DATE], is made between Nasty Gal Inc. ("**Seller**"), a California corporation located at 523 W. 6th Street, Suite 330, Los Angeles, California 90014, and Boohoo F I Limited ("**Buyer**"), a company limited by shares registered in England, company number 10487954, located at 910 Imperial Point, Manchester, United Kingdom, M50 3RB, the purchaser of certain assets of Seller pursuant to an Asset Purchase Agreement between Buyer and Seller, dated as of December 27, 2016 (the "**Asset Purchase Agreement**").

WHEREAS, under the terms of the Asset Purchase Agreement, Seller has conveyed, transferred, and assigned to Buyer, among other assets, certain intellectual property of Seller, and has agreed to execute and deliver this Domain Assignment, for recording with the domain registries and registrars, and corresponding entities or agencies in any applicable jurisdictions.

NOW THEREFORE, the parties agree as follows:

## 1    Assignment

1.1    For good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Seller hereby irrevocably conveys, transfers, and assigns to Buyer, and Buyer hereby accepts:

(a)    all of Seller's right, title, and interest in and to the domain names set forth on Schedule 1 (the "**Domain Names**"), including the current registration thereof with the current registrar any other rights (including, but not limited to, trademark rights in any jurisdiction) Seller may have in the Domain Names including any goodwill associated therewith;

(b)    all rights of any kind whatsoever of Seller accruing under any of the foregoing provided by applicable law of any jurisdiction, by international treaties and conventions, and otherwise throughout the world;

(c)    any and all royalties, fees, income, payments, and other proceeds now or hereafter due or payable with respect to any and all of the foregoing; and

(d)    any and all claims and causes of action, with respect to any of the foregoing, whether accruing before, on, or after the date hereof, including all rights to and claims for damages, restitution, and injunctive and other legal and equitable relief for past, present, and future infringement, dilution, misappropriation, violation, misuse, breach, or default, with the right but no obligation to sue for such legal and equitable relief and to collect, or otherwise recover, any such damages.

2       **Recordation and Further Actions.**

Seller hereby authorizes the relevant domain registries and registrars, and officials of corresponding entities or agencies in any applicable jurisdictions to record and register this Domain Assignment upon request by Buyer. Following the date hereof, upon Buyer's reasonable request, Seller shall take such steps and actions, and provide such cooperation and assistance to Buyer and its successors, assigns, and legal representatives, including the execution and delivery of any affidavits, declarations, oaths, exhibits, assignments, powers of attorney, or other documents, as may be necessary to effect, evidence, or perfect the assignment of the Domain Names to Buyer, or any assignee or successor thereto.

3       **Transfer of Domain Names.**

Upon execution of this Domain Assignment, Seller shall execute all documents, papers, forms and authorizations, and take such other actions as are necessary to effectuate the transfer of ownership and control of the Domain Names to Buyer, and cause the Domain Names to be registered in the name of Buyer with the domain name registry and registrar of Buyer's choosing.  The Domain Names will be deemed transferred when: (i) Buyer's Registrar has confirmed the transfer in accordance with its procedures therefor; (ii) the applicable WHOIS database identifies Buyer as the registrant of the Domain Name; and (iii) the Buyer has administrative and technical access to the Domain Names, and sole control over where the Domain Names point.

4       **Terms of the Asset Purchase Agreement.**

The parties hereto acknowledge and agree that this Domain Assignment is entered into pursuant to the Asset Purchase Agreement, to which reference is made for a further statement of the rights and obligations of Seller and Buyer with respect to the Domain Names. The representations, warranties, covenants, agreements, and indemnities contained in the Asset Purchase Agreement shall not be superseded hereby but shall remain in full force and effect to the full extent provided therein. In the event of any conflict or inconsistency between the terms of the Asset Purchase Agreement and the terms hereof, the terms of the Asset Purchase Agreement shall govern.

5       **Counterparts.**

This Domain Assignment may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed one and the same agreement. A signed copy of this Domain Assignment delivered by facsimile, e-mail, or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Domain Assignment.

6       **Successors and Assigns.**

This Domain Assignment shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and assigns.

Active 30022962v2 250512.000001

Exhibit D – Forms of Intellectual Property Assignment Agreements

Exhibit D – Forms of Intellectual Property Assignment Agreements

IN WITNESS WHEREOF, Seller has duly executed and delivered this Domain Assignment as of the date first above written.

**NASTY GAL INC.**

By: _____

Name:

Title:

ACKNOWLEDGEMENT

STATE OF _____ )
                              )SS.
COUNTY OF _____ )

On the [ORDINAL NUMBER] day of [MONTH], [YEAR], before me personally appeared [SIGNATORY NAME], personally known to me (or proved to me on the basis of satisfactory evidence) to be the persons whose names is subscribed to the foregoing instrument, who, being duly sworn, did depose and say that he/she executed the same in his/her authorized capacity, and acknowledged the instrument to be the free act and deed of Nasty Gal Inc. for the uses and purposes mentioned in the instrument.

_____
Notary Public
Printed Name:_____

My Commission Expires: _____

AGREED TO AND ACCEPTED:

BOOHOO F I LIMITED

By: _____

Name:

Title:

## TRADE MARK ASSIGNMENT AGREEMENT

## TERRITORY: [INSERT TERRITORY]

This TRADE MARK ASSIGNMENT AGREEMENT ("**Trade Mark Assignment"**), dated as of [DATE], is made between Nasty Gal Inc. ("**Seller"**), a California corporation located at 523 W. 6th Street, Suite 330, Los Angeles, California 90014, and Boohoo F I Limited ("**Buyer**"), a company limited by shares registered in England, company number 10487954, located at 910 Imperial Point, Manchester, United Kingdom, M50 3RB.

The parties agree as follows:

**1      Assignment.**

1.1     Seller hereby irrevocably assigns to Buyer all of Seller's right, title, and interest in and to the trade mark registrations and applications set forth on Schedule 1 (the "**Trade Marks**"), together with the goodwill of the business and any unregistered trade mark rights connected with the use of, and symbolized by, the Trade Marks.

**2      Recordation**

Seller hereby authorizes the relevant trade mark registry to record and register this Trade Mark Assignment upon request by Buyer.

**3      Counterparts.**

This Trade Mark Assignment may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed one and the same agreement. A signed copy of this Trade Mark Assignment delivered by facsimile, e-mail, or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Trade Mark Assignment.

**4      Successors and Assigns.**

4.1     This Trade Mark Assignment shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and assigns.

IN WITNESS WHEREOF, Seller has duly executed and delivered this Trade Mark Assignment as of the date first above written.

**NASTY GAL INC.**

By: _____

Name:

Title:

ACKNOWLEDGEMENT

STATE OF _____            )
                                        )SS.
COUNTY OF _____                )


On the [ORDINAL NUMBER] day of [MONTH], [YEAR], before me personally appeared [SIGNATORY NAME], personally known to me (or proved to me on the basis of satisfactory evidence) to be the persons whose names is subscribed to the foregoing instrument, who, being duly sworn, did depose and say that he/she executed the same in his/her authorized capacity, and acknowledged the instrument to be the free act and deed of Nasty Gal Inc. for the uses and purposes mentioned in the instrument.


_____
Notary Public
Printed Name:_____

My Commission Expires: _____

AGREED TO AND ACCEPTED:

BOOHOO F I Limited

By: _____

Name:

Title:

**SCHEDULE 1**

**TRADE MARKS**

# TRADE MARK ASSIGNMENT AGREEMENT

## TERRITORY: UNITED STATES

This TRADE MARK ASSIGNMENT AGREEMENT ("**Trade Mark Assignment**"), dated as of [DATE], is made between Nasty Gal Inc. ("**Seller**"), a California corporation located at 523 W. 6th Street, Suite 330, Los Angeles, California 90014, and Boohoo F I Limited ("**Buyer**"), a company limited by shares registered in England, company number 10487954, located at 910 Imperial Point, Manchester, United Kingdom, M50 3RB.

The parties agree as follows:

**1**      **Assignment.**

1.1      Seller hereby irrevocably assigns to Buyer all of Seller's right, title, and interest in and to the trade mark registrations and applications set forth on Schedule 1 (the "**Trade Marks**"), together with the goodwill of the business and any unregistered trade mark rights connected with the use of, and symbolized by, the Trade Marks; provided that, with respect to the United States intent-to-use trade mark applications set forth on Schedule 1 hereto, the transfer of such applications accompanies, pursuant to the Asset Purchase Agreement, the transfer of Seller's business, or portion of the business to which the trade mark pertains, and that business is ongoing and existing.

**2**      **Recordation**

Seller hereby authorizes the relevant trade mark registry to record and register this Trade Mark Assignment upon request by Buyer.

**3**      **Counterparts.**

This Trade Mark Assignment may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed one and the same agreement. A signed copy of this Trade Mark Assignment delivered by facsimile, e-mail, or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Trade Mark Assignment.

**4**      **Successors and Assigns.**

4.1      This Trade Mark Assignment shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and assigns.

IN WITNESS WHEREOF, Seller has duly executed and delivered this Trade Mark Assignment as of the date first above written.

**NASTY GAL INC.**

By: _____

Name:

Title:

ACKNOWLEDGEMENT

STATE OF _____                )
                                                          )SS.
COUNTY OF _____                )

On the [ORDINAL NUMBER] day of [MONTH], [YEAR], before me personally appeared [SIGNATORY NAME], personally known to me (or proved to me on the basis of satisfactory evidence) to be the persons whose names is subscribed to the foregoing instrument, who, being duly sworn, did depose and say that he/she executed the same in his/her authorized capacity, and acknowledged the instrument to be the free act and deed of Nasty Gal Inc. for the uses and purposes mentioned in the instrument.

_____
Notary Public
Printed Name:_____

My Commission Expires: _____

AGREED TO AND ACCEPTED:

BOOHOO F I LIMITED

By: _____

Name:

Title:

**SCHEDULE 1**

**TRADE MARKS**

Active 30022962v2 250512.000001

Exhibit D – Forms of Intellectual Property Assignment Agreements

117

**Exhibit E**

**EXHIBIT E**

**RELEASE OF INTELLECTUAL PROPERTY SECURITY INTEREST**

This RELEASE OF INTELLECTUAL PROPERTY SECURITY INTEREST ("**Release**") is made and effective as of [DATE] and granted by HERCULES TECHNOLOGY GROWTH CAPITAL, INC. (the "**Collateral Agent**"), a Maryland corporation, as collateral agent for the secured parties under the Loan Agreement referred to below (the "**Secured Parties**"), in favor of NASTY GAL INC., a California corporation located at 523 W. 6th Street, Suite 330, Los Angeles, California 90014 (the "**Grantor**") and its successors, assigns and legal representatives.

WHEREAS, pursuant to that certain Loan and Security Agreement dated as of November 6, 2015 (the "**Loan Agreement**") among the Grantor, the Collateral Agent and the lender parties thereto, the Grantor executed and delivered to the Collateral Agent (i) that certain Loan and Security Agreement by and between the Grantor and the Collateral Agent dated as of November 6, 2015 (the "**Master Security Agreement**") and (ii) that certain Intellectual Property Security Agreement by and [between/among] the Grantor and the Collateral Agent dated as of November 6, 2015  (the "**IP Security Agreement**" and, together with the Master Security Agreement, the "**Security Agreements**");

WHEREAS, pursuant to the Security Agreements, Grantor pledged and granted to the Collateral Agent for the ratable benefit of the Secured Parties a security interest in and to all of the right, title and interest of such Grantor in, to and under the IP Collateral (as defined below);

WHEREAS, the IP Security Agreement was recorded with the United States Patent and Trademark Office at Reel 05866, Frame 0966 and with the United States Copyright Office at Document Number V9909 D361 P1-6; and

WHEREAS, the Grantor has requested that the Collateral Agent enter into this Release in order to effectuate, evidence and record the release and reassignment to the Grantor of any and all right, title and interest the Collateral Agent and the Secured Parties may have in the IP Collateral pursuant to the Security Agreements.

NOW THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Collateral Agent hereby states as follows:

<u>Release of Security Interest</u>. Collateral Agent, on behalf of itself and the Secured Parties, their successors, legal representatives and assigns, hereby terminates the IP Security Agreement and terminates, releases and discharges any and all security interests that it has pursuant to the Security Agreements in any and all right, title and interest of the Grantor, and reassigns to the Grantor any and all right, title and interest that it may have, in, to and under the following (collectively, the "**IP Collateral**"):

Exhibit E – Release of Intellectual Property Security Interest
Active 30022962v2 250512.000001

any and all patents, patent applications and other patent rights and any other governmental authority-issued indicia of invention ownership, including the patents and patent applications listed in Schedule 1 hereto, and all reissues, divisions, continuations, continuations-in-part, renewals, extensions and reexaminations thereof and amendments thereto (the "**Patents**");

any and all trademarks, service marks, trade names, brand names, logos, trade dress, design rights and other similar designations of source, whether registered or unregistered, including the trademark registrations and applications set forth in Schedule 2 hereto, together with the goodwill connected with the use thereof and symbolized thereby and all extensions and renewals thereof ("**Trademarks**");

any and all copyrights, copyright applications and registrations, and like protections in each work of authorship, whether registered or unregistered and whether published or unpublished, including the copyright registrations and applications set forth in Schedule 3 hereto, and all extensions and renewals thereof ("**Copyrights**");

all rights of any kind whatsoever of such Grantor accruing under any of the foregoing provided by applicable law of any jurisdiction, by international treaties and conventions and otherwise throughout the world;

any and all license and other agreements in which such Grantor has granted or is granted a license or other right under any Patent, Trademark or Copyright;

any and all royalties, fees, income, payments and other proceeds now or hereafter due or payable with respect to any and all of the foregoing; and

any and all claims and causes of action with respect to any of the foregoing, whether occurring before, on or after the date hereof, including all rights to and claims for damages, restitution and injunctive and other legal and equitable relief for past, present and future infringement, dilution, misappropriation, violation, misuse, breach or default, with the right but no obligation to sue for such legal and equitable relief and to collect, or otherwise recover, any such damages.

<u>Further Assurances</u>. Collateral Agent agrees to take all further actions, and provide to the Grantor and its successors, assigns and legal representatives all such cooperation and assistance, including, without limitation, the execution and delivery of any and all further documents or other instruments, as the Grantor and its successors, assigns and legal representatives may reasonably request in order to confirm, effectuate or record this Release.

[SIGNATURE PAGE FOLLOWS]

**IN WITNESS WHEREOF**, Collateral Agent has caused this Release to be duly executed and delivered by its officer thereunto duly authorized as of the date first above written.

> **HERCULES TECHNOLOGY**
> **GROWTH CAPITAL, INC.**
> as Collateral Agent
>
>
> By: _____
> Name:
> Title:

**SCHEDULE 1**

**PATENTS AND PATENT APPLICATIONS**

None.

Active 30022962v2 250512.000001

Exhibit E – Release of Intellectual Property Security Interest

## SCHEDULE 2

### TRADEMARK REGISTRATIONS AND APPLICATIONS

| Mark | Jurisdiction | [Application]/Registration Number |
|---|---|---|
| AFTER PARTY | Australia | [1566244] |
| AFTER PARTY | Canada | [1635379] |
| AFTER PARTY | European Union | 011927365 |
| AFTER PARTY | United States | 4728316 |
| AFTER PARTY BY NASTY GAL | Australia | 1566249 |
| AFTER PARTY BY NASTY GAL | Canada | [1635380] |
| AFTER PARTY BY NASTY GAL | European Union | 011927571 |
| AFTER PARTY BY NASTY GAL | United States | [86000962] |
| MIRAGE | United States | [85475417] |
| MIRAGE AT NASTY GAL | United States | [85713544] |
| NASTY GAL | Argentina | 2554092 |
| NASTY GAL | Argentina | 2554093 |
| NASTY GAL | Australia | 1564847 |
| NASTY GAL | Australia | 1460581 |
| NASTY GAL | Bahamas | [035639] |
| NASTY GAL | Bahamas | [035638] |
| NASTY GAL | Bahrain | 90496 |
| NASTY GAL | Bahrain | 90497 |
| NASTY GAL | Bermuda | [51564] |
| NASTY GAL | Bermuda | [51565] |
| NASTY GAL | Brazil | 904264475 |
| NASTY GAL | Brazil | [831266635] |
| NASTY GAL | Canada | TMA890413 |
| NASTY GAL | Canada | [1635378] |
| NASTY GAL | Chile | 997484 |
| NASTY GAL | Chile | 997486 |
| NASTY GAL | China | [10281464] |
| NASTY GAL | China | [10281465] |
| NASTY GAL | Colombia | 507288 |
| NASTY GAL | Colombia | 488290 |
| NASTY GAL | Costa Rica | 220480 |
| NASTY GAL | Costa Rica | 219539 |
| NASTY GAL | Croatia | 220112174 |
| NASTY GAL | Dominican Republic | 193676 |
| NASTY GAL | Egypt | [267713] |

| NASTY GAL | Egypt | [267714] |
|---|---|---|
| NASTY GAL | European Union | 011952421 |
| NASTY GAL | European Union | 010430189 |
| NASTY GAL | Hong Kong | 302091366 |
| NASTY GAL | Iceland | 2402012 |
| NASTY GAL | Israel | 242232 |
| NASTY GAL | Japan | 5495981 |
| NASTY GAL | Malaysia | 2011054879 |
| NASTY GAL | Malaysia | 2011054880 |
| NASTY GAL | Mexico | 1312708 |
| NASTY GAL | Mexico | 1313215 |
| NASTY GAL | New Zealand | 852637 |
| NASTY GAL | Norway | 265131 |
| NASTY GAL | Peru | 00186441 |
| NASTY GAL | Peru | 00071140 |
| NASTY GAL | Philippines | 42011014702 |
| NASTY GAL | Saudi Arabia | 147180 |
| NASTY GAL | Saudi Arabia | [175102] |
| NASTY GAL | Singapore | T1116460H |
| NASTY GAL | South Africa | 201130149 |
| NASTY GAL | South Africa | 201130150 |
| NASTY GAL | South Korea | 450044151 |
| NASTY GAL | Switzerland | 627086 |
| NASTY GAL | Taiwan | 01543271 |
| NASTY GAL | Thailand | SM57194 |
| NASTY GAL | Turkey | 201202369 |
| NASTY GAL | United Arab Emirate | 168060 |
| NASTY GAL | United Arab Emirates | 168061 |
| NASTY GAL | United States | [85964637] |
| NASTY GAL | United States | 4444069 |
| NASTY GAL | United States | 3953331 |
| NASTY GAL | Uruguay | 429938 |
| NASTY GAL (stylized) | Australia | 1510890 |
| NASTY GAL (stylized) | Canada | 1594906 |
| NASTY GAL (stylized) | China | [12199381] |
| NASTY GAL (stylized) | China | [12199380] |
| NASTY GAL (stylized) | European Union | 011157112 |
| NASTY GAL (stylized) | Thailand | TM380894 |
| NASTY GAL (stylized) | United States | 4548339 |
| NASTY GALLERY | United States | [85746814] |
| NASTYGAL (and in Chinese Characters) | China | [11532621] |
| NASTYGAL (and in Chinese Characters) | China | 11532620 |
| NASTYGAL (in Chinese | China | 11532619 |

Active 30022962v2 250512.000001

Exhibit E – Release of Intellectual Property Security Interest

| | | |
|---|---|---|
| Characters) | | |
| NASTYGAL (in Chinese Characters) | China | 11532618 |
| SHOE CULT | Australia | 1571710 |
| SHOE CULT | Canada | [1638548] |
| SHOE CULT | China | 12700811 |
| SHOE CULT | China | 12700810 |
| SHOE CULT | European Union | 012027942 |
| SHOE CULT | United States | [85475404] |
| SHOE CULT | United States | 4549130 |
| SHOE CULT BY NASTY GAL | Australia | 1536308 |
| SHOE CULT BY NASTY GAL | Canada | [1610514] |
| SHOE CULT BY NASTY GAL | European Union | 011500361 |
| SHOE CULT BY NASTY GAL | United States | 4426477 |
| SHOE CULT BY NASTY GAL (stylized) | China | 12708031 |
| SUPER NASTY | Australia | 1536309 |
| SUPER NASTY | Canada | [1610509] |
| SUPER NASTY | China | 12708030 |
| SUPER NASTY | China | 12788104 |
| SUPER NASTY | European Union | 011500006 |
| SUPER NASTY | United States | 4422832 |

## SCHEDULE 3
Copyright

| Title | Type | Reg. No. | Reg. Date |
|-------|------|----------|-----------|
| MercedesLeopardShoes. | Visual Material | VA0001872765 | 2013-05-07 |

Active 30022962v2 250512.000001
Exhibit E – Release of Intellectual Property Security Interest

**EXHIBIT F**

**FORM OF SALE MOTION**

**(attached)**

Exhibit F – Form of Sale Motion
Active 30022962v2 250512.000001

Scott F. Gautier (State Bar No. 211742)
*SGautier@RobinsKaplan.com*
Lorie A. Ball (State Bar No. 210703)
*LBall@RobinsKaplan.com*
Kevin D. Meek (State Bar No. 280562)
*KMeek@RobinsKaplan.com*
ROBINS KAPLAN LLP
2049 Century Park East, Suite 3400
Los Angeles, CA 90067
Telephone:    310 552 0130
Facsimile:    310 229 5800

*Attorneys for Debtor and Debtor in Possession*

# UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

### LOS ANGELES DIVISION

| | |
|---|---|
| In re: | Case No.  2:16-bk-24862-BB |
| NASTY GAL INC., a California corporation, | Chapter  11 |
| Debtor and Debtor in Possession. | **DEBTOR'S NOTICE OF MOTION AND MOTION FOR AN ORDER: (1) APPROVING "STALKING HORSE" ASSET PURCHASE AGREEMENT; (2) APPROVING BID PROTECTIONS; (3)APPROVING BIDDING PROCEDURES AND NOTICE; (4) SCHEDULING AN AUCTION AND A HEARING FOR SALE APPROVAL; (5) AUTHORIZING DEBTOR TO SELL ASSETS "FREE AND CLEAR" AND TO ASSUME AND ASSIGN CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES; AND (6) GRANTING RELATED RELIEF** |

<u>**Hearing:**</u>

Date:    January 5, 2017
Time:    10:00 a.m.
Place:   Courtroom 1539
         255 East Temple Street
         Los Angeles, CA  90012

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

61273483.1

- 1 -

**TO THE HONORABLE SHERI BLUEBOND, UNITED STATES BANKRUPTCY JUDGE, AND OTHER INTERESTED PARTIES:**

**PLEASE TAKE NOTICE** that, on January 5, 2017, at 10:00 a.m., before the Honorable Sheri Bluebond, United States Bankruptcy Judge, Nasty Gal Inc., the debtor and debtor in possession in the above-captioned bankruptcy case (the "**Debtor**" or "**Nasty Gal**"), will move the Bankruptcy Court (the "**Motion**") pursuant to Sections 105, 362, 363 and 365 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (as amended, the "**Bankruptcy Code**"), Rules 2002, 6004 and 6006 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**") and Rule 6004-1 of the Local Bankruptcy Rules of the United States Bankruptcy Court for the Central District of California (the "**Local Rules**"), for the entry of (i) an Order (the "**Bidding Procedures Order**"), substantially in the form attached to the Motion as <u>**Exhibit A**</u>:

    a. approving a "stalking horse" asset purchase agreement for the sale of substantially all of the Debtor's intellectual property and customer database assets as more fully described in the APA (as defined below) (collectively the "**Purchased Assets**");

    b. approving Bid Protections (as defined below) as super-priority administrative claims of the Debtor's estate;

    c. approving bidding procedures and form, manner and sufficiency of notice thereof;

    d. scheduling (i) an auction sale (the "**Auction**"), and (ii) a final hearing (the "**Sale Hearing**") to consider approving the highest and best offer in connection with the sale (the "**Sale**") of the Purchased Assets;

    e. establishing procedures for the assumption and assignment, or rejection, as the case may be, of executory contracts and unexpired leases, including notice of proposed cure amounts (the "**Assumption and Assignment Procedures**"), and approving the form and manner of notice of the proposed assumption and assignment of executory contracts and unexpired leases in the form attached hereto to the Bidding Procedures Order (the "**Assumption and Assignment**

61273483.1

- 2 -

**Notice**"); and

    f.   approving the form and manner of notice of the Auction and the Sale Hearing including the form and manner of notice (the "**Auction and Hearing Notice**") attached to the Bidding Procedures Order; and

(ii) an Order (the "**Sale Order**"), substantially attached hereto as **<u>Exhibit C</u>**:

    a.   authorizing the Sale to the party or parties that are the successful bidders at the Auction, free and clear of all liens, interests, claims and encumbrances;

    b.   authorizing the assumption and assignment, or rejection, as the case may be, of certain executory contracts and unexpired leases and determination of cure amounts in connection with the Sale; and

    c.   granting certain related relief as described herein.

      **PLEASE TAKE FURTHER NOTICE** that the Motion is based upon this Notice of Motion, the annexed memorandum of points and authorities, the Declaration of Joe Scirocco filed concurrently herewith (the "<u>Scirocco Sale Declaration</u>"), Local Bankruptcy Rule 6004-1, the records and files in this chapter 11 case, and such additional evidence and argument as may be presented at or before the hearing on the Motion.  Pursuant to Local Rule 6004-1, the proposed bidding procedures and the Debtor's marketing efforts are described in detail in the annexed memorandum of points and authorities.

61273483.1

**PLEASE TAKE FURTHER NOTICE** that pursuant to Local Bankruptcy Rule 6004-1(b)(4), any party wishing to respond to the Motion must file with the Bankruptcy Court and serve on counsel for the Debtor a written response at least one (1) day before the hearing. Pursuant to Local Bankruptcy Rule 9013-1(h), failure to timely file and serve a response in accordance with the Local Bankruptcy Rules may be deemed by the Bankruptcy Court to be consent to the granting of relief requested in the Motion.

Date: December 28, 2016

_____/s/ Scott F. Gautier_____
Scott F. Gautier (State Bar No. 211742)
*SGautier@RobinsKaplan.com*
Lorie A. Ball (State Bar No. 210703)
*LBall@RobinsKaplan.com*
Kevin D. Meek (State Bar No. 280562)
*KMeek@RobinsKaplan.com*
ROBINS KAPLAN LLP
2049 Century Park East, Suite 3400
Los Angeles, CA 90067
Telephone: 310 552 0130
Facsimile: 310 229 5800

*Attorneys for Debtor and Debtor in Possession*

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

61273483.1

- 4 -

Exh. B-92

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

# MEMORANDUM OF POINTS AND AUTHORITIES

## I.

## JURISDICTION AND VENUE

This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This matter relates to the administration of the Debtor's bankruptcy estate and is accordingly a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (N) and (O).  Venue of the Case is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.  The statutory predicates for the relief sought herein are Sections 105, 362, 363(b), (f), (k) and (m) and 365 of the Bankruptcy Code, Rules 2002, 6004, 6006 and 9014 of the Federal Rules of Bankruptcy Procedure ("**FRBP**") and Rule 6004-1 of the Local Bankruptcy Rules for the Central District of California (the "**Local Bankruptcy Rules**").

## II.

## STATEMENT OF FACTS

### A.    **Background Facts**

On November 9, 2016 (the "**Petition Date**"), the Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code.  The Debtor continues to operate its business as a debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

Information regarding the Debtor's business and the circumstances leading to the commencement of this chapter 11 case is set forth in the Declaration of Joe Scirocco In Support of First Day Motions (the "**First Day Declaration**"), which has been filed with the Court.  The facts therein are incorporated herein in full by this reference.

As set forth in the First Day Declaration, Nasty Gal is a leading lifestyle brand promoting professionally curated fashion merchandise coupled with imagery, content, and an intuitive web experience.  To its primary demographic—young educated professional women— Nasty Gal has historically been a highly respected style authority with a track record of delivering on-trend merchandise at a great price point.  Nasty Gal enjoys an incredible and loyal customer base that connects with the Nasty Gal brand and the lifestyle that it promotes.  Nasty Gal's clientele have historically been active shoppers with a higher than average household income.

- 5 -

**B.** **Marketing Efforts By Peter J Solomon Company**

The Debtor retained Peter J Solomon Company, LLC ("**PJSC**") in September 2015 to provide financial advisory services in connection with a potential sale or debt and/or equity investment. Prior to that retention, PJSC had signed a nondisclosure agreement in August 2014 and worked actively with the Debtor on an intermittent basis between then and September 2015 to explore a sale or capital raising alternatives.

With PJSC's assistance, in February 2015, the Debtor received $4,000,000 in equity financing from Stamos + Johnson Fund I, L.P. ("**Stamos Capital**") in the form of a Series C preferred equity investment. In May 2015, PJSC began a stepped-up formal process of pursuing a sale or additional financing transactions on behalf of the Debtor which resulted in the retention of PJSC in September 2015. As part of that stepped-up process PJSC performed due diligence, prepared marketing materials, established a data room and contacted numerous parties about a sale or financing transaction. In November 2015, with PJSC's assistance, the Debtor received funding from Hercules Technology Growth Capital, Inc. ("**Hercules**") in the form of a secured, first lien $15 million loan and, subsequently, on April 6, 2016, the Debtor received effectively a $5 million unsecured convertible bridge loan from Stamos Capital.

In September 2016, PJSC was again engaged to provide services in connection with a sale transaction, financing transaction or restructuring transaction, including the potential need to consummate a transaction through a bankruptcy filing. Despite substantial efforts by PJSC and other Debtor constituents, including Hercules and Stamos Capital, the Debtor was not able to effectuate a value-maximizing transaction that fundamentally addressed the Company's operating challenges prior to the Debtor's bankruptcy filing.

**III.**

**THE NEGOTIATION OF A STALKING HORSE AGREEMENT**

After the commencement of the bankruptcy case, the Debtor, its advisors and BooHoo F I Limited (the "**Stalking Horse Bidder**"), a leading United Kingdom on-line fashion retailer, engaged in rigorous negotiations of an asset purchase agreement and related annex, schedules and exhibits. On December 27, 2016, the Debtor and the Stalking Horse Bidder agreed upon a final

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

form of Asset Purchase Agreement by and among the Debtor and the Stalking Horse Bidder with related annex, schedules and exhibits (as modified, the "**APA**"), a true copy of which is attached as **Exhibit B**.

The APA contemplates the sale of the Debtor's intellectual property and customer databases.  The APA provides for a deadline for competing bids of February 2, 2017, and an auction on or before February 7, 2017.  The Debtor, with the assistance of PJSC, will continue its marketing effort for the Debtor's assets with the goal of soliciting higher and better bids.

The Debtor believes that the contemplated time period for the marketing effort is sufficient under the circumstances in order for prospective buyers to have a reasonable opportunity to evaluate and submit overbids on the Debtor's assets, particularly given the extensive marketing by the Debtors and PJSC prior to and during the Debtor's bankruptcy case.  Absent this timetable, the value of the Debtor's assets may continue to erode.  In particular, the Debtor believes that the ability for a potential buyer to acquire the Company or its valuable brand by end of February will permit a potential buyer to order goods for the spring season.  If a sale is delayed, the value paid to the Estate may be decreased if a buyer is not able to fully exploit the spring season.

### IV.

### SUMMARY OF THE MATERIAL TERMS OF THE APA[1]

Pursuant to the terms and subject to the conditions of the APA, the Debtor, subject to a Court-approved auction and sale process and any higher and better offers in accordance with the proposed bidding procedures outlined below (the "**Bidding Procedures**," which are attached to the Bidding Procedures Order as Schedule 1), will sell to the Stalking Horse Bidder its right, title and interest in and to the Purchased Assets and, in connection therewith, to assign to the Stalking Horse Bidder the Assumed and Assigned Contracts of the Debtor.  The Stalking Horse Bidder will purchase the Purchased Assets and Assumed and Assigned Contracts free and clear of all

---

[1] The following is only a summary of the APA.  The reader is urged to consult the APA for a complete and accurate description of its terms.  Any capitalized terms used but not otherwise defined in Section IV hereof shall have the meanings ascribed to them in the APA.  In the event of any inconsistency between the summary above and the APA, the APA shall control.

liens, claims, encumbrances and interests pursuant to Sections 363 and 365 of the Bankruptcy Code.

The terms of the Stalking Horse Bidder's offer to purchase the Purchased Assets are set forth in the APA and are summarized herein:

**Buyer**.  The APA provides that if the Stalking Horse Bidder's bid is successful, the Purchased Assets will be acquired by the Stalking Horse Bidder.  See APA, § 1.1.

**Purchased Assets**.  Pursuant to Section 1.1 of the APA, at the Closing, and on the terms and conditions set forth in the APA and the Sale Order, the Debtor shall sell, transfer, assign, convey and deliver to the Stalking Horse Bidder, and the Stalking Horse Bidder shall accept all the Debtor's right, title and interest in and to the Purchased Assets, including, but not limited to: all intellectual property; customer databases, and the Debtor's rights existing under the contracts set forth in Schedule 1.1(b) to the APA (collectively, the "**Assumed and Assigned Contracts**"). See APA, § 1.1.

**Excluded Assets**.  Section 1.2 of the APA sets forth the Excluded Assets, which includes all of the Debtor's assets not included in the definition of Purchased Assets, any Contracts or Intellectual Property Licenses not included as an Assumed and Assigned Contract, and certain assets set forth on Schedule 1.2 of the APA.  See APA, § 1.2.

**No Assumed Liabilities**.  The Stalking Horse Bidder shall not assume or become liable or responsible for the payment, performance or discharge of any liabilities or obligations of the Debtor (except for liabilities and obligations of the Debtor under the Assumed and Assigned Contracts arising after the Closing Date).  See APA, §§ 1.3 and 1.5(e).

**Cure Payments**.  The Debtor shall assume and assign to the Stalking Horse Bidder, as of the Closing Date, the Assumed and Assigned Contracts to which the Debtor is a party pursuant to Sections 365 of the Bankruptcy Code and the Sale Order.  To the extent that any Assumed and Assigned Contract is subject to a cure pursuant to Section 365 of the Bankruptcy Code (the "**Cure Costs**"), the Debtor shall be responsible for and pay such Cure Costs from the proceeds of the Sale, provided that if the Stalking Horse Purchaser adds any Contracts or Intellectual Property Licenses to the Assumed and Assigned Contracts Schedule after the Execution Date, the Stalking

Horse Bidder will be responsible for paying any such Cure Costs.  See APA, § 1.5(a).

**Purchase Price**.  In consideration of the sale, transfer, conveyance and assignment of the Purchased Assets to the Stalking Horse Bidder at the Closing, the Stalking Horse Bidder shall pay to the Debtor a purchase price of $20,000,000 at the Closing.  See APA, § 2.1.

**Good Faith Deposit/Liquidated Damages**.  The APA provides that the Stalking Horse Bidder shall provide a good faith deposit in the amount of $3,000,000, which shall be deemed as Debtor's liquidated damages in the event the APA is terminated pursuant to Section 3.4(i).  See APA, § 2.2.

**Closing Date**.  The Closing Date shall be February 28, 2017.  See APA, § 3.1.

**Representations and Warranties**.  The APA contains representations and warranties of the Debtor in Article IV and of the Stalking Horse Bidder in Article V.

**Covenants**.  The APA contains covenants of the Debtor in Article XIII.

**Bankruptcy Court Matters**.  The APA requires the Debtor to obtain a hearing for entry, and to obtain entry, of the Bidding Procedures Order by January 5, 2017; and to obtain a hearing for entry, and to obtain entry, of the Sale Order on or before February 8, 2017.  See APA, § 3.4. As summarized in more detail below, should other potential parties not submit a Qualified Bid by February 2, 2017, the Debtor requests a hearing to approve the Sale to the Stalker Horse Bidder as soon after February 2, 2017 that the Court's schedule permits.

**Bid Protections.**  The APA provides that the Stalking Horse Bidder shall be entitled to receive a Break-up Fee in the amount of $700,000 and an Expense Reimbursement up to the amount of $250,000 (the Break-up Fee and the Expense Reimbursement collectively being the "**Bid Protections**") in the event that the APA is terminated under certain circumstances, including the consummation of an Alternative Transaction.  The APA further requires that the Bid Procedures Order approve the Bid Protections as super-priority administrative expenses of Seller under Sections 503(b) and 507 of the Bankruptcy Code, and that the Bid Protections be paid to the Stalking Horse Purchaser prior to the payment of the proceeds of any Alternative Transaction to any party asserting a lien or other Encumbrance on the Purchased Assets (and no lien or other Encumbrance of any third party shall attach to the portion of the proceeds representing the Bid

- 9 -

Protections).

**Conditions to Closing**.  The APA contains conditions to Closing in Article IX.

**Termination**.  The APA contains termination provisions in Article III.

The Debtor seeks authority to sell the Purchased Assets to the Stalking Horse Bidder on the terms and conditions set forth in the APA or to a higher and better bidder to be determined in accordance with the Bidding Procedures.  The Debtor believes that securing the Stalking Horse Bidder after many months of extensive marketing efforts, further marketing of the Assets with the assistance of PJSC over the time period contemplated by the Bidding Procedures, and the holding of the Auction will result in the highest and best price for the Purchased Assets.

## V.

### SUMMARY OF THE PROPOSED BIDDING PROCEDURES

The proposed Bidding Procedures are summarized as follows:[2]

Description of Purchased Assets to be Sold.  The Debtor is seeking to sell its business, consisting of, among other things, all of its intellectual property, customer databases, and contracts and licenses related thereto free and clear of all liens, claims and encumbrances thereon. The sale of the Purchased Assets shall be subject to a competitive bidding process as set forth in the Bidding Procedures.  The Debtor may consider bids for the Purchased Assets (or any portion thereof) in a single bid from a single bidder, or in multiple bids from multiple bidders, provided that any bid otherwise satisfies the Bid Requirements (defined below).

Confidentiality Agreement.  Unless otherwise ordered by the Bankruptcy Court for cause shown, to participate in the Bidding Process (as defined below), each person or entity must enter into (unless previously entered into) with the Debtor, on or before the NDA Deadline (as defined below), an executed confidentiality agreement in form and substance reasonably satisfactory to the Debtor (the "**Confidentiality Agreement**").  Each person or entity that enters into the Confidentiality Agreement with the Debtor on or before the NDA Deadline is hereinafter referred

---

[2] The following is a brief summary only and is subject to the terms of the Bidding Procedures Order, and in the event of any inconsistency between the summary above and the Bidding Procedures Order, the Bidding Procedures Order shall control.  Capitalized terms used in this summary that are not otherwise defined shall have the meanings ascribed to them in the Bidding Procedures Order.

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

- 10 -

61273483.1

to as a "**Potential Bidder**."  After a Potential Bidder enters into the Confidentiality Agreement with the Debtor, the Debtor shall deliver or make available (unless previously delivered or made available) to each Potential Bidder certain designated information (including, if applicable, financial data) with respect to the Purchased Assets.

Due Diligence.  Up to and including the Bid Deadline (such period, the "**Diligence Period**"), the Debtor shall afford any Potential Bidder such available due diligence access or additional information as may be reasonably requested by the Potential Bidder that the Debtor, in its business judgment, determines to be reasonable and appropriate under the circumstances.  The Debtor will provide, in an electronic data room to be established for these purposes, the APA, and will grant each Potential Bidder access to such data room.  The Debtor may designate a representative or representatives to coordinate all reasonable requests for additional information and due diligence access from such Potential Bidders.  Each Potential Bidder shall be required to acknowledge that it has had an opportunity to conduct any and all due diligence regarding the Purchased Assets in conjunction with submitting its Bid (as defined below), and no Bid shall be subject to or conditioned upon any further due diligence.

Bid and other Deadlines.  A Potential Bidder that desires to make an offer shall deliver  a Qualified Bid by no later than February 2, 2017, and in each instance simultaneously provide copies of each of the foregoing to: (a) counsel for the Debtor, Robins Kaplan LLP, 2049 Century Park East, Suite 3400, Los Angeles, CA 90067, Attn: Scott F. Gautier, (b) co-counsel to Hercules Technology Growth Capital, Inc., Cole Schotz P.C., 25 Main Street, Hackensack, NJ 07601, Attn: Stuart Komrower, (c) counsel to the Stalking Horse Bidder: Troutman Sanders LLP, 600 Peachtree Street, Suite 5200, Atlanta, GA 30308 (Attn: Harris B. Winsberg (harris.winsberg@troutmansanders.com) and Stephen S. Roach (stephen.roach@troutmansanders.com) and (d) counsel to any official committee of unsecured creditors (the "**Committee**"), by no later than 1:00 p.m. (Pacific Standard Time) on the above-referenced date, or such later date that both the Debtor and the Stalking Horse Bidder, in its sole discretion, permit (the "**Bid Deadline**").

Bid Requirements.  All bids (each hereinafter, a "**Bid**"), in order to be a Qualified Bid and

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

permitted to participate at the Auction, must (collectively, the "**Bid Requirements**"):

(i)    include a letter or detailed email stating with specificity the assets to be acquired (including the specific executory contracts and unexpired leases) such Potential Bidder wishes to bid on and the liabilities and obligations (including applicable cure costs) to be assumed by the Potential Bidder in the sale;

(ii)    include a duly executed definitive asset purchase agreement having substantially identical terms and conditions as the APA, provided that any such agreement shall provide for higher and better consideration and shall not provide for the payment of any break-up fee, expense reimbursement, topping fee, or other similar arrangement (the "**Purchase Agreement**"), and

(iii)    include a redline of the Purchase Agreement marked to reflect any proposed amendments and modifications to the Stalking Horse Bidder APA and the applicable schedules and exhibits;

(iv)    not be subject to any diligence, financing, internal approvals, or any other contingencies of any nature except the entry of a bankruptcy court Order providing for findings that the transaction shall be free and clear of liens pursuant to 11 USC 363(f) and the bidder is a good faith party under 11 USC 363(m),

(v)    agree that the Potential Bidder's offer is binding and irrevocable until (i) the Closing Date (as defined herein) if the Potential Bidder is selected as the Successful Bidder or the Next Highest Bidder (as both terms are defined below), or (ii) ten (10) days after the Sale Hearing if the Potential Bidder is not selected as the Successful Bidder or the Next Highest Bidder;

(vi)    provide for a Closing Date that is no later than February 28, 2017 ("Closing Date");

(vii)    provide that the Potential Bidder agrees to serve as a backup bidder (the "**Next-Highest Bidder**") if the Potential Bidder's Qualified Bid (as defined below) is the next highest and best bid after the Successful Bid (as defined below) (the "**Next-Highest Bid**");

(viii)    provide for a purchase price with a minimum cash portion of not less than $21,150,000, and in the event that a Bid includes assets in addition to the Purchased Assets, indicate how much of the Bid is allocated to the Purchased Assets;

(ix)    be accompanied by adequate assurance of the ability to close and future performance information (the "**Adequate Assurance Information**"), including (i) information about the Potential Bidder's financial condition, such as federal tax returns for two years, a current financial statement, or bank account statements, (ii) information demonstrating (in the Debtor's reasonable business judgment) that the Potential Bidder has the financial capacity to consummate the proposed Sale, (iii) evidence that the Potential Bidder has obtained authorization or approval from its board of directors (or comparable governing body) with respect to the submission and closing of its Bid, (iv) the identity and exact name of the Potential Bidder (including any equity holder or other financial backer if the Potential Bidder is an entity formed for the purpose of consummating the proposed Sale), and (v) such additional information regarding the Potential Bidder as the Debtor may require.  By submitting a Bid, each Potential Bidder agrees that the Debtor may disseminate their Adequate Assurance Information to affected

- 12 -

Exh. B-100

landlords, contract counterparties, and other interested parties in the event that the Debtor determines such bid to be a Qualified Bid (as defined below); and

(x)      contain or be accompanied by (a) a deposit in the form of a certified check or wire transfer, payable to the order of the Debtor, in the amount of fifteen percent (15%) of the minimum cash portion of the Bid as required by the Bid Requirements, which funds will be deposited into an interest bearing escrow account to be identified and established by the Debtor (a "**Good Faith Deposit**") and (b) written evidence, documented to the Debtor's satisfaction, that demonstrates the Potential Bidder has available cash, a commitment for financing if selected as the Successful Bidder (as defined below) sufficient to pay the full consideration in the bid (provided, however, that the closing shall not be contingent in any way on the Successful Bidder's financing) and such other evidence of ability to consummate the transaction(s) as the Debtor may request, including proof that such funding commitments or other financing are not subject to any internal approvals, syndication requirements, diligence or credit committee approvals.  The Debtor reserves the right to increase the Good Faith Deposit for one or more Qualified Bidders (as defined below) in its sole discretion.

Evaluation of Qualified Bids.  The Debtor will review each Bid received from a Potential Bidder to determine whether it meets the requirements set forth above.  A Bid received from a Potential Bidder that meets the above requirements, and is otherwise satisfactory to the Debtor, will be considered a "**Qualified Bid**."  Any Bid of a secured lender of the Debtor, including Hercules, must comply with the Bid Requirements in all respects to be a Qualified Bidder.  The Debtor shall inform Qualified Bidders that their Bids have been designated as Qualified Bids no later than February 5, 2017.  For the avoidance of doubt, (a) the APA is deemed a Qualified Bid, and (b) the Stalking Horse Bidder is hereby deemed a Qualified Bidder for all purposes and requirements pursuant to the Bidding Procedures, notwithstanding the requirements that a Potential Bidder must satisfy to be a Qualified Bidder.  A Qualified Bid will be valued by the Debtor based upon any and all factors that the Debtor reasonably deems pertinent in its reasonable business judgment, including, among others, (a) the amount of the Qualified Bid, (b) the risks and timing associated with consummating the transaction(s) with the Qualified Bidder, (c) any excluded assets or executory contracts and leases, and (d) any other factors that the Debtor may reasonably deem relevant.  The Debtor will reject any Bid if such Bid, among other things:

(xi)      is on terms that are more burdensome or conditional than the terms of the APA;

(xii)      requires any indemnification of the Potential Bidder in its Purchase Agreement;

- 13 -

1

        (xiii)   is not received by the Bid Deadline;

2

        (xiv)   is subject to any contingencies (including representations, warranties, covenants and timing requirements) of any kind or any other conditions precedent to such party's obligation to acquire the relevant Assets;

3

4

        (xv)   does not include a fair and adequate price or the acceptance of which would not be in the best interests of the Debtor's estate; or

5

        (xvi)   does not otherwise meet the Bid Requirements as provided in the Bidding Procedures.

6

7

Any Bid rejected pursuant to this paragraph shall not be deemed to be a Qualified Bid.  In the

8

event that any Bid is so rejected, the Debtor shall cause the Good Faith Deposit of such Potential

9

Bidder to be refunded to it within five (5) business days after the Bid Deadline.

10

    <u>Auction</u>.  Only Qualified Bidders are eligible to participate at the Auction (as defined

11

below), and must participate in the Auction in person or by a duly authorized representative.  At

12

least one (1) day prior to the Auction, each Qualified Bidder must inform the Debtor in writing

13

whether it intends to participate in the Auction.  If the Debtor receives no Qualified Bid for the

14

Purchased Assets other than that of the Stalking Horse Bidder, (a) the Debtor shall not hold an

15

Auction with respect to the Purchased Assets; (b) the Stalking Horse Bidder will be deemed the

16

Successful Bid with respect to the Purchased Assets; and (c) the Stalking Horse Bidder will be

17

named the Successful Bidder with respect to the Purchased Assets.  If at least two Qualified Bids

18

(including the Stalking Horse Bidder) are received by the Bid Deadline with regard to the

19

Purchased Assets, the Debtor will conduct an auction (the "**Auction**") for the Purchased Assets

20

and shall determine, in the Debtor's judgment, which Qualified Bid is the highest or otherwise

21

best Qualified Bid (the "**Starting Bid**"), which determination will be communicated to Qualified

22

Bidders prior to the commencement of the Auction.  The Auction shall take place at **10:00 a.m.**

23

**(Pacific Standard Time) on February 7, 2017** at the offices of the Debtor's counsel, Robins

24

Kaplan LLP, 2049 Century Park East, Suite 3400, Los Angeles, CA 90067, or such later time or

25

such other place as the Debtor, with the consent of the Stalking Horse Bidder, shall designate and

26

notify to all Qualified Bidders who have submitted Qualified Bids.  Professionals and principals

27

for the Debtor, the Stalking Horse Bidder, the Secured Lender, the Committee and each Qualified

28

Bidder shall be able to attend and observe the Auction, along with any other parties the Debtor

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

- 14 -

61273483.1

1   deems appropriate.    Each Qualified Bidder participating in the Auction will be required to

2   confirm, in writing, and on the record at the Auction, that (a) it has not engaged in any collusion

3   with respect to the Bidding Process, and (b) its Qualified Bid is a good faith *bona fide* offer that it

4   shall consummate if selected as the Successful Bidder.

5         Bidding at the Auction.  Bidding at the Auction for the Purchased Assets will begin with

6   the Starting Bid and continue in one or more rounds of bidding in increments of no less than

7   $200,000 (the "**Incremental Overbid**") over the Starting Bid or the Leading Bid (as defined

8   below), as the case may be; provided that any Bid of the Stalking Horse Bidder shall receive a

9   cash "credit" in the amount of the Bid Protections.  After the first round of bidding and between

10  each subsequent round of bidding, the Debtor shall announce the Bid that it believes to be the

11  highest or otherwise best offer for the Purchased Assets (the "**Leading Bid**").  A round of bidding

12  will conclude after each participating Qualified Bidder has had the opportunity to submit a

13  subsequent Bid with full knowledge of the Leading Bid.  The Debtor may announce at the

14  Auction additional procedural rules (*e.g.*, the amount of time to make subsequent Bids, or the

15  requirement that parties submit "best and final" Bids) for conducting the Auction provided that

16  such rules (1) are not inconsistent with these Bidding Procedures, the Bankruptcy Code or any

17  order of the Bankruptcy Court, and (2) are disclosed to each Qualified Bidder during the Auction.

18  The bidding at the Auction shall be transcribed or videotaped and the Debtor shall maintain a

19  transcript of all Bids made and announced at the Auction.

20        Determination of Successful Bid and Next-Highest Bid.   Immediately prior to the

21  conclusion of the Auction, the Debtor will determine, consistent with the Bidding Procedures,

22  which Bid constitutes the highest or otherwise best Bid for the Purchased Assets (the "**Successful**

23  **Bid**"); and notify all Qualified Bidders at the Auction, prior to its conclusion, of the name of the

24  maker of the Successful Bid (the "**Successful Bidder**"), and the amount and other material terms

25  of the Successful Bid.  The Debtor may designate the Next-Highest Bid (and the corresponding

26  Next-Highest Bidder) in the event that the Successful Bidder does not close the Sale.  The Debtor

27  shall not consider any Bids submitted after the conclusion of the Auction and any and all such

28  Bids shall be deemed untimely and shall under no circumstances constitute a Qualified Bid.

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

61273483.1

- 15 -

Exh. B-103

Following conclusion of the Auction, the Debtors shall file a notice on the Bankruptcy Court's docket identifying the Successful Bidder and any applicable Next-Highest Bidders.

Acceptance of Qualified Bid.  The Debtor may reject at any time, before entry of an order of the Bankruptcy Court approving the Sale, any Bid that, in the judgment of the Debtor, is (i) inadequate or insufficient, (ii) not in conformity with the requirements of the Bankruptcy Code or the Bidding Procedures, or (iii) contrary to the best interests of the Debtor and its estate.  The Debtor's presentation to the Bankruptcy Court for approval of a selected Qualified Bid as a Successful Bid does not constitute the Debtor's acceptance of such Bid.  The Debtor will have accepted a Successful Bid only when such Successful Bid has been approved by the Bankruptcy Court at the Sale Hearing.  For the avoidance of doubt, the Debtor's right to do any of the foregoing in connection with the bid of the Stalking Horse Bidder shall be subject in all respects to the terms of the APA.

No Fees for Potential or Qualified Bidders.  Other than the Bid Protections for the Stalking Horse Bidder, no Potential Bidder nor Qualified Bidder shall be allowed any bidding fee, break-up fee, expense reimbursement, termination or other fees (a "**Bidding Fee**") as a precondition to, or in consideration of, presenting any bid or participating in the Bidding Process provided for herein, and any request by a Potential Bidder for any such Bidding Fee shall disqualify such Potential Bidder from being a Qualified Bidder.  Moreover, all Potential Bidders and Qualified Bidders, by participating in the Bidding Process, will be deemed to have waived any right to seek a claim for substantial contribution or any Bidding Fee pursuant to section 503 of the Bankruptcy Code or the payment of any professionals or broker fees or other costs.

Sale Hearing.  The Successful Bid and any Next-Highest Bid will be subject to approval by the Bankruptcy Court.  The hearing to approve the Successful Bid and any Next-Highest Bid shall take place on **February 8, 2017 at __:00 a.m. (Pacific Standard Time)** (the "**Sale Hearing**").  The Sale Hearing may be adjourned by the Debtor, with the consent of the Stalking Horse Bidder, from time to time without further notice to creditors or other parties in interest other than by announcement of the adjournment in open court on the date scheduled for the Sale Hearing or by filing a notice, which may be a hearing agenda stating the adjournment, on the

- 16 -

61273483.1

1    docket of the Debtor's chapter 11 case.

2    <u>Return of Good Faith Deposit</u>.  The Good Faith Deposits of all Potential Bidders shall be

3    held in escrow, but shall not become property of the Debtor's estate absent further order of the

4    Bankruptcy Court.  The Debtor shall retain any Good Faith Deposit submitted by the Successful

5    Bidder.  At the closing of a Sale contemplated by the Successful Bid, the Successful Bidder will

6    be entitled to a credit for the amount of its Good Faith Deposit to the extent such a deposit was

7    provided.  The Good Faith Deposits of the Next-Highest Bidder shall be retained until three (3)

8    business days after the applicable Closing Date.  The Good Faith Deposits of the other Qualified

9    Bidders will be returned as soon as practicable but no later than five (5) Business Days following

10   the Auction.  If the Successful Bidder (or, if the Sale is to be closed with the Next-Highest

11   Bidder, then the Next-Highest Bidder) fails to consummate the Sale because of a breach or failure

12   to perform on the part of such bidder, then the Debtor and its estate shall be entitled to retain the

13   Good Faith Deposit of the Successful Bidder (or, if the Sale is to be closed with the Next-Highest

14   Bidder, then the Next-Highest Bidder) as part of the damages resulting to the Debtor and its estate

15   for such breach or failure to perform.  Notwithstanding any of the foregoing, the terms of the

16   APA shall control in all respects in relation to the Good-Faith Deposit of the Stalking Horse

17   Bidder, including any damage claims of the Debtor for a breach of the APA.

18   <u>Modifications</u>.  The Debtor shall not modify the Bidding Procedures at or prior to the

19   Auction without the express written consent of the Stalking Horse Bidder.

20   <u>Next-Highest Bidder</u>.  Notwithstanding any of the foregoing, in the event that the

21   Successful Bidder fails to close a Sale prior to such date as specified in the applicable Purchase

22   Agreement, the Debtor, upon written notice to the Next-Highest Bidder, may designate the

23   applicable Next-Highest Bid as the Successful Bid for the Purchased Assets (or subset thereof),

24   the Next-Highest Bidder will be deemed to be the Successful Bidder for the Purchased Assets,

25   and the Debtor will be authorized, but not directed, to close the Sale to the Next-Highest Bidder

26   subject to the terms of the Next-Highest Bid without the need for further order of the Bankruptcy

27   Court and without the need for further notice to any interested parties.

28   The following chart summarizes the Debtor's proposed timetable and milestones for the

sale, which is incorporated in the Bid Procedures Order:

| **Description of Milestone** | **Date** |
|---|---|
| Bid Procedures Hearing | January 5, 2017 |
| Serve Sale, Cure Notices | January 6, 2017 |
| Bid Deadline to Submit Competing Bids | February 2, 2017 |
| Deadline to Object to Sale / Cure / Adequate Assurance of Stalking Horse | January 30, 2017 |
| Auction and responses to Sale and Cure Objections | February 7, 2017 |
| Sale Hearing (only if all Deadlines met) | February 8, 2017 |
| Deadline for Entry of Sale Order | February 8, 2017 |
| Closing on Sale of the Debtor's assets | February 28, 2017 |

## VI.

## RELIEF REQUESTED AND BASIS THEREFOR

The Debtor requests that this Court, inter alia, (i) authorize the Sale of the Assets to the Stalking Horse Bidder pursuant to the APA or to another Successful Bidder pursuant to the Purchase Agreement entered into with such Successful Bidder in accordance with the Bidding Procedures, free and clear of all liens, claims, encumbrances, and interests pursuant to Section 363(b), (f), (k), and (m), (ii) approve the assumption and assignment of the Assumed and Assigned Contracts pursuant to Sections 365 of the Bankruptcy Code, (iii) approve the APA as a stalking horse bid, the Bidding Procedures and the form, manner and sufficiency of notice of the Sale, and (iv) grant such other and further relief as set forth in the Sale Order.

**A.    The Debtor Should be Authorized to Sell the Purchased Assets Pursuant to Sections 105(a) and 363(b)(1) of the Bankruptcy Code.**

Section 363(b)(1) of the Bankruptcy Code governs sales of assets outside the ordinary course of business and provides as follows:

> The trustee [or debtor-in-possession], after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate.

61273483.1

- 18 -

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

11 U.S.C. § 363(b)(l).[3] Section 105(a) provides, in relevant part, that "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a).

The Ninth Circuit has ruled in bankruptcy cases that a sale of a debtor's property should be approved if it is in the best interests of the estate and creditors. In re Huntington Ltd., 654 F.2d 578, 589 (9th Cir. 1991); In re Equity Funding Corp., 492 F.2d 793, 794 (9th Cir. 1974). The application of the business judgment test affords the debtor in possession discretion in balancing the costs and benefits of administering or disposing of estate assets according to the needs of the estate. See In re Canyon P'ship, 55 B.R. 520, 524 (Bankr. S.D. Cal. 1985).

In determining whether any sale of assets out of the ordinary course of business should be approved, bankruptcy courts usually consider the following factors:

Whether a sufficient business reason exists for the sale;

Whether the proposed sale is in the best interest of the estate, which in turn consists of the following factors:

    a.    that terms of the sale are fair and reasonable;

    b.    that the proposed sale has been adequately marketed;

    c.    that the proposed sale terms have been properly negotiated and proposed in good faith;

    d.    that the purchaser is involved in an "arms-length" transaction with the seller; and

Whether notice of the sale was sufficient.

See In re Walter, 83 B.R. 14, 19-20 (B.A.P. 9th Cir. 1988).

Courts have uniformly held that approval of a proposed sale of property pursuant to section 363(b) of the Code is appropriate if a court finds that the transaction represents a reasonable business judgment on the part of the debtor or trustee. See Institutional Creditors of Continental Air Lines, Inc. v. Continental Air Lines, Inc. (In re Continental Air Lines, Inc.), 780 F.2d 1223, 1226 (5th Cir. 1986) (stating that "there must be articulated business justifications for

---

[3] Federal Rule of Bankruptcy Procedure 6004 authorizes sales outside of the ordinary course of business to be conducted privately or by public auction. Fed. R. Bankr. P. 6004(f)(1).

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

1   using, selling, or leasing the property outside of the ordinary course of business); <u>Comm. of</u>

2   <u>Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)</u>, 780 F.2d 1223, 1226 (2d Cir. 1983).

3   Courts have permitted a proposed sale of all or substantially all the assets of a debtor outside the

4   ordinary course of business if such a sale is necessary to preserve the value of the assets for the

5   estate, its creditors, or interest holders.  <u>See</u> <u>In re Abbots Dairies of Pennsylvania, Inc.</u>, 788 F.2d

6   143 (3d Cir. 1986); <u>In re Lionel Corp.</u>, 722 F.2d 1063.

7        Here, a sufficient business justification exists for the sale of the Debtor's assets as a sale is

8   likely the best way for the estate to obtain value for the benefit of its stakeholders.  Through

9   PJSC, the Debtor extensively marketed the Sale of the Purchased Assets for months before the

10  Petition Date.  Additionally, the sale of the Debtor and the "Nasty Gal" brand has been widely

11  publicized in the media and well known to investors and strategic purchasers in the industry.

12  Despite the widespread and comprehensive pre-petition marketing efforts, no bidder committed to

13  an asset purchase, or additional and sufficient debt or financing to enable the Debtor to maintain

14  long term viability, prompting the Debtor to enter into the APA.  The APA was ardently

15  negotiated by the Debtor and the Stalking Horse Bidder in good faith and at arms-length. The

16  Debtor believes that the Purchase Price and other consideration being provided under the APA

17  represent reasonably equivalent value and fair consideration for the Purchased Assets, and also a

18  base valuation to encourage the submission of Qualified Bids.

19       Moreover, the Debtor, with the assistance of PJSC, will further solicit proposals for the

20  purchase of the Purchased Assets before the proposed bid deadline and, based on the Debtor's

21  extensive pre- and post-petition marketing efforts, the Debtor will have amply marketed the

22  Purchased Assets before the proposed date of the Sale Hearing (as defined below).  The Debtor

23  has proposed Bidding Procedures designed to maximize the purchase price for the Purchased

24  Assets.

25       The Debtor believes that the Stalking Horse Bidder's offer for the Purchased Assets is fair

26  and reasonable.  Moreover, the reasonableness of such offer will be tested in accordance with the

27  Bidding Procedures and post-petition marketing efforts to be undertaken by PJSC.

28       Lastly, the Debtor has fully disclosed and requested the Court's approval of the Bidding

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

Procedures and all the terms and conditions of the Sale and proposed Auction (as defined below), and intends to provide comprehensive notice of the Sale. The Debtor is hopeful that, as a result of its intended notice of the Sale to all bidders who previously expressed to PJSC an interest in the Debtor or the Purchased Assets, interested purchasers will be encouraged to submit bids, attend the Auction and generate a spirited bidding process.

For all these reasons, the Debtor respectfully submits that the Sale of the Purchased Assets is supported by sound business reasons and is in the best interests of the Debtor and its estate. Accordingly, the Debtor requests approval of the Sale to the Stalking Horse Bidder, or the Successful Bidder, pursuant to Section 363(b) of the Bankruptcy Code.

**B.**   **The Debtor Should Be Authorized to Sell the Purchased Assets Free and Clear of Liens, Claims, Encumbrances, and Interests Pursuant to Section 363(f) of the Bankruptcy Code**

The Bankruptcy Code authorizes a debtor-in-possession to sell property of the estate under Section 363(b) free and clear of any interest or lien in such property if one of the following five criteria is met:

1.   applicable non-bankruptcy law permits sale of such property free and clear of such interest;

2.   such entity consents;

3.   such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

4.   such interest is in bona fide dispute; or

5.   such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

U.S.C. § 363(f).

Section 363(f) is written in the disjunctive; thus, satisfaction of any one of the five conditions is sufficient to sell property free and clear of all liens and the relevant bases for the sale being "free and clear" will be set forth in the applicable notice. In re PW, LLC, 391 B.R. 25, 41 (9th Cir. BAP 2008). Here, the Sale of the Purchased Assets free and clear of liens, claims, encumbrances, and interests should be approved under Section 363(f)(2) and (3) of the Bankruptcy Code by virtue of Hercules' expected consent to the Sale and the fact that the sale

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

- 21 -

61273483.1

1    price is greater than all liens on the Purchased Assets.

2       Further, to the extent that any other party asserting an interest receives notice of the

3    Motion and does not file a written objection hereto, such party should be deemed to have

4    consented to the proposed Sale of the Purchased Assets free and clear of its asserted interests.

5       Accordingly, the Debtor should be authorized to sell the Purchased Assets free and clear

6    of any interest or lien in such assets under Section 363(f).

7       **C.**     **The Stalking Horse Bidder Acted in Good Faith and Is Entitled to Protections Under Section 363(m) and 363(n) of the Bankruptcy Code**

8

9       Section 363(m) of the Bankruptcy Code provides:

10         The reversal or modification on appeal of an authorization under

11         subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such

12         authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the

13         appeal, unless such authorization and such sale or lease were stayed pending appeal.

14    U.S.C. § 363(m).

15       Section 363(m) is a codification of some aspects of equitable mootness with respect to

16    sales. Unlike equitable mootness, however, § 363(m) provides for specific procedures and

17    findings in order to provide certainty for sales. In re PW, LLC, 391 B.R. at 35.

18       Here, the APA represents a zealously negotiated, arms-length transaction, in which the

19    Stalking Horse Bidder has acted in good faith, without collusion or fraud of any kind. Further, all

20    of the material terms of the Sale have been fully disclosed. Therefore, the Debtor respectfully

21    requests that the Court find that the Stalking Horse Bidder has purchased the Purchased Assets in

22    good faith within the meaning of Section 363(m) of the Bankruptcy Code, and is entitled to the

23    protections of Sections 363(m) as reflected in the Sale Order. See Paulman v. Gateway Venture

24    Partners III, L.P. (In re Filtercorp, Inc.), 163 F.3d 570 (9th Cir. 1998); Ewell v. Diebert (In re

25    Ewell), 958 F.2d 276, 280 (9th Cir. 1992).[4] The Debtor also respectfully requests that the Court

26

27    _____

[4] If a party other than the Buyer emerges as the Successful Bidder, the Debtor intends to make the appropriate showing at the Sale Hearing that such Successful Bidder satisfies the requirements of "good

28    faith" and similarly is entitled to relief under Sections 363(m) and 363(n).

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

- 22 -

1    find that the Stalking Horse Bidder has not colluded with any other party and is entitled to a

2    finding that the Sale is not subject to any avoidance under Section 363(n).

3         Notwithstanding the foregoing, the Debtor shall present evidence, as necessary, prior to or

4    at the Sale Hearing relating to the Stalking Horse Bidder's good faith.

5         **D.      The Debtor Should Be Authorized to Assume and Assign the Assumed and**

6              **Assigned Contracts**

7         The APA requires the Debtor to assume and assign the Assumed and Assigned Contracts,

8    if any, to the Stalking Horse Bidder upon the Closing.

9         The Debtor will file and serve on the affected non-debtor counterparties

10   ("**Counterparties**") an Assumption and Assignment Notice, substantially in the form attached to

11   the Bidding Procedures Order, by no later than one (1) business day following entry of the

12   Bidding Procedures Order, which shall contain a schedule of Assumed and Assigned Contracts

13   and proposed cure amounts, if any.  Counterparties will have an opportunity to object to such

14   proposed assumption and/or cure amounts as provided in the Bidding Procedures Order.

15        The Debtor requests, pursuant to sections 363 and 365 of the Bankruptcy Code, authority

16   to assume, assign and sell the estates' interests in the Assumed and Assigned Contracts to the

17   Stalking Horse Bidder (or successful bidder), subject to payment of the cure amount designated

18   for each such Assumed and Assigned Contract on the Assumption and Assignment Notice and

19   any adequate assurance of future performance which the Court may order the Stalking Horse

20   Bidder to provide upon the request of a party in interest.  The Debtor further requests that the

21   Order approving the proposed Sale provides that the Assumed and Assigned Contracts will be

22   assigned and sold to, and remain in full force and effect for the benefit of, the Stalking Horse

23   Bidder, notwithstanding any provisions therein, including those described in sections 365(b)(2)

24   and (f)(1) and (3) of the Bankruptcy Code, that prohibit such assignment.

25        Section 365 of the Bankruptcy Code authorizes a debtor-in-possession to assume any

26   executory contract or unexpired lease, subject to Court approval.  11 U.S.C. § 365(a).  The

27   requirements for assumption of executory contracts and unexpired leases, if there has been a

28   default thereunder, are set forth in Section 365(b)(1):

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

(b)(1) If there has been a default in an executory contract or unexpired lease of the debtor, the trustee [debtor-in-possession] may not assume such contract or lease unless, at the time of assumption of such contract or leases, the trustee -

(A)    cures, or provides adequate assurance that the trustee will promptly cure, such default . . . .;

(B)    compensates, or provides adequate assurance that the trustee will promptly compensate, a party other than the debtor to such contract or lease, for any actual pecuniary loss to such party resulting from such default; and

(C)    provides adequate assurance of future performance under such contract or lease.

11 U.S.C. § 365(b).

In turn, a debtor-in-possession may assign an executory contract or unexpired lease if: (i) it assumes the contract in accordance with the provisions of Section 365(b) of the Bankruptcy Code; and (ii) adequate assurance of future performance by the assignee is provided. 11 U.S.C. § 365(f)(2). The Bankruptcy Code does not define the meaning of "adequate assurance of future performance." Courts have held that adequate assurance of future performance depends on the facts and circumstances of each case, but should be given "practical, pragmatic construction." See Carlisle Homes, Inc. v. Arrari (In re Carlisle Homes, Inc.), 103 B.R. 524, 538 (Bankr. D.N.J. 1989); see also In re Natco Indus., Inc., 54 B.R. 436, 440 (Bankr. S.D.N.Y. 1985) (adequate assurance of future performance does not mean absolute assurance that debtor will thrive and pay rent).

In addition, Section 365(f)(1) of the Bankruptcy Code permits a debtor to assign executory contracts and unexpired leases free from anti-assignment restrictions. Section 365(f)(1) renders unenforceable provisions that prohibit, restrict or condition an assignment of an executory contract or unexpired lease. Section 365(f)(3) prohibits the termination or modification of an executory contract or unexpired lease because of the assumption or assignment of such contract or lease.

Here, the assumption and assignment of the Assumed and Assigned Contracts are a necessary part of the APA, and the Debtor satisfies all the relevant requirements of Section 365 of the Bankruptcy Code. First, pursuant to Section 1.5 of the APA, all cure amounts required to be

paid to the counterparties to the Assumed and Assigned Contracts will be paid or satisfied by the Debtor from the proceeds of the sale.  As reflected in the Bidding Procedures Order, the counterparties to the Assumed and Assigned Contracts will have sufficient opportunity to review and object to the Assumption and Assignment Notice, which reflects the amounts the Debtor believes are due and owing to the Counterparties.  In the event any potential disputes to the Assumption and Assignment Notice cannot be resolved consensually, the Debtor will request that the Court schedule a hearing to adjudicate the dispute.

Second, the Debtor will demonstrate at the Sale Hearing that the Stalking Horse Bidder or Successful Bidder can provide adequate assurance of future performance under the Acquired Contracts.  Accordingly, given the requirements of Section 365 of the Bankruptcy Code are satisfied, the Debtor should be authorized to assume and assign the Assumed and Assigned Contracts to the Stalking Horse Bidder or Successful Bidder.

With these safeguards in place, assumption, assignment and sale of the Assumed and Assigned Contracts is appropriate and should be approved.

**E.    The Proposed Bidding Procedures Are Reasonable and Appropriate and Should Be Approved**

In accordance with Bankruptcy Rule 6004(f)(1), sales of property outside the ordinary course of business may be by private sale or by auction. The Debtor has obtained a stalking horse bid from the Stalking Horse Bidder for the Purchased Assets, and seeks authority to conduct the Auction (if applicable) at which the Stalking Horse Bidder's bid will be subjected to higher and/or better offers.  The Bidding Procedures described above are reasonably calculated to encourage a buyer to submit a bid within the range of reasonably anticipated values and to maximize the value of the Purchased Assets for the benefit of the Debtor's estate.

The Stalking Horse Bidder will be the stalking horse for competitive bids, establishing a baseline against which higher and/or otherwise better offers can be measured.  The Debtor, with the assistance of its professionals, will further solicit proposals for the purchase of the Purchased Assets prior to the proposed bid deadline, and based on the Debtor's efforts, the Debtor will have more than sufficiently marketed the Purchased Assets prior to the Sale Hearing.

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

- 25 -

1   The Bidding Procedures are designed to maximize the purchase price that should be

2   realized from the sale of the Purchased Assets.  The Debtor submits that the timeframes are

3   appropriate as collateral value may continue to erode through and after the conclusion of the

4   holiday selling season, and the Bidding Procedures and sale could be an essential element of the

5   Debtor's agreement with Hercules for the consensual use of cash collateral for the remainder of

6   the process and the Debtor does not believe that it is advisable to undergo expensive and

7   distracting litigation at this critical time.  Therefore, the Debtor submits that good cause exists to

8   approve such procedures and provisions because they are fair and reasonable under the

9   circumstances and will encourage competitive bidding and the highest and best price for the

10  Purchased Assets.

11      Courts frequently approve competitive bidding procedures like the proposed Bidding

12  Procedures as a means of ensuring that such sales will maximize value for the estate.  See, e.g.,

13  Doehring v. Crown Corp. (In re Crown Corp.), 679 F.2d 774, 775 (9th Cir. 1982) (district court

14  required specific minimum overbid amounts, deposits, and comparable deal terms to be used by

15  all overbidders); In re Victor Valley Community Hospital, Case No. 10-39537 (Bankr. C.D. Cal.

16  Oct. 7, 2010) (J. Bauer) (order approving qualified bidder, overbidding and other sale/auction

17  procedures); In re Barbecues Galore, Inc., Case No. 08-16036-MT (Bankr. C.D.Cal. Sept. 4,

18  2008) (J. Tighe) (similar).

19      For the reasons set forth above, the Debtor respectfully requests approval of: (a) the

20  Bidding Procedures for the conduct of overbidding, the Auction, and selection of the Successful

21  Bidder(s); (b) the procedures set forth herein for notice to counterparties under contracts and

22  leases proposed to be assumed, assigned and sold in connection with the proposed Sale, and the

23  determination and payment of applicable Cure Costs; (c) the scheduling of the Sale Hearing and

24  other matters for which scheduling is requested; and (d) the related relief sought hereby.

25      **F.**      **The Bid Protections Are Reasonable and Should Be Approved as**
            **Administrative Expenses**
26

27      The Bid Protections are reasonable and supported by the facts and circumstances of this

28  case and applicable law.  Local Rule 6004-1(b)(6) provides that break up fees and similar bid

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

- 26 -

61273483.1

1    protections must be supported by evidence establishing that such fee is likely to enhance the

2    ultimate sale price and is reasonable.  The Debtor submits that the evidence will show both

3    requirements to be met here.  The inducement of the Bid Protections was critical in persuading

4    the Stalking Horse Bidder to make an initial offer and to expend the time and resources associated

5    with conducting due diligence regarding the Purchased Assets and with negotiating and entering

6    into the APA.  Indeed, without approval of the Bid Protections, the Stalking Horse Purchase will

7    have the ability, and likely will, terminate the APA and have no further obligation to pursue a

8    transaction.  The APA will further serve as a "floor" for other bidders in connection with the sale

9    process, and increase the likelihood that other Potential Bidders will emerge and make Bids and

10    participate in the Auction.  Without the Stalking Horse Bidder, which has made by far the best

11    offer for the Purchased Assets to date despite extensive marketing efforts of the Debtor and PJSC,

12    the Debtor believes that its business and the Purchased Assets will substantially erode in value

13    while the Debtor pursues alternative transactions, leading to a substantially reduced price for the

14    Purchased Assets than possible through the proposed APA and Auction process.

15    Moreover, the Bid Protections are reasonable.  The Break-up Fee of $700,000 represents

16    3.5% of the proposed purchase price, and the expense reimbursement is capped at $250,000 for

17    actual costs incurred by the Stalking Horse Purchaser or its affiliates.  Combined, the Bid

18    Protections are capped at $950,000, which represents 4.75% of the proposed purchase price.  The

19    Debtor submits that this fee is reasonable when compared to similar bid protections approved by

20    this court.  See In re Net Data Centers, Case No. 15-12690-BB, Dkt. No. 259 (Bankr. CD Cal.

21    Sep. 1, 2015) (approving 5% breakup fee - $100,000 fee on $2 million bid).

22    Further, the Bid Protections should be approved pursuant to various tests adopted by other

23    courts.  Historically, bankruptcy courts have approved bidding incentives, including break-up fees

24    awarded to an initial bidder or "stalking horse," in the event of a successful overbid based on the

25    business judgment of the debtor. See, e.g., In re 995 Fifth Ave. Assocs., L.P., 96 B.R. 24, 28

26    (Bankr. S.D.N.Y. 1992) (bidding incentives may "be legitimately necessary to convince a white

27    knight to enter the bidding by providing some form of compensation for the risks it is

28    undertaking"); In re Integrated Resources, Inc., 147 B.R. 650, 656 (Bankr. S.D.N.Y. 1992)

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

- 27 -

61273483.1

1   (noting that "the business judgment of the Debtor is the standard applied under the law in this

2   district" and applying the standard to a break-up fee).

3       The Third Circuit Court of Appeals has also addressed the appropriate standard for

4   determining whether proposed bidding incentives in the bankruptcy context are appropriate.  In In

5   re O'Brien Environmental. Energy, Inc., 181 F.3d 527 (3d Cir. 1999), the Court of Appeals held

6   that even though bidding incentives are measured against a business judgment standard in

7   nonbankruptcy transactions, the administrative expense provisions of section 503(b) of the

8   Bankruptcy Code govern bidding incentives in the bankruptcy context.  Finding no "compelling

9   justification" for treating an application for break-up fees and expenses under section 503(b) any

10  differently from other applications for administrative expenses, the Court concluded that "the

11  determination whether break-up fees or expenses are allowable under § 503(b) must be made in

12  reference to general administrative expense jurisprudence.  In other words, the allowability of

13  break-up fees, like that of other administrative expenses, depends upon the requesting party's

14  ability to show that the fees were actually necessary to preserve the value of the estate." Id. at

15  535.

16      In O'Brien, the Third Circuit identified at least two circumstances in which bidding

17  incentives may provide actual benefit to the estate, justifying administrative expense status.  First,

18  there exists an actual benefit to the estate where "assurance of a break-up fee promoted more

19  competitive bidding, such as by inducing a bid that otherwise would not have been made and

20  without which bidding would have been limited." Id. at 537.  Second, where the availability of

21  bidding incentives induces a prospective buyer to research the value of the debtor and submit a

22  bid that serves as a minimum bid on which other bidders can rely, the initial "bidder may have

23  provided a benefit to the estate by increasing the likelihood that the price at which the Debtors is

24  sold will reflect its true worth." Id.  The Bid Protections here satisfy both of the O'Brien

25  circumstances, as the Stalking Horse Bidder would not have entered into the APA without the Bid

26  Protections, and the Stalking Horse Bidder will provide the "floor" for other bidders in

27  connection with the sale process

28      Whether analyzed under the Local Rule, the "administrative expense" standard enunciated

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

- 28 -

in O'Brien, as well as the "sound business judgment" standard followed in other jurisdictions, the

Bid Procedures proposed by the Debtors should be approved as fair and reasonable.

**G.      The Sale Will Not Require the Appointment of a Consumer Privacy Ombudsman**

The Sale of the Purchased Assets will not necessitate the appointment of a consumer

privacy ombudsman in accordance with Section 332 of the Bankruptcy Code.  Section 363(b)(l)

of the Bankruptcy Code provides that:

> if the debtor in connection with offering a product or a service
> discloses to an individual a policy prohibiting the transfer of
> personally identifiable information about individuals to persons that
> are not affiliated with the debtor and if such policy is in effect on
> the date of the commencement of the case, then the trustee may not
> sell or lease personally identifiable information to any person unless
> . . . such sale or such lease is consistent with such policy.

11 U.S.C. § 363(b)(l).

Section 101(41A) defines "personally identifiable information" as an individual's name,

residence address, email address, telephone number, social security number or credit card

number, as well as an individual's birth date or other information that, if associated with the

information described previously, would permit the identification or contacting of the individual."

11 U.S.C. § 10l(41A).

As of the Petition Date, the Debtor's privacy policy provided, among other things, that:

> Personal Information: We, our service providers and other third-parties,
> may require Customers who visit the Services and/or purchase products on
> the Services to give us personally identifiable information ("Personal
> Information"). Personal Information is individually identifiable information
> about you, your friends and contacts, that we collect online, including, but
> not limited to, your full name, a user name and password, email address,
> phone number, physical address, financial information, and your credit
> card information and other billing information. Information in a form that
> (a) is aggregated with other information, (b) anonymized, or (c) is
> otherwise is detached, combined, organized, segmented, modified or
> processed, in each case so as not to be reasonably capable of being
> associated with you, will not be considered Personal Information, and will
> not be restricted by this Privacy Policy as to use, sharing or otherwise. You
> can choose not to provide us with Personal Information, but then you may
> not be able to fully take advantage of certain features of our Services and
> we may not be able to provide you with certain requested information,
> products and/or services.

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

<u>Personal Information</u>: We may share the Personal Information we collect from you only with your consent, and personal information you provide about others, as otherwise outlined in this Privacy Policy, or under the following circumstances:

<u>Business or Asset transfers</u>: We continue to develop our business and in doing so may choose to buy or sell our business or related assets. Personal Information and other information we collect from you is generally one of the assets acquired or transferred in such transactions.

As a result, the Debtor submits that pursuant to its privacy policy in existence on the Petition Date, it may transfer personally identifiable information to the Stalking Horse Bidder without the need for the appointment of a consumer privacy ombudsman.

### H. Notice of the Proposed Sale and Related Matters Is Reasonable Under the Circumstances

By no later than one (1) business day following entry of the Bid Procedures Order, the Debtor will serve the Auction and Hearing Notice, substantially in the form attached to the Bidding Procedures Order, by U.S. or international mail of the sale upon (a) the Office of the United States Trustee, (b) counsel to the Creditors Committee; (c) Hercules Technology Growth Capital, Inc., as agent for the prepetition lender; (d) the parties that file with the Court requests for notice of all matters in accordance with Bankruptcy Rule 2002; (e) all entities known to the Debtor to have asserted any liens or other interests in any Purchased Assets; (f) all federal, state, and local regulatory, taxing and other authorities which have a reasonably known interest in the relief requested by the Motion, including the United States Attorney's office, all state attorneys general in states in which the Debtor does business, and the Internal Revenue Service; and (g) all of the Debtor's known creditors and all other known vendors, suppliers, lenders, contract/license/lease counterparties.

Further, as provided in the Bidding Procedures Order and by no later than one (1) business day following entry of the Bidding Procedures Order, the Debtor will serve by U.S. or international mail the Assumption and Assignment Notice on the Counterparties to the Assumed and Assigned Contracts that may be assumed, assigned and sold as part of the Sale transaction.

Under Bankruptcy Rule 2002(a) and (c), the Debtor is required to notify their creditors of the proposed Sale, disclosure of the time and place of the Auction, the terms and conditions of the

1    Sale, and the deadline for filing any objections thereto.  The notices prepared by the Debtor

2    contain the type of information required under Bankruptcy Rule 2002, and other relevant

3    information. This information will enable interested parties to participate in the Sale process, the

4    Auction and the Sale Hearing if they so choose.  Thus, the Debtor submits that adequate notice of

5    the Motion and the Sale Hearing has been and will be provided.  See, e.g., In re Delaware &

6    Hudson Ry., 124 B.R. 169, 180 (Bankr. D. Del. 1991) (the disclosures necessary in a sale notice

7    need only include the terms of the sale and the reasons why such a sale is in the best interests of

8    the estate and do not need to include the functional equivalent of a disclosure statement).

9        **I.        The Court Should Schedule the Sale Hearing**

10        In addition, the Debtor respectfully requests that the Court schedule the Sale Hearing to

11    confirm the results of the Auction, if any, and to approve the Sale on February 8, 2017, at 11:00

12    a.m. (Pacific Standard Time) or as soon thereafter as the Court's calendar permits.  As detailed

13    above and in the Scirocco Declaration, the Purchased Assets have been widely marketed for sale

14    for months.  After the Petition Date, the Debtor, through PJSC, will continue their marketing

15    efforts.  The Debtor firmly believes, based on their pre-petition testing of the market, that the

16    efforts to sell the Purchased Assets have been maximized and, therefore, any delay in the date of

17    the Auction or the Sale Hearing will serve no meaningful purpose.  To the contrary, such delay

18    will only cause the further decline in value of the Purchased Assets to the detriment of the Debtor,

19    its creditors and estate.

20        **J.        Request for Waivers of Stay under Bankruptcy Rules 6004(h) and 6006(d)**

21        In order to allow the immediate realization of value from the proposed Sale, the Debtor

22    respectfully requests that any orders on the Motion be effective immediately, notwithstanding the

23    fourteen-day stay imposed by Bankruptcy Rules 6004(h) and 6006(d) or otherwise.

24        As the Debtor expressed above, its goal is to efficiently and expeditiously administer the

25    estates' financial and business affairs. An expedient conclusion to the Sale process will inure to

26    the benefit of the estates and their creditors. Waiver of any stay will permit the proposed Sale to

27    take place as early as possible under the circumstances.

28

61273483.1

158                                                                                  Exh. B-119

## VII.

## CONCLUSION

For all the foregoing reasons, the Debtor respectfully requests that this Court enter an order: (i) granting the Motion; (ii) approving the Bid Protections; (iii) entering the Bid Procedures Order in the form attached hereto as Exhibit A, including approving the Bidding Procedures and forms of Notice attached thereto; (iv) approving the APA and the Sale of the Purchased Assets to the Stalking Horse Bidder (or other Successful Bidder or Next-Highest Bidder), free and clear of all liens, claims, encumbrances and interests, subject to the bidding/auction process proposed by the Debtor; (v) authorizing the assumption, assignment and sale of the Assumed and Assigned Contracts; and (vi) granting such other and further relief as is just and proper under the circumstances.

Date: December 28, 2016

    /s/ Scott F. Gautier

Scott F. Gautier (State Bar No. 211742)
*SGautier@RobinsKaplan.com*
Lorie A. Ball (State Bar No. 210703)
*LBall@RobinsKaplan.com*
Kevin D. Meek (State Bar No. 280562)
*KMeek@RobinsKaplan.com*
ROBINS KAPLAN LLP
2049 Century Park East, Suite 3400
Los Angeles, CA 90067
Telephone: 310 552 0130
Facsimile: 310 229 5800

*Attorneys for Debtor and*
*Debtor in Possession*

1

**EXHIBIT A**

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

61273483.1

1

**EXHIBIT B**

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

61273483.1

- 2 -

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**EXHIBIT C**

61273483.1

- 3 -

**EXHIBIT G**

**FORM OF SALE PROCEDURES ORDER**

**(attached)**

Exhibit G – Form of Sale Procedures Order
Active 30022962v2 250512.000001

1  Scott F. Gautier (State Bar No. 211742)
   *SGautier@RobinsKaplan.com*
2  Lorie A. Ball (State Bar No. 210703)
   *LBall@RobinsKaplan.com*
3  Kevin D. Meek (State Bar No. 280562)
   *KMeek@RobinsKaplan.com*
4  ROBINS KAPLAN LLP
   2049 Century Park East, Suite 3400
5  Los Angeles, CA  90067
   Telephone:    310 552 0130
6  Facsimile:    310 229 5800

7  *Attorneys for Debtor and Debtor in Possession*

8
                    **UNITED STATES BANKRUPTCY COURT**
9
                    **CENTRAL DISTRICT OF CALIFORNIA**
10
                    **LOS ANGELES DIVISION**
11

12  In re:                                  Case No.  2:16-bk-24862-BB

13  NASTY GAL INC., a California            Chapter  11
    corporation,
14                                          **ORDER (A) APPROVING STALKING**
15          Debtor and Debtor in Possession.  **HORSE ASSET PURCHASE AGREEMENT**
                                             **(B) APPROVING BID PROTECTIONS; (C)**
16                                           **APPROVING PROCEDURES IN**
                                             **CONNECTION WITH THE SALE OF**
17                                           **ASSETS; (D) SCHEDULING THE RELATED**
                                             **AUCTION AND HEARING TO CONSIDER**
18                                           **APPROVAL OF SALE; (E) APPROVING**
                                             **PROCEDURES RELATED TO THE**
19                                           **ASSUMPTION OF CERTAIN EXECUTORY**
                                             **CONTRACTS AND UNEXPIRED LEASES;**
20                                           **(F) APPROVING THE FORM AND**
                                             **MANNER OF NOTICE THEREOF; AND (G)**
21                                           **GRANTING RELATED RELIEF**

22
                                             **Hearing:**
23
                                             Date:     January 5, 2017
24                                           Time:     10:00 a.m.
                                             Place:    Courtroom 1539
25                                                     255 East Temple Street
                                                       Los Angeles, CA  90012
26

27

28

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

61273515.1                                                        Exh. A-1

164                                                               Exh. B-125

This matter coming before the Court on the motion (the "**Motion**")[1] of the above-captioned debtor and debtor in possession (the "**Debtor**") for the entry of an order pursuant to sections 105, 362, 363 and 365 of title 11 of the United States Code (the "**Bankruptcy Code**"), Rules 2002, 6004, and 6006 of the Federal Rules of Bankruptcy Procedure (as amended from time to time, the "**Bankruptcy Rules**"), and Rule 6004-1 of the Local Bankruptcy Rules of the United States Bankruptcy Court for the Central District of California (the "**Local Rules**"): (I)(A) approving "stalking horse" asset purchase agreement for the sale of substantially all of the Debtor's intellectual property and customer database assets; (B) approving the Bid Protections; (C) approving procedures in connection with the auction and sale of the Debtor's assets; (D) scheduling the related auction and hearing to consider approval of sale; (E) approving procedures for the assumption and assignment of certain executory contracts and unexpired leases; (F) approving the form and manner of notice thereof; and (G) granting related relief; and (II)(A) authorizing the sale of the Debtor's assets pursuant to the successful bidder's asset purchase agreement free and clear of liens, claims, encumbrances, and other interests; (B) approving the assumption and assignment of certain executory contracts and unexpired leases related thereto; and (C) granting related relief; the Court having found that (i) the Court has jurisdiction to consider the Motion and the relief requested therein pursuant to 28 U.S.C. §§ 157 and 1334; (ii) venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409; (iii) this is a core proceeding pursuant to 28 U.S.C. § 157(b); and (iv) notice of the Motion was sufficient under the circumstances; and after due deliberation the Court having determined that the relief requested in the Motion is in the best interests of the Debtor, its estate and its creditors; and good and sufficient cause having been shown;

**IT IS FURTHER FOUND AND DETERMINED THAT:**

A.    The Debtor's proposed notice of the Bidding Procedures, the Assumption and Assignment Notice, and the notice of the Auction and the hearing to approve the sale of the Purchased Assets (the "**Sale Hearing**") are appropriate and reasonably calculated to provide all

---

[1] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Motion.

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

1    interested parties with timely and proper notice, and no other or further notice is required.

2        B.        The Bidding Procedures substantially in the form attached hereto as **Schedule 1**

3    are fair, reasonable, and appropriate and are designed to maximize the recovery from the Sale of

4    the Purchased Assets.

5        C.        The findings and conclusions set forth herein constitute the Court's findings of fact

6    and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding

7    pursuant to Bankruptcy Rule 90144.

8        D.        To the extent any of the following findings of fact constitute conclusions of law,

9    they are adopted as such. To the extent any of the following conclusions of law constitute

10    findings of fact, they are adopted as such.

11        **IT IS HEREBY ORDERED THAT:**

12    1.        The Motion is GRANTED as set forth herein.

13    2.        All objections to the relief requested in the Motion that have not been withdrawn,

14    waived or settled are overruled.

15    3.        The Bidding Procedures attached hereto as **Schedule 1** are APPROVED.

16    4.        Boohoo F I Limited is hereby approved to be and designated as the Stalking Horse

17    Bidder.

18    5.        Subject to the Bidding Procedures and approval of the sale at the Sale Hearing, the

19    Debtor's entry into the APA with the Stalking Horse Bidder (including any amendments thereto)

20    attached as Exhibit B to the Motion (the "**Stalking Horse Agreement**"), is hereby approved.

21    6.        The Breakup Fee and Expense Reimbursement are APPROVED and shall be paid

22    when and as set forth in the Stalking Horse Agreement as an administrative claim of the estate

23    under sections 503(b)(1)(A) and 507(a)(2) of the Bankruptcy Code and shall have priority and not

24    be subordinated to any other administrative expense claims against the Debtor.  Any Breakup Fee

25    or Expense Reimbursement payable pursuant to the terms of the Stalking Horse Agreement shall

26    be payable without any further order of the Bankruptcy Court.  Upon the consummation of any

27    Alternative Transaction (as defined in the Stalking Horse Agreement), the Breakup Fee and

28

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

Expense Reimbursement shall be paid, if due, to the Stalking Horse Bidder from the proceeds of

such Alternative Transaction before payment of such proceeds to any other person or entity,

including any lender holding a lien on the assets sold in such Alternative Transaction, and no lien

shall attach to the portion of the proceeds of such Alternative Transaction representing the amount

of Breakup Fee and Expense Reimbursement.

7.      The deadline for Potential Bidders to submit Qualified Bids in accordance with the

Bidding Procedures shall be February 2, 2017 at 1:00 p.m. (Pacific Standard Time) (the "**Bid**

**Deadline**").

8.      The Debtor shall determine whether a bid is a Qualified Bid, provided that the

Debtor shall not determine that any bid is a Qualified Bid if such bid does not comply with the

Bidding Procedures.  Any secured lender must comply with the Bidding Procedures in all respects

to be a Qualified Bidder.  The Debtor shall notify Qualified Bidders whether their bids have been

recognized as such as promptly as practicable after a Qualified Bidder delivers all of the materials

required by the Bidding Procedures, and in no event later than February 5, 2017.

Notwithstanding any other provisions of this Order or the Bidding Procedures, the Stalking Horse

Agreement is a Qualified Bid, and the Stalking Horse Bidder is a Qualified Bidder, for all

purposes under this Order and the Bidding Procedures.

9.      The Auction, if necessary, shall be held on February 7, 2017 at 10:00 a.m. (Pacific

Standard Time) at the offices of Debtor's counsel, Robins Kaplan LLP, 2049 Century Park East,

Suite 3400, Los Angeles, CA 90067, or such later time or such other place as the Debtor, with the

consent of the Stalking Horse Bidder, shall designate and notify to all Qualified Bidders who

have submitted Qualified Bids.  If no Qualified Bids are received by the Bid Deadline, there shall

be no Auction, and the Stalking Horse Bidder shall be declared the Successful Bidder.

10.      At the Auction, each Qualified Bidder shall be required to confirm, in writing, and

on the record that it has not engaged in any collusion with respect to the bidding or the sale and

that its Qualified Bid is a good faith bona fide offer that it shall consummate if selected as the

Successful Bidder.

11.    The Auction shall be transcribed.

12.    The Debtor shall determine which offer is the highest and otherwise best offer for the Purchased Assets, provided that the Debtor shall give a cash credit to the Stalking Horse Bidder for the amount of the Breakup Fee and Expense Reimbursement.

13.    Neither the Stalking Horse Bidder nor the Successful Bidder (if different) shall be required to seek or obtain relief from the automatic stay under section 362 of the Bankruptcy Code to enforce any of its remedies under the Stalking Horse Agreement (or, in the case of a Successful Bidder other than the Stalking Horse Purchaser, the applicable asset purchase agreement) or any other Sale related document.  The automatic stay imposed by section 362 of the Bankruptcy Code is modified solely to the extent necessary to implement the preceding sentence.

14.    The Sale Hearing shall be held on February 8, 2017 at ____:00 __.m. (Pacific Standard Time) before this Court, the U.S. Bankruptcy Court for the Central District of California, 255 East Temple Street, Los Angeles, CA  90012, Courtroom 1539.  Any objections to the Sale shall be filed and served so as to be received no later than January 30, 2017 at 4:00 p.m. (Pacific Standard Time) by: (i) Nasty Gal, Inc., 539 W. 6th Street, Los Angeles, CA (Attn: Joe Scirocco (joe.scirocco@shopnastygal.com)); (ii) counsel to the Debtor: Robins Kaplan LLP, 2049 Century Park East, Suite 3400, Los Angeles, CA 90067 (Attn: Scott F. Gautier (SGautier@RobinsKaplan.com)), (iii) counsel to the Stalking Horse Bidder: Troutman Sanders LLP, 600 Peachtree Street, Suite 5200, Atlanta, GA 30308 (Attn: Harris B. Winsberg (harris.winsberg@troutmansanders.com) and Stephen S. Roach (stephen.roach@troutmansanders.com), (iv) counsel to the Official Committee of Unsecured Creditors: Levene, Neale, Bender, Yoo & Brill LLP, 10250 Constellation Blvd., Suite 1700, Los Angeles, CA 90067 (Attn. Gary Klausner (gek@lnbyb.com)) and (v) counsel to the Office of the United States Trustee: Office of the United States Trustee, 915 Wilshire Boulevard, Suite 1850, Los Angeles, CA 90017 (Attn: Ron Maroko) (collectively, the "**Notice Parties**").

15.    The Sale Hearing may be adjourned by the Debtor, with consent from the Stalking

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

Horse Bidder, from time to time without further notice to creditors or parties in interest other than by announcement of the adjournment in open court on the date scheduled for the Sale Hearing or by filing a notice, which may be a hearing agenda stating the adjournment, on the docket of the Debtor's chapter 11 case.

16.    The following forms of notice are approved: (a) the Auction and Hearing Notice, in the form substantially similar to that attached hereto as **Schedule 3** (the "**Auction and Hearing Notice**") and (b) the Notice to Counterparties to Executory Contracts and Unexpired Leases of the Debtor That May Be Assumed and Assigned (the "**Assumption and Assignment Notice**"), in the form substantially similar to that attached hereto as **Schedule 4**.

17.    The Debtor shall, within one (1) business day after the entry of this Order, serve this Order, the Bidding Procedures, and the Auction and Hearing Notice by first class mail, postage prepaid on (a) the US Trustee, (b) any Official Committee of Unsecured Creditors, (c) any parties requesting notices in this case pursuant to Bankruptcy Rule 2002, (d) counsel to the Stalking Horse Bidder, (e) Hercules Technology Growth Capital, Inc., as agent for the prepetition lender; and (f) all Potential Bidders.

18.    The Debtor shall, within one (1) business day after the entry of this Order, serve the Auction and Hearing Notice by first class U.S. or international mail, postage prepaid, upon (a) all entities known to the Debtor to have asserted any liens or other interests in any Purchased Assets; (b) all federal, state, and local regulatory, taxing and other authorities which have a reasonably known interest in the relief requested by the Motion, including the United States Attorney's office, all state attorneys general in states in which the Debtor does business, and the Internal Revenue Service; and (c) all of the Debtor's known creditors and all other known vendors, suppliers, lenders, contract/license/lease counterparties.

19.    The Debtor shall serve the Motion and the Assumption and Assignment Notice upon each counterparty to an Assumed and Assigned Contract or their counsel (if known) no later than one business day after the entry of this Order.  The Assumption and Assignment Notice shall state the date, time and place of the Sale Hearing as well as the date by which any objection to the

assumption and assignment of the Assumed and Assigned Contracts must be filed and served.

The Assumption and Assignment Notice also will identify the amounts, if any, that the Debtor

believes are owed to each counterparty to an Assumed and Assigned Contract in order to cure any

defaults that exist under such contract (the "**Cure Amounts**").

20.    If any counterparty to an Assumed and Assigned Contract objects for any reason to

the assumption and assignment of an Assumed and Assigned Contract (an "**Assumption

Objection**"), such counterparty must file and serve such Assumption Objection so as to be received

by the Notice Parties by no later than (the "**Assumption Objection Deadline**"): (i) **4:00 p.m. (Pacific

Standard Time) on January 30, 2017**, provided, however, if any bidder other than the Stalking

Horse Bidder is the Successful Bidder, then any counterparty may file and serve an objection to the

assumption and assignment of the Assumed and Assigned Contract solely with respect to the

Successful Bidder's ability to provide adequate assurance of future performance under the Assumed

and Assigned Contract up to the time of the Sale Hearing, or raise it at the Sale Hearing; or (ii) the

date otherwise specified in the Assumption and Assignment Notice (or, alternatively, the date set forth

in the motion to assume such Assumed and Assigned Contract if such contract is to be assumed and

assigned after the Sale Hearing).  The Court will make any and all determinations concerning

adequate assurance of future performance under the Assumed and Assigned Contracts pursuant to

sections 365(b) and (f)(2) of the Bankruptcy Code at the Sale Hearing.

21.    If a Contract or Lease is assumed and assigned pursuant to Court order, then,

except for Disputed Cure Amounts (as defined herein) or if the counterparty agrees otherwise, the

Assumed and Assigned Contract counterparty shall receive no later than three (3) business days

following the closing of the Sale, the Cure Amount, if any, as set forth in the Assumption and

Assignment Notice.  To the extent an Assumed and Assigned Contract counterparty wishes to

object to the Cure Amount, if any, set forth in the Assumption and Assignment Notice, its

Assumption Objection must set forth with specificity each and every asserted default in any

executory contract or unexpired lease and the monetary cure amount asserted by such

counterparty to the extent it differs from the amount, if any, specified by the Debtor in the

1    Assumption and Assignment Notice.

2    22.    In the event that the Debtor and the non-Debtor party cannot resolve any Cure

3    Amount prior to closing of the Sale, the Debtor shall segregate any disputed Cure Amounts

4    ("**Disputed Cure Amounts**") pending the resolution of any such disputes by the Court or mutual

5    agreement of the parties.  Assumption Objections may be resolved by the Court at the Sale

6    Hearing, or at a separate hearing either before or after the Sale Hearing.  Any counterparty to an

7    Assumed and Assigned Contract that fails to timely file and serve an objection to the Cure

8    Amounts shall be forever barred from asserting that a Cure Amount is owed in an amount in

9    excess of that set forth in the Assumption and Assignment Notice.

10    23.    Nothing in this Order or the service of the Assumption and Assignment Notice on

11    any counterparty to an Assumed and Assigned Contract shall require the Debtor to assume or

12    assign any contract or unexpired lease included in the Assumption and Assignment Notice, and

13    nothing in this Order shall impair the right of the Stalking Horse Bidder or other Successful

14    Bidder to remove any contract or unexpired lease from the list of Assumed and Assigned

15    Contracts at any time prior to the closing of the Sale in accordance with the terms of the Stalking

16    Horse Agreement or other applicable purchase agreement.

17    24.    Except to the extent otherwise provided in the Successful Bidder's Purchase

18    Agreement, the Debtor and the Debtor's estate shall be relieved of all liability accruing or arising

19    after the assumption and assignment of the Assumed and Assigned Contracts pursuant to section

20    365(k) of the Bankruptcy Code.

21    25.    To the extent the provisions of this Order are inconsistent with the provisions of any

22    Exhibit or Schedule referenced herein or with the Motion, the provisions of this Order shall control.

23    26.    The Court shall retain jurisdiction over all matters arising from or related to the

24    interpretation and implementation of this Order.

25    27.    Notwithstanding the possible applicability of Bankruptcy Rules 6004, 6006, 7062,

26    9014 or otherwise, the terms and conditions of this Order shall be immediately effective and

27    enforceable.

28

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

1

2

3      Dated:          February _____, 2017

4

5      _____
                         United States Bankruptcy Judge

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

## **Schedule 1**

**(Bidding Procedures)**

## BIDDING PROCEDURES

Set forth below are the bidding procedures (the "**Bidding Procedures**") to be employed in connection with the sale of all or substantially all of the intellectual property and customer database assets (the "**Assets**") of the Debtor, in connection with the chapter 11 case pending in the United States Bankruptcy Court for the Central District of California (the "Bankruptcy Court"), case number 16-24862-BB (the "**Bankruptcy Case**").

The Debtor entered into that certain asset purchase agreement, dated December ___, 2016 (together with the schedules and related documents thereto, the "**Stalking Horse Agreement**") between the Debtor and Boohoo F I Limited (the "**Stalking Horse Purchaser**"), pursuant to which the Stalking Horse Purchaser has agreed to acquire all or substantially all of the Assets (collectively, to the extent provided in the Stalking Horse Agreement, the "**Purchased Assets**") on the terms and conditions specified therein.

The sale transaction pursuant to the Stalking Horse Agreement is subject to competitive bidding as set forth herein. Capitalized terms used herein and not otherwise defined shall have the meanings set forth in the Stalking Horse Agreement.  These Bidding Procedures may not be modified at or prior to the Auction without the express written consent of the Stalking Horse Purchaser.

## I        ASSETS TO BE SOLD

The Debtor seeks to complete a sale of the Purchased Assets (the "**Sale**") described in Section 1.1 of the Stalking Horse Agreement.  The Stalking Horse Agreement will serve as the "stalking-horse" bid for the Purchased Assets.  Except as otherwise provided in the Stalking Horse Agreement or such other approved purchase agreement of the Successful Bidder, all of the Seller's right, title and interest in and to each Purchased Asset to be acquired shall be sold free and clear of all Encumbrances and Liabilities (as defined in the Stalking Horse Agreement), such Encumbrances and Liabilities to attach solely to the net proceeds of the Sale of such Purchased Assets.

## II       THE BID PROCEDURES

In order to ensure that the Debtor receives the maximum value for the Purchased Assets, it intends to conduct a sale process for the Purchased Assets pursuant to the procedures and on the timeline proposed herein.

### A.        **Provisions Governing Qualifications of Bidders**

Unless otherwise ordered by the Bankruptcy Court for cause shown, to participate in the bidding process, prior to the Bid Deadline (defined below), each person or entity, other than the Stalking Horse Purchaser, who wishes to participate in the bidding process (a "**Potential Bidder**") must deliver the following to the Notice Parties (as defined below):

(i)    a written disclosure of the identity of each person or entity including all affiliates, equity sources or other parties that will be or is associated with bidding for the Purchased Assets or otherwise participating in connection with such bid and the complete terms of any such participation; and

(ii)   an executed confidentiality agreement (to be delivered prior to the distribution of any confidential information by the Debtor to a Potential Bidder in form and substance satisfactory to the Debtor, which shall inure to the benefit of any purchaser of the Purchased Assets; without limiting the foregoing, each confidentiality agreement executed by a Potential Bidder shall contain standard non-solicitation provisions.

A Potential Bidder that delivers the documents and information described above and that the Debtor determines in its reasonable business judgment, after consultation with its advisors, is likely (based on availability of financing, experience and other considerations) to be able to consummate the sale, will be deemed a "**Qualified Bidder**."  The Debtor will limit access to due diligence to those parties it believes, in the exercise of its reasonable judgment, are pursuing the transaction in good faith.

As promptly as practicable after a Potential Bidder delivers all of the materials required above (and in any event no later than two (2) business days thereafter), the Debtor will determine and will notify the Potential Bidder and the Notice Parties if such Potential Bidder is a Qualified

Bidder.

### B.  Due Diligence

The Debtor will afford any Qualified Bidder such due diligence access or additional information as the Debtor, in consultation with its advisors, deems appropriate, in its reasonable discretion. The Debtor will provide, in an electronic data room to be established for these purposes, the APA, and will grant each Qualified Bidder access to such data room.  The Debtor may designate a representative or representatives to coordinate all reasonable requests for additional information and due diligence access from such Qualified Bidders.  Each Qualified Bidder shall be required to acknowledge that it has had an opportunity to conduct any and all due diligence regarding the Purchased Assets in conjunction with submitting its Bid (as defined below), and no Bid shall be subject to or conditioned upon any further due diligence

The Debtor must promptly advise the Stalking Horse Purchaser in the event any other Qualified Bidder receives diligence the Stalking Horse Purchaser has not previously received and shall promptly be provided with access to such diligence materials.

The due diligence period shall end on the Bid Deadline.  For the avoidance of doubt, neither the Debtor nor any of its respective representatives shall be obligated to furnish any due diligence information to any person other than a Qualified Bidder.

### C.  Provisions Governing Qualified Bids

A bid submitted will be considered a Qualified Bid only if the bid is submitted by a Qualified Bidder and complies with all of the following (a "**Qualified Bid**"):

(i)     it fully discloses the identity of the Qualified Bidder;

(ii)    it includes a letter or detailed email stating with specificity the assets to be acquired (including the specific executory contracts and unexpired leases) such Qualified Bidder wishes to bid on and the liabilities and obligations (including applicable cure costs) to be assumed by the Qualified Bidder in the sale;

(iii)   it includes a duly executed definitive asset purchase agreement having

substantially identical terms and conditions as the APA, provided that any such agreement shall provide for higher and better consideration and shall not provide for the payment of any break-up fee, expense reimbursement, topping fee, or other similar arrangement (the "**Purchase Agreement**");

(iv)    it includes a redline of the Purchase Agreement marked to reflect any proposed amendments and modifications to the Stalking Horse Agreement and the applicable schedules and exhibits;

(v)    it states in writing that it is not subject to any diligence, financing, internal approvals, or any other contingencies of any nature except the entry of a bankruptcy court Order providing for findings that the transaction shall be free and clear of liens pursuant to 11 USC § 363(f) and the bidder is a good faith party under 11 USC § 363(m);

(vi)    it agrees in writing that the Qualified Bidder's offer is binding and irrevocable until (i) the Closing Date (as defined below) if the Qualified Bidder is selected as the Successful Bidder or the Back-up Bidder (as both terms are defined below), or (ii) ten (10) days after the Sale Hearing (as defined below) if the Qualified Bidder is not selected as the Successful Bidder or the Back-up Bidder;

(vii)    it provides for a closing date that is no later than February 28, 2017 ("**Closing Date**");

(viii)    it agrees in writing that the Qualified Bidder agrees to serve as the Back-up Bidder if the Qualified Bidder's bid at the Auction is selected as the Back-up Bid (as defined below);

(ix)    it provides for a purchase price with a minimum cash portion of not less than $21,150,000, and in the event that the bid includes assets in addition to the Purchased Assets, indicates how much of the bid is allocated to the Purchased Assets;

(x)     it is accompanied by adequate assurance of the ability to close and future performance information (the "**Adequate Assurance Information**"), including (i) information about the Qualified Bidder's financial condition, such as federal tax returns for two years, a current financial statement, or bank account statements, (ii) information demonstrating (in the Debtor's reasonable business judgment) that the Qualified Bidder has the financial capacity to consummate the proposed Sale, (iii) evidence that the Qualified Bidder has obtained authorization or approval from its board of directors (or comparable governing body) with respect to the submission and closing of its bid, (iv) the identity and exact name of the Qualified Bidder (including any equity holder or other financial backer if the Qualified Bidder is an entity formed for the purpose of consummating the proposed Sale), and (v) such additional information regarding the Qualified Bidder as the Debtor may require.  By submitting a bid, each Qualified Bidder agrees that the Debtor may disseminate their Adequate Assurance Information to affected landlords, contract counterparties, and other interested parties in the event that the Debtor determines such bid to be a Qualified Bid; and

(xi)    contain or be accompanied by (a) a deposit in the form of a certified check or wire transfer, payable to the order of the Debtor, in the amount of fifteen percent (15%) of the minimum cash portion of consideration required by clause (ix) above, which funds will be deposited into an interest bearing escrow account to be identified and established by the Debtor (a "**Good Faith Deposit**") and (b) written evidence, documented to the Debtor's satisfaction, that demonstrates the Qualified Bidder has available cash, a commitment for financing if selected as the Successful Bidder (as defined below) sufficient to pay the full consideration in the bid (provided,

however, that the closing shall not be contingent in any way on the Successful Bidder's financing) and such other evidence of ability to consummate the transaction(s) as the Debtor may request, including proof that such funding commitments or other financing are not subject to any internal approvals, syndication requirements, diligence or credit committee approvals.   The Debtor reserves the right to increase the Good Faith Deposit for one or more Qualified Bidders (as defined below) in its sole discretion.

(xii)   it offers to purchase the Purchased Assets upon terms and conditions that the Debtor reasonably determines are at least as favorable to the Debtor as those set forth in the Stalking Horse Agreement;

(xiii)   it identifies with particularity which executory contracts and unexpired leases the Qualified Bidder wishes to assume and provides for the Qualified Bidder to pay related cure costs;

(xiv)   it includes an acknowledgement and representation that the bidder: (A) has had an opportunity to conduct any and all required due diligence regarding the Purchased Assets prior to making its offer; (B) has relied solely upon its own independent review, investigation and/or inspection of any documents and/or the Purchased Assets in making its bid; (C) did not rely upon any written or oral statements, representations, promises, warranties or guaranties whatsoever, whether express or implied (by operation of law or otherwise), regarding the Purchased Assets or the completeness of any information provided in connection therewith or with the Auction (defined below), except as expressly stated in the Purchase Agreement; and (D) is not entitled to any expense reimbursement, break-up fee, or similar type of payment in connection with its bid;

(xv)   it includes evidence, in form and substance reasonably satisfactory to the

Debtor, of authorization and approval from the Qualified Bidder's board of directors (or comparable governing body) with respect to the submission, execution, delivery and closing of the Purchase Agreement;

(xvi) it states that the Qualified Bidder consents to the jurisdiction of the Bankruptcy Court;

(xvii) it contains such other information reasonably requested by the Debtor; and

(xviii) it is received prior to the Bid Deadline.

Notwithstanding the foregoing, the Stalking Horse Purchaser is deemed a Qualified Bidder and the Stalking Horse Agreement is deemed a Qualified Bid, for all purposes in connection with the Bidding Procedures, the Auction, and the Sale. The Stalking Horse Purchaser shall not be required to take any further action in order to participate in the Auction (if any) or, if the Stalking Horse Purchaser is the Successful Bidder, to be named the Successful Bidder at the Sale Hearing (as defined below).

The Debtor shall notify the Stalking Horse Purchaser and all Qualified Bidders in writing as to whether or not any bids constitute Qualified Bids (and with respect to each Qualified Bidder that submitted a bid as to whether such Qualified Bidder's bid constitutes a Qualified Bid) no later than one (1) business day following the expiration of the Bid Deadline.

The Debtor shall inform Qualified Bidders that their Bids have been designated as Qualified Bids no later than February 3, 2017.

**D.    Bid Deadline**

A Qualified Bidder that desires to make a bid will deliver written copies of its bid to the following parties (collectively, the "**Notice Parties**"): (i) Nasty Gal, Inc., 539 W. 6th Street, Los Angeles, CA (Attn: Joe Scirocco (joe.scirocco@shopnastygal.com)); (ii) counsel to the Debtor: Robins Kaplan LLP, 2049 Century Park East, Suite 3400, Los Angeles, CA 90067 (Attn: Scott F. Gautier (SGautier@RobinsKaplan.com)), (iii) counsel to the Stalking Horse Bidder: Troutman Sanders LLP, 600 Peachtree Street, Suite 5200, Atlanta, GA 30308 (Attn: Harris B. Winsberg (harris.winsberg@troutmansanders.com)   and   Stephen   S.   Roach   (stephen.roach@troutman

sanders.com), (iv) counsel to the Official Committee of Unsecured Creditors: Levene, Neale, Bender, Yoo & Brill LLP, 10250 Constellation Blvd., Suite 1700, Los Angeles, CA 90067 (Attn. Gary Klausner (gek@lnbyb.com)) and (v) counsel to the Office of the United States Trustee: Office of the United States Trustee, 915 Wilshire Boulevard, Suite 1850, Los Angeles, CA 90017 (Attn: Ron Maroko)), so as to be received by the Notice Parties not later than 1:00 p.m. (Pacific Standard Time) on February 2, 2017 (the "**Bid Deadline**").

### E.   Evaluation of Competing Bids

A Qualified Bid will be valued based upon several factors including, without limitation, (1) the amount of such bid, (2) the risks and timing associated with consummating such bid, (3) any proposed revisions to the Stalking Horse Agreement, and (4) any other factors deemed relevant by the Debtor in its reasonable discretion.

### F.   No Qualified Bids

If the Debtor does not receive any Qualified Bids other than the Stalking Horse Agreement, the Debtor will not hold an auction and the Stalking Horse Purchaser will be named the Successful Bidder for the Purchased Assets.

### G.   Auction Process

If the Debtor receives one or more Qualified Bids in addition to the Stalking Horse Agreement, the Debtor will conduct an auction of the Purchased Assets (the "**Auction**"), which shall be transcribed, at 10:00 a.m. (Pacific Standard Time) on **February 7, 2017** at the offices of the Debtor's counsel, Robins Kaplan LLP, 2049 Century Park East, Suite 3400, Los Angeles, CA 90067, or such later time or such other place as the Debtor, with the consent of the Stalking Horse Purchaser, shall designate and notify to all Notice Parties and Qualified Bidders who have submitted Qualified Bids.  The Auction shall run in accordance with the following procedures:

(a)   Professionals and principals for the Debtor, the Stalking Horse Purchaser, and each Qualified Bidder shall be able to attend and observe the Auction, along with any other parties the Debtor deems appropriate;

(b)   only the Stalking Horse Purchaser and the Qualified Bidders who have

timely submitted a Qualified Bid will be entitled to make any subsequent bids at the Auction;

(c)    Each Qualified Bidder participating in the Auction will be required to confirm, in writing, and on the record at the Auction, that (a) it has not engaged in any collusion with respect to the Auction, and (b) its Qualified Bid is a good faith bona fide offer that it shall consummate if selected as the Successful Bidder;

(d)    at least one (1) business day prior to the Auction, each Qualified Bidder who has timely submitted a Qualified Bid must inform the Debtor whether it intends to attend the Auction; provided that in the event a Qualified Bidder elects not to attend the Auction, such Qualified Bidder's Qualified Bid shall nevertheless remain fully enforceable against such Qualified Bidder until the date of the selection of the Successful Bidder and the Back-up Bidder at the conclusion of the Auction.  At least one (1) business day prior to the Auction, the Debtor will identify to the Stalking Horse Purchaser and all other Qualified Bidders which Qualified Bid the Debtor believes in its reasonable discretion is the highest or otherwise best offer (the "**Starting Bid**");

(e)    all Qualified Bidders who have timely submitted Qualified Bids will be entitled to be present for all Subsequent Bids (as defined below) at the Auction and the actual identity of each Qualified Bidder will be disclosed on the record at the Auction; provided that all Qualified Bidders wishing to attend the Auction must have at least one individual representative with authority to bind such Qualified Bidder attending the Auction in person;

(f)    the Debtor, after consultation with its advisors and with the consent of the Stalking Horse Purchaser, may employ and announce at the Auction additional procedural rules that are reasonable under the circumstances for

conducting the Auction, provided that such rules are (i) not inconsistent with these Bidding Procedures, the Bankruptcy Code, or any order of the Court entered in connection herewith, and (ii) disclosed to each Qualified Bidder at the Auction; and

(g)     bidding at the Auction will begin with the Starting Bid and continue in bidding increments (each a "**Subsequent Bid**") providing a net value to the estate of at least an additional $200,000 above the prior bid.  After the first round of bidding and between each subsequent round of bidding, the Debtor shall announce the bid that it believes to be the highest or otherwise better offer (the "**Leading Bid**"). A round of bidding will conclude after each participating Qualified Bidder has had the opportunity to submit a Subsequent Bid with full knowledge of the Leading Bid.  Except as specifically set forth herein, for the purpose of evaluating the value of the consideration provided by Subsequent Bids, the Debtor will give a cash credit to the Stalking Horse Purchaser in the amount of the Breakup Fee and Expense Reimbursement (defined below).

(h)     The bidding at the Auction shall be transcribed or videotaped and the Debtor shall maintain a transcript of all bids made and announced at the Auction.

### H.     Selection of Successful Bid

Prior to the conclusion of the Auction, the Debtor, in consultation with its advisors, will review and evaluate each Qualified Bid in accordance with the procedures set forth herein and determine which offer is the highest or otherwise best offer from among the Qualified Bidders submitted at the Auction (one or more such bids, collectively the "**Successful Bid**" and the bidder(s) making such bid, collectively, the "Successful Bidder**"), and communicate to the** Qualified Bidders the identity of the Successful Bidder and the details of the Successful Bid.  The determination of the Successful Bid by the Debtor at the conclusion of the Auction shall be final,

subject only to approval by the Court.

Unless otherwise agreed to by the Debtor and the Successful Bidder, within one (1) business days after the conclusion of the Auction, the Successful Bidder shall complete and execute all agreements, contracts, instruments and other documents evidencing and containing the terms and conditions upon which the Successful Bid was made.  Immediately following the conclusion of the Auction, the Debtor shall file a notice identifying the Successful Bidder with the Court and, if the Stalking Horse Purchaser is not the Successful Bidder, shall serve such notice by fax, email or overnight mail to all counterparties whose contracts are to be assumed and assigned.

The Debtor will sell the Purchased Assets to the Successful Bidder pursuant to the terms of the Successful Bid upon the approval of such Successful Bid by the Court at the Sale Hearing.

I.      **Return of Deposits**

All deposits shall be returned to each bidder not selected by the Debtor as the Successful Bidder or the Back-Up Bidder (as defined below) no later than five (5) business days following the conclusion of the Auction.

J.      **Back-Up Bidder**

If an Auction is conducted, the Qualified Bidder with the next highest or otherwise best Qualified Bid to the Successful Bidder (the "**Back-up Bid**"), as determined by the Debtor in the exercise of its business judgment, at the Auction shall be required to serve as a back-up bidder (the "**Back-up  Bidder**") and keep such bid open and irrevocable until the Closing Date; provided that the Stalking Horse Purchaser shall not be required to be the Back-Up Bidder.   Following the Sale Hearing, if the Successful Bidder fails to consummate the approved sale because of a breach or failure to perform on the part of such Successful Bidder, the Back-Up Bidder will be deemed to be the new Successful Bidder, and the Debtor will be authorized to consummate the sale with the Back-Up Bidder without further order of the Bankruptcy Court.

K.      **Return of Good Faith Deposit**

The Good Faith Deposits of all Qualified Bidders shall be held in escrow, but shall not

become property of the Debtor's estate absent further order of the Bankruptcy Court.  The Debtor shall retain any Good Faith Deposit submitted by the Successful Bidder. At the closing of a Sale contemplated by the Successful Bid, the Successful Bidder will be entitled to a credit for the amount of its Good Faith Deposit to the extent such a deposit was provided. The Good Faith Deposits of the Back-up Bidder shall be retained until three (3) business days after the applicable Closing Date. The Good Faith Deposits of the other Qualified Bidders, including the Stalking Horse Purchaser if it elects not to serve as the Back-up Bidder, will be returned as soon as practicable but no later than five (5) Business Days following the conclusion of the Auction.  If the Successful Bidder (or, if the Sale is to be closed with the Back-up Bidder, then the Back-up Bidder) fails to consummate the Sale because of a breach or failure to perform on the part of such bidder, then the Debtor and its estate shall be entitled to retain the Good Faith Deposit of the Successful Bidder (or, if the Sale is to be closed with the Back-up Bidder, then the Back-up Bidder) as part of the damages resulting to the Debtor and its estate for such breach or failure to perform.  Notwithstanding any of the foregoing, the terms of the Stalking Horse Agreement shall control in all respects in relation to the Good-Faith Deposit of the Stalking Horse Purchaser, including any liquidated damages provisions contained in the Stalking Horse Agreement, provided that the Good-Faith Deposit of the Stalking Horse Purchaser shall be returned to the Stalking Horse Purchaser within five (5) business days following the conclusion of the Auction if the Stalking Horse Purchaser is not the Successful Bidder or elects not to serve as the Back-up Bidder.

**L.     The Bid Protections**

In recognition of its expenditure of time, energy, and resources, the Debtor has agreed that if the Stalking Horse Purchaser is not the Successful Bidder, the Debtor will pay the Stalking Horse Purchaser an amount in cash equal to (i) $700,000 as more fully described in the Stalking Horse Agreement (the "**Breakup Fee**") plus (ii) the aggregate amount of the actual and documented fees and expenses incurred by the Stalking Horse Purchaser and its affiliates (including fees and expenses for legal, accounting, and financial advisors) in connection with the

Stalking Horse Agreement, the Auction, and the transactions contemplated in the Stalking Horse Agreement in an amount not to exceed $250,000 (the "**Expense Reimbursement**"). The Breakup Fee and the Expense Reimbursement shall be payable as provided for pursuant to the terms of the Stalking Horse Agreement and nothing herein shall be deemed to limit or otherwise modify the terms thereof, including other circumstances pursuant to which the Breakup-Up Fee and Expense Reimbursement may be payable.

The Debtor has further agreed that its obligation to pay the Breakup Fee and Expense Reimbursement pursuant to the Stalking Horse Agreement shall survive termination of the Stalking Horse Agreement, shall, to the extent owed by the Debtor, constitute an administrative expense claim under section 503(b)(1)(A) and 507(a)(2) of the Bankruptcy Code and shall be payable under the terms and conditions of the Stalking Horse Agreement and the Bankruptcy Court's order approving these Bidding Procedures.

### III     Sale <u>Hearing</u>

The Debtor will seek entry of an order from the Court at a hearing set for February 8, 2017 to approve and authorize the sale transaction to the Successful Bidder on terms and conditions determined in accordance with the Bidding Procedures (the "**<u>Sale Hearing</u>**").

**Schedule 2**

**(Significant Dates)**

- **Assumption Objection Deadline:**    <u>January 30, 2017</u> **at 4:00 p.m. (Pacific Time)**

- **Bid Deadline:**    <u>February 2, 2017</u> **at 1:00 p.m. (Pacific Time)**

- **Auction:**    <u>February 7, 2017</u> **at 10:00 a.m. (Pacific Time)**

- **Sale Objection Deadline:**    <u>January 30, 2017</u> **at 4:00 p.m. (Pacific Time)**

- **Sale Hearing:**    <u>February 8, 2017</u> **at __:00 _.m. (Pacific Time)**

**<u>Schedule 3</u>**

**(Auction and Hearing Notice)**

1  Scott F. Gautier (State Bar No. 211742)
   *SGautier@RobinsKaplan.com*
2  Lorie A. Ball (State Bar No. 210703)
   *LBall@RobinsKaplan.com*
3  Kevin D. Meek (State Bar No. 280562)
   *KMeek@RobinsKaplan.com*
4  ROBINS KAPLAN LLP
   2049 Century Park East, Suite 3400
5  Los Angeles, CA  90067
   Telephone:    310 552 0130
6  Facsimile:    310 229 5800

7  *Attorneys for Debtor and Debtor in Possession*

8

9                    **UNITED STATES BANKRUPTCY COURT**

10                    **CENTRAL DISTRICT OF CALIFORNIA**

11                    **LOS ANGELES DIVISION**

12

13  In re:                              Case No.  2:16-bk-24862-BB

14  NASTY GAL INC., a California        Chapter  11
    corporation,
15                                      **NOTICE OF SALE PROCEDURES,**
          Debtor and Debtor in Possession.  **AUCTION DATE AND SALE HEARING**

16

17

18          **PLEASE TAKE NOTICE** that on    [_____], the above-captioned Debtor and Debtor in

19  possession (the "**Debtor**") filed the Motion of the Debtor and Debtor in Possession Pursuant to

20  sections 105, 362, 363 and 365 of the Bankruptcy Code for an Order (I)(A) approving "stalking

21  horse" asset purchase agreement for the sale of substantially all of the Debtor's intellectual

22  property and customer database assets; (B) approving the Bid Protections; (C) approving

23  procedures in connection with the auction and sale of the Debtor's assets; (D) scheduling the

24  related auction and hearing to consider approval of sale; (E) approving procedures for the

25  assumption and assignment of certain executory contracts and unexpired leases; (F) approving the

26  form and manner of notice thereof; and (G) granting related relief; and (II)(A) authorizing the

27  sale of the Debtor's assets pursuant to the successful bidder's asset purchase agreement free and

28  clear of liens, claims, encumbrances, and other interests; (B) approving the assumption and

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

assignment of certain executory contracts and unexpired leases related thereto; and (C) granting

related relief (the "**Motion**").[1] The Debtor seeks, among other things, to sell all or substantially

all of its intellectual property and customer database assets (the "**Purchased Assets**") to Boohoo

F I Limited (the "**Stalking Horse Purchaser**") or the bidder submitting the highest or otherwise

best offer for the Purchased Assets (such bidder, the "**Successful Bidder**"), at an auction free and

clear of all liens, claims, encumbrances and other interests pursuant to sections 105(a), 363 and

365 of the Bankruptcy Code.

     **PLEASE TAKE FURTHER NOTICE** that, on January 5, 2017, the Bankruptcy Court

entered an order (the "**Bidding Procedures Order**") approving the Motion and the bidding

procedures (the "**Bidding Procedures**"), which set the key dates and times related to the Sale of

the Purchased Assets. All interested bidders should carefully read the Bidding Procedures Order

and the Bidding Procedures. To the extent that there are any inconsistencies between the Bidding

Procedures Order (including the Bidding Procedures) and the summary description of its terms

and conditions contained in this Notice, the terms of the Bidding Procedures Order shall control.

     **PLEASE TAKE FURTHER NOTICE** that, pursuant to the terms of the Bidding

Procedures, an auction (the "**Auction**") to sell the Purchased Assets will be conducted on

February 7, 2017 at 10:00 a.m. (Pacific Standard Time) at the offices of at the offices of Debtor's

counsel, Robins Kaplan LLP, 2049 Century Park East, Suite 3400, Los Angeles, CA 90067, or

such later time or such other place as the Debtor, with the consent of the Stalking Horse

Purchaser, shall designate and notify to all Qualified Bidders who have submitted Qualified Bids.

     **PLEASE TAKE FURTHER NOTICE** that a hearing will be held to approve the sale of

the Purchased Assets to the Successful Bidder (the "**Sale Hearing**") before the United States

Bankruptcy Court for the Central District of California, [court address], on **February 8, 2017** at

__:00 _.m. (Pacific Standard Time), or at such time thereafter as counsel may be heard or at such

other time as the Bankruptcy Court may determine. The Sale Hearing may be adjourned from

time to time without further notice to creditors or parties in interest other than by announcement

---

[1] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Motion.

of the adjournment in open court on the date scheduled for the Sale Hearing or by filing a notice, which may be a hearing agenda stating the adjournment, on the docket of the Debtor's chapter 11 case.  Objections to the Sale shall be filed and served **so as to be received no later than 4:00 p.m. (Pacific Standard Time) on January 30, 2017** by: (i) Nasty Gal, Inc., 539 W. 6th Street, Los Angeles, CA (Attn: Joe Scirocco (joe.scirocco@shopnastygal.com)); (ii) counsel to the Debtor: Robins Kaplan LLP, 2049 Century Park East, Suite 3400, Los Angeles, CA 90067 (Attn: Scott F. Gautier (SGautier@RobinsKaplan.com)), (iii) counsel to the Stalking Horse Bidder: Troutman Sanders LLP, 600 Peachtree Street, Suite 5200, Atlanta, GA 30308 (Attn: Harris B. Winsberg (harris.winsberg@troutmansanders.com) and Stephen S. Roach (stephen.roach@troutmansanders.com), (iv) counsel to the Official Committee of Unsecured Creditors: Levene, Neale, Bender, Yoo & Brill LLP, 10250 Constellation Blvd., Suite 1700, Los Angeles, CA 90067 (Attn. Gary Klausner (gek@lnbyb.com)) and (v) counsel to the Office of the United States Trustee: Office of the United States Trustee, 915 Wilshire Boulevard, Suite 1850, Los Angeles, CA 90017 (Attn: Ron Maroko)) (collectively, the "**Notice Parties**").

**PLEASE TAKE FURTHER NOTICE** that this Notice of the Auction and Sale Hearing is subject to the full terms and conditions of the Motion, Bidding Procedures Order and Bidding Procedures, which Bidding Procedures Order shall control in the event of any conflict, and the Debtor encourages parties in interest to review such documents in their entirety. Any party that has not received a copy of the Motion or the Bidding Procedures Order that wishes to obtain a copy of the Motion or the Bidding Procedures Order, including all exhibits thereto, may make such a request in writing to Robins Kaplan LLP, 2049 Century Park East, Suite 3400, Los Angeles, CA 90067 (Attn: Scott F. Gautier (SGautier@RobinsKaplan.com)).

Dated:  [_____], 2017

Respectfully submitted,

Scott F. Gautier (State Bar No. 211742)
*SGautier@RobinsKaplan.com*
Lorie A. Ball (State Bar No. 210703)
*LBall@RobinsKaplan.com*
Kevin D. Meek (State Bar No. 280562)
*KMeek@RobinsKaplan.com*
ROBINS KAPLAN LLP

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

2049 Century Park East, Suite 3400
Los Angeles, CA 90067
Telephone: 310 552 0130
Facsimile: 310 229 5800

*Attorneys for Debtor and
Debtor in Possession*

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

## <u>Schedule 4</u>

**(Assumption and Assignment Notice)**

1  Scott F. Gautier (State Bar No. 211742)
   *SGautier@RobinsKaplan.com*
2  Lorie A. Ball (State Bar No. 210703)
   *LBall@RobinsKaplan.com*
3  Kevin D. Meek (State Bar No. 280562)
   *KMeek@RobinsKaplan.com*
4  ROBINS KAPLAN LLP
   2049 Century Park East, Suite 3400
5  Los Angeles, CA  90067
   Telephone:    310 552 0130
6  Facsimile:    310 229 5800

7  *Attorneys for Debtor and Debtor in Possession*

8

9              UNITED STATES BANKRUPTCY COURT

10             CENTRAL DISTRICT OF CALIFORNIA

11                 LOS ANGELES DIVISION

12

13  In re:                              Case No.  2:16-bk-24862-BB

14  NASTY GAL INC., a California        Chapter  11
    corporation,
15                                      **NOTICE TO COUNTERPARTIES TO**
         Debtor and Debtor in Possession.  **EXECUTORY CONTRACTS AND**
16                                      **UNEXPIRED LEASES OF THE DEBTOR**
                                        **THAT MAY BE ASSUMED AND ASSIGNED**
17

18

19

20

21

22

23

24

25

26

27

28

**PLEASE TAKE NOTICE** that on    [_____], the above-captioned Debtor and Debtor in possession (the "**Debtor**") filed the Motion of the Debtor and Debtor in Possession Pursuant to sections 105, 362, 363 and 365 of the Bankruptcy Code for an Order (I)(A) approving "stalking horse" asset purchase agreement for the sale of substantially all of the Debtor's intellectual property and customer database assets; (B) approving the Bid Protections; (C) approving procedures in connection with the auction and sale of the Debtor's assets; (D) scheduling the related auction and hearing to consider approval of sale; (E) approving procedures for the assumption and assignment of certain executory contracts and unexpired leases; (F) approving the form and manner of notice thereof; and (G) granting related relief; and (II)(A) authorizing the sale of the Debtor's assets pursuant to the successful bidder's asset purchase agreement free and clear of liens, claims, encumbrances, and other interests; (B) approving the assumption and assignment of certain executory contracts and unexpired leases related thereto; and (C) granting related relief (the "**Motion**").  The Debtor seeks, among other things, to sell all or substantially all of its intellectual property and customer database assets (the "**Purchased Assets**") to BooHoo F I, Limited (the "**Stalking Horse Purchaser**") or the bidder submitting the highest or otherwise best offer for the Purchased Assets (such bidder, the "**Successful Bidder**"), at an auction free and clear of all liens, claims, encumbrances and other interests pursuant to sections 105(a), 363 and 365 of the Bankruptcy Code.

**PLEASE TAKE FURTHER NOTICE** that, on January 5, 2017, the Court entered an Order (the "**Bidding Procedures Order**") approving, among other things, the Bidding Procedures requested in the Motion, which Bidding Procedures Order governs (i) the bidding process for the sale of the "Purchased Assets of the Debtor and (ii) procedures for the assumption and assignment of certain of the Debtor's executory contracts and unexpired leases.

**PLEASE TAKE FURTHER NOTICE** that pursuant to the Stalking Horse Agreement your contract with the Debtor may be assumed and assigned to the Stalking Horse Purchaser, or to such other Purchaser that may emerge as the Successful Bidder following the Auction (if any) conducted pursuant to the Bidding Procedures.

**PLEASE TAKE FURTHER NOTICE** that the Motion also seeks Court approval of the sale (the "**Sale**") of the Purchased Assets to the Successful Bidder, free and clear of all liens, claims, interests and encumbrances pursuant to sections 105(a) and 363 of the Bankruptcy Code, including the assumption by the Debtor and assignment to the buyer of certain executory contracts and unexpired leases pursuant to section 365 of the Bankruptcy Code (the "**Assumed and Assigned Contracts**").[1] Immediately after conclusion of the Auction (if any), the Debtor shall file a notice identifying the Successful Bidder with the Bankruptcy Court and, if the Stalking Horse Purchaser is not the Successful Bidder, serve such notice by fax, email or overnight mail to all counterparties whose contracts are to be assumed and assigned.

**PLEASE TAKE FURTHER NOTICE** that an evidentiary hearing (the "**Sale Hearing**") to approve the Sale and authorize the assumption and assignment of the Assigned Contracts will be held on **February 8, 2016 at __:__ _.m (Pacific Standard Time)**, before the United States Bankruptcy Court for the Central District of California, [address]. The Sale Hearing may be adjourned from time to time without further notice to creditors or parties in interest other than by announcement of the adjournment in open court on the date scheduled for the Sale Hearing or by filing a notice, which may be a hearing agenda stating the adjournment, on the docket of the Debtor's chapter 11 case.

**PLEASE TAKE FURTHER NOTICE** that, consistent with the Bidding Procedures Order, the Debtor may seek to assume an executory contract or unexpired lease to which you may be a party. The Assumed and Assigned Contract(s) are described on **Exhibit A** attached to this Notice. The amount shown on **Exhibit A** hereto as the "Cure Amount" is the amount, if any, based upon the Debtor's books and records, which the Debtor asserts is owed to cure any defaults existing under the Assumed and Assigned Contract.

**PLEASE TAKE FURTHER NOTICE** that if you disagree with the Cure Amount

---

[1] "Assumed and Assigned Contracts" are those contracts and leases that the Debtor believes may be assumed and assigned as part of the orderly transfer of the Purchased Assets; however, (i) the Stalking Horse Purchaser may exclude contracts and leases from the list of Assumed and Assigned Contracts as provided in the Stalking Horse Agreement, and (ii) if different, the Successful Bidder may choose to exclude certain of the Debtor's contracts or leases from the list of Assumed and Assigned Contracts as part of their Qualifying Bid, causing such contracts and leases not to be assumed by the Debtor.

shown for the Assumed and Assigned Contract(s) on **Exhibit A** to which you are a party, you must file in writing with the United States Bankruptcy Court for the Central District of California, [address], an objection on or before **January 30, 2017 at 4:00 p.m. (Pacific Standard Time)**. Any objection must set forth the specific default or defaults alleged and set forth any cure amount as alleged by you. If a contract or lease is assumed and assigned pursuant to a Court order approving same, then unless you properly file and serve an objection to the Cure Amount contained in this Notice, you will receive at the time of the closing of the sale (or as soon as reasonably practicable thereafter), the Cure Amount set forth herein, if any. Any non-Debtor party to an Assigned Contract that fails to timely file and serve an objection to the Cure Amounts shall be forever barred from asserting that a Cure Amount is owed in an amount in excess of the amount, if any, set forth in the attached **Exhibit A**.

 **PLEASE TAKE FURTHER NOTICE** that if you have any other objection to the Debtor's assumption and assignment of the Assigned Contract to which you may be a party, you also must file that objection in writing on or before **January 30, 2017 at 4:00 p.m. (Pacific Standard Time)**; provided, however, if any bidder other than the Stalking Horse Purchaser is the Successful Bidder, then any counterparty to an Assumed and Assigned Contract may file and serve an objection to the assumption and assignment of the Assumed and Assigned Contract solely with respect to the Successful Bidder's ability to provide adequate assurance of future performance under the Assumed and Assigned Contract up to the time of the Sale Hearing, or raise it at the Sale Hearing.

 **PLEASE TAKE FURTHER NOTICE** that any objection you may file must be served so as to be received by the following parties by the applicable objection deadline date and time: (i) Nasty Gal, Inc., 539 W. 6th Street, Los Angeles, CA (Attn: Joe Scirocco (joe.scirocco@shopnastygal.com)); (ii) counsel to the Debtor: Robins Kaplan LLP, 2049 Century Park East, Suite 3400, Los Angeles, CA 90067 (Attn: Scott F. Gautier (SGautier@RobinsKaplan.com)), (iii) counsel to the Stalking Horse Bidder: Troutman Sanders LLP, 600 Peachtree Street, Suite 5200, Atlanta, GA 30308 (Attn: Harris B. Winsberg

1    (harris.winsberg@troutmansanders.com) and Stephen S. Roach

2    (stephen.roach@troutmansanders.com), (iv) counsel to the Official Committee of Unsecured

3    Creditors: Levene, Neale, Bender, Yoo & Brill LLP, 10250 Constellation Blvd., Suite 1700, Los

4    Angeles, CA 90067 (Attn. Gary Klausner (gek@lnbyb.com)) and (v) counsel to the Office of the

5    United States Trustee: Office of the United States Trustee, 915 Wilshire Boulevard, Suite 1850,

6    Los Angeles, CA 90017 (Attn: Ron Maroko)) (collectively, the "**Notice Parties**").

7        **PLEASE TAKE FURTHER NOTICE** that the buyer shall be responsible for satisfying

8    any requirements regarding adequate assurance of future performance that may be imposed under

9    sections 365(b) and (f) of title 11 of the United States Code §§ 101-1532 (the "**Bankruptcy**

10   **Code**"), in connection with the proposed assignment of any Assumed and Assigned Contract. The

11   Court shall make its determinations concerning adequate assurance of future performance under

12   the Assigned Contracts pursuant to 11 U.S.C. §§ 365(b) and (f) at the Sale Hearing.

13       **PLEASE TAKE FURTHER NOTICE** that, in the event that the Debtor and the non-

14   Debtor party cannot resolve the Cure Amount, the Debtor shall segregate any disputed Cure

15   Amounts ("**Disputed Cure Amounts**") pending the resolution of any such disputes by the Court

16   or mutual agreement of the parties. Assumption Objections may be resolved by the Court at the

17   Sale Hearing, or at a separate hearing either before or after the Sale Hearing.

18       **PLEASE TAKE FURTHER NOTICE** that, except to the extent otherwise provided in

19   the Purchase Agreement with the Successful Bidder, pursuant to section 365(k) of the Bankruptcy

20   Code, the Debtor and the Debtor's estate shall be relieved of all liability accruing or arising after

21   the effective date of assumption and assignment of the Assumed and Assigned Contracts.

22       **PLEASE TAKE FURTHER NOTICE** that nothing contained herein shall obligate the

23   Debtor to assume any Assumed and Assigned Contracts or to pay any Cure Amount.

24       **PLEASE TAKE FURTHER NOTICE** THAT IF YOU DO NOT TIMELY FILE AND

25   SERVE AN OBJECTION AS STATED ABOVE, THE COURT MAY GRANT THE RELIEF

26   REQUESTED IN THE MOTION WITH NO FURTHER NOTICE.

27       ANY NON-DEBTOR PARTY TO ANY ASSIGNED CONTRACT WHO DOES NOT

28

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

1   FILE A TIMELY OBJECTION TO THE CURE AMOUNT FOR SUCH ASSIGNED

2   CONTRACT IS DEEMED TO HAVE CONSENTED TO SUCH CURE AMOUNT.

3

4

5   Dated:  [_____], 2017              Respectfully submitted,

6                                               Scott F. Gautier (State Bar No. 211742)
                                                *SGautier@RobinsKaplan.com*
7                                               Lorie A. Ball (State Bar No. 210703)
                                                *LBall@RobinsKaplan.com*
8                                               Kevin D. Meek (State Bar No.
                                                280562)*KMeek@RobinsKaplan.com*
9                                               ROBINS KAPLAN LLP
                                                2049 Century Park East, Suite 3400
10                                              Los Angeles, CA 90067
                                                Telephone: 310 552 0130
11                                              Facsimile: 310 229 5800

12                                              *Attorneys for Debtor and*
                                                *Debtor in Possession*
13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

**EXHIBIT A**

**(Assigned Contracts)**

**EXHIBIT H**

**FORM OF SALE ORDER**

**(attached)**

1  Scott F. Gautier (State Bar No. 211742)
   *SGautier@RobinsKaplan.com*
2  Lorie A. Ball (State Bar No. 210703)
   *LBall@RobinsKaplan.com*
3  Kevin D. Meek (State Bar No. 280562)
   *KMeek@RobinsKaplan.com*
4  ROBINS KAPLAN LLP
   2049 Century Park East, Suite 3400
5  Los Angeles, CA  90067
   Telephone:     310 552 0130
6  Facsimile:     310 229 5800

7  *Attorneys for Debtor and Debtor in Possession*

8
                  **UNITED STATES BANKRUPTCY COURT**
9
                  **CENTRAL DISTRICT OF CALIFORNIA**
10
                       **LOS ANGELES DIVISION**
11

12
   In re:                              | Case No.  2:16-bk-24862-BB
13
   NASTY GAL INC., a California           Chapter  11
14 corporation,
                                          **ORDER (A) AUTHORIZING THE SALE OF**
15      Debtor and Debtor in Possession.  **THE DEBTOR'S ASSETS PURSUANT TO**
                                          **THE BUYER'S ASSET PURCHASE**
16                                        **AGREEMENT FREE AND CLEAR OF**
                                          **LIENS, CLAIMS, ENCUMBRANCES, AND**
17                                        **OTHER INTERESTS; (B) APPROVING THE**
                                          **ASSUMPTION AND ASSIGNMENT OF**
18                                        **CERTAIN EXECUTORY CONTRACTS AND**
                                          **UNEXPIRED LEASES RELATED**
19                                        **THERETO; AND (C) GRANTING RELATED**
                                          **RELIEF**
20
                                          <u>**Hearing:**</u>
21
                                          Date:
22                                        Time:
                                          Place:
23

24      This matter coming before the Court on the motion (the "**Motion**") of the above-captioned

25 debtor and debtor in possession (the "**Debtor**") for the entry of an order pursuant to sections 105,

26 362, 363 and 365 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (as amended, the

27 "**Bankruptcy Code**"), Rules 2002, 6004, and 6006 of the Federal Rules of Bankruptcy Procedure

28 (as amended from time to time, the "**Bankruptcy Rules**"), and Rule 6004-1 of the Local Rules of

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

61273514.1                                                           Exh. C-1

Bankruptcy Practice and Procedures of the Bankruptcy Court for the Central District of California (the "**Local Rules**") (I)(A) approving "stalking horse" asset purchase agreement for the sale of substantially all of the Debtor's intellectual property and customer database assets; (B) approving the Bid Protections; (C) approving procedures in connection with the auction and sale of the Debtor's assets; (D) scheduling the related auction and hearing to consider approval of sale; (E) approving procedures for the assumption and assignment of certain executory contracts and unexpired leases; (F) approving the form and manner of notice thereof; and (G) granting related relief; and (II)(A) authorizing the sale of the Debtor's assets pursuant to the successful bidder's asset purchase agreement free and clear of liens, claims, encumbrances, and other interests; (B) approving the assumption and assignment of certain executory contracts and unexpired leases related thereto; and (C) granting related relief; and this Court having entered an order on [ ] (the "**Bidding Procedures Order**") approving, among other things, the proposed procedures for bidding at the auction appended to the Bidding Procedures Order (the "**Bidding Procedures**"), notice of the sale of all or substantially all of the Debtor's intellectual property and customer database assets (as defined in detail in the Asset Purchase Agreement, the "**Purchased Assets**"), and procedures for determining and fixing cure costs to be paid in respect of the Assumed and Assigned Contracts[1] (the "**Cure Costs**"); and the Debtor having determined, after a full marketing process, that the highest and best bid for the Purchased Assets was received from [_____] ("**Purchaser**"); and Purchaser and the Debtor having entered into that certain Asset Purchase Agreement, dated December [__], 2016 (as may be amended or supplemented pursuant to its terms, the "**Asset Purchase Agreement**") pursuant to which Purchaser shall acquire the Purchased Assets; and adequate and sufficient notice of the Motion and the Asset Purchase Agreement, and all transactions contemplated thereunder, having been provided; and all interested parties having been afforded an opportunity to be heard with respect to the Motion and all relief related thereto; and the Court having reviewed and considered (i) the Motion and all relief related thereto, and (ii) the objections thereto; and the Court having heard statements of

---

[1] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Asset Purchase Agreement (as defined herein) or, if not defined in the Asset Purchase Agreement, in the Motion.

61273514.1     - 2 -     Exh. C-2

counsel and the evidence proffered or adduced in support of the relief requested by the Debtor in the Motion at the hearing before the Court on [ ], 2017 (the "**Sale Hearing**"); and it appearing that the Court has jurisdiction over this matter; and it further appearing that the legal and factual bases set forth in the Motion and at the Sale Hearing establish just cause for the relief granted herein; and after due deliberation thereon; and good and sufficient cause appearing therefor, it is hereby

**FOUND AND DETERMINED THAT:**

A.    This Court has jurisdiction over the Motion under 28 U.S.C. §§ 157 and 1334. This matter relates to the administration of the Debtor's bankruptcy estate and is accordingly a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (N) and (O).  Venue of the Case is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

B.    As evidenced by the affidavits of service [and publication] filed with this Court and based on representations of counsel at the Sale Hearing, (i) due, proper, timely, adequate and sufficient notice of the Motion, the Auction, the Sale Hearing, the Sale and the transactions contemplated thereby, including without limitation, the assumption and assignment of the Assumed and Assigned Contracts, has been provided in accordance with sections 102(1), 105(a), 363 and 365 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, 6006 and 9006, and in compliance with the Bidding Procedures Order, the Bidding Procedures and the Asset Purchase Agreement; (ii) such notice was good, sufficient and appropriate under the circumstances; and (iii) no other or further notice of the Motion, the Auction, the Sale Hearing, the Sale or the transactions contemplated thereby (including, without limitation, the assumption and assignment of the Assumed and Assigned Contracts), is or shall be required.

C.    The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.

D.    To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such. To the extent any of the following conclusions of law constitute

findings of fact, they are adopted as such.

E.    A reasonable opportunity to object and be heard with respect to the Sale and the

Motion and the relief requested therein (including the transactions contemplated by the Asset

Purchase Agreement and the assumption and assignment of the Assumed and Assigned Contracts

to Purchaser and any Cure Costs, as such amounts have been scheduled by the Debtor or

transmitted pursuant to a written notice delivered to the applicable counterparty) has been

afforded to all interested persons and entities, including the following: (i) the Office of the United

States Trustee; (ii) counsel to the Purchaser; (iii) counsel to the Official Committee of Unsecured

Creditors appointed in this case (the "**Committee**"); (iv) Hercules Technology Growth Capital,

Inc., as agent for the prepetition lender; (v) all entities known to have expressed a *bona fide*

interest in purchasing the Purchased Assets; (vi) all entities known to have asserted any liens in or

upon any of the Purchased Assets; (vii) all federal, state, and local regulatory, taxing and other

authorities which have a reasonably known interest in the relief requested by the Motion,

including the United States Attorney's office, all state attorneys general in states in which the

Debtor does business, and the Internal Revenue Service; (viii) all regulatory authorities or

recording offices that have a reasonably known interest in the relief requested in the Motion; (ix)

all governmental agencies having jurisdiction over the Debtor with respect to environmental laws;

(x) parties to governmental approvals, permits or licenses; (xi) all non-Debtor parties to the

Assumed and Assigned Contracts; (xii) all other parties that had filed a notice of appearance and

demand for service of papers in this bankruptcy case under Bankruptcy Rule 2002 as of the date

of the Motion; and (xii) all of the Debtor's known creditors and all other known vendors,

suppliers, lenders, contract/license/lease counterparties.

F.    The Debtor may sell the Purchased Assets free and clear of all Liens and Claims

(as each is defined below), because the purchase price is greater than the aggregate amount of

liens on the Purchased Assets and because each entity with any such interest in any Purchased

Assets to be transferred pursuant to the Asset Purchase Agreement, including the Assumed and

Assigned Contracts, (i) has consented to the Sale (including the assumption and assignment of the

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

Assumed and Assigned Contracts) or is deemed to have consented to the Sale; (ii) could be compelled in a legal or equitable proceeding to accept money satisfaction of such interest; or (iii) otherwise falls within the provisions of section 363(f) of the Bankruptcy Code, and, therefore, in each case, one or more of the standards set forth in section 363(f)(1)-(5) of the Bankruptcy Code has been satisfied. Those holders of any such interest who did not object, or who withdrew their objections, to the Motion are deemed to have consented pursuant to section 363(f)(2) of the Bankruptcy Code. Those holders of any such interest who did object are adequately protected by having such interests, if any, attach to the cash proceeds of the Sale ultimately attributable to the property against or in which they claim an interest, subject to the terms hereof.

G.     Good and sufficient reasons for approval of the Asset Purchase Agreement and the Sale have been articulated. The relief requested in the Motion is in the best interests of the Debtor, its estate, its creditors and other parties in interest.

H.     The Debtor has demonstrated both (i) good, sufficient and sound business purpose and justification and (ii) compelling circumstances for the Sale other than in the ordinary course of business, pursuant to section 363(b) of the Bankruptcy Code, in that, among other things, the immediate consummation of the Sale to the Purchaser is necessary and appropriate to maximize the value of the Debtor's estate; the Sale will provide the means for the Debtor to maximize distributions to creditors; and absent consummation of the Sale, the Debtor may be forced to discontinue its operations and liquidate.

I.     Subject only to the entry of this Order, the Debtor has full corporate power and authority to execute the Asset Purchase Agreement, and all other documents contemplated thereby, and to consummate the transactions contemplated by the Asset Purchase Agreement. The Asset Purchase Agreement and all of the transactions contemplated thereby have been duly and validly authorized by all necessary corporate action of the Debtor. No consents or approvals, other than the consent and approval of this Court, are required for the Debtor to consummate the Sale.

J.     At the conclusion of the Auction held on [February 7, 2017], the Debtor

determined that Purchaser was the Successful Bidder (as such term is defined in the Bidding Procedures Order) for the Purchased Assets.

K.    The Asset Purchase Agreement was negotiated, proposed and entered into by the Debtor and the Purchaser without collusion, in good faith and from arms'-length bargaining positions. Neither the Debtor nor the Purchaser have engaged in any conduct that would cause or permit the Asset Purchase Agreement to be avoided under section 363(n) of the Bankruptcy Code.

L.    The Purchaser is a good faith purchaser under section 363(m) of the Bankruptcy Code and, as such, is entitled to all of the protections afforded thereby. The Purchaser will be acting in good faith within the meaning of section 363(m) of the Bankruptcy Code in closing the transactions contemplated by the Asset Purchase Agreement and at all times after the entry of this Order.

M.    The consideration provided by the Purchaser pursuant to the Asset Purchase Agreement (i) is fair and reasonable, (ii) is the highest and best offer for the Purchased Assets, and (iii) constitutes reasonably equivalent value and fair consideration under the Bankruptcy Code and under the laws of the United States, any state, territory, possession or the District of Columbia.

N.    The Asset Purchase Agreement was not entered into for the purpose of hindering, delaying or defrauding creditors under the Bankruptcy Code and under the laws of the United States, any state, territory, possession, or the District of Columbia.

O.    The transfer of the Purchased Assets to the Purchaser pursuant to the Asset Purchase Agreement will be a legal, valid, and effective transfer of the Purchased Assets, and vests or will vest the Purchaser with all right, title, and interest of the Debtor to the Purchased Assets free and clear of: (a) any lien (statutory or otherwise), encumbrance, claim (as defined in Section 101(5) of the Bankruptcy Code), indebtedness, obligation, right, demand, charge, right of setoff, mortgage, deed of trust, pledge, security interest, preference, option, lease, license, tax, right of first refusal or similar interests, title defects, hypothecations, easements, rights of way,

restrictive covenants, encroachments, judgments, conditional sales or other title retention

agreements and other impositions, imperfections or defects of title or restrictions on transfer or

use of any nature whatsoever, or any other interest (as used in any applicable section of the

Bankruptcy Code, including Section 363(f)) (including (i) any conditional sale or other title

retention agreement and any lease having substantially the same effect as any of the foregoing,

(ii) any assignment or deposit arrangement in the nature of a security devise, and (iii) any claim

based on any theory that the Purchaser is a successor or continuation of Seller or the Business),

whether secured or unsecured, choate or inchoate, filed or unfiled, scheduled or unscheduled,

noticed or unnoticed, recorded or unrecorded, contingent or liquidated, material or non-material,

known or unknown (collectively, "**Lien**") and (b) any claim (as defined in Section 101(5) of the

Bankruptcy Code), debt, adverse claim, liability, obligation, commitment, assessment, cost,

expense, loss, expenditure, charge, fee, penalty, fine, contribution or premium of any kind or

nature whatsoever, whether known or unknown, asserted or unasserted, absolute or contingent,

direct or indirect, accrued or unaccrued, liquidated or unliquidated, or due or to become due, and

regardless of when sustained, incurred or asserted or when the relevant events occurred or

circumstances existed, including all costs and expenses relating thereto (collectively, "**Claims**"),

(except as expressly stated in the Asset Purchase Agreement), with all such non-assumed Liens,

Claims, and Encumbrances to attach to the Debtor's interest in the proceeds of the Sale (the "**Sale**

**Proceeds**") in order of priority, subject to any rights, claims and defenses of the Debtor with

respect thereto.

      P.      Neither the Purchaser nor its affiliates, successors or assigns, shall be deemed, as a

result of any action taken in connection with the purchase of the Purchased Assets, to: (1) be a

successor (or other such similarly situated party) to the Debtor (except as expressly stated in the

Asset Purchase Agreement); (2) have, *de facto* or otherwise, merged with or into any of the

Debtor; (3) be an alter ego or a continuation of the Debtor; and/or (4) the Purchaser does not have

any responsibility for any obligations of the Debtor based on any theory of successor or similar

theories of liability.

Q.      The Debtor has demonstrated that assuming and assigning the Assumed and Assigned Contracts in connection with the Sale is an exercise of its sound business judgment, and that such assumption and assignment is in the best interests of the Debtor's estates.

R.      The Debtor has cured, or has provided adequate assurance of cure of, any default existing prior to the Closing Date, within the meaning of section 365(b)(1)(A) of the Bankruptcy Code, under any of the Assumed and Assigned Contracts that will be assigned to the Purchaser as of the Closing Date, and have provided compensation or adequate assurance of compensation to any non-Debtor party to such contracts or leases for any of their actual pecuniary losses resulting from any default arising prior to the Closing Date under any of such Assumed and Assigned Contracts, within the meaning of section 365(b)(1)(B) of the Bankruptcy Code.

S.      As of the Closing Date, each Assumed and Assigned Contract will be in full force and effect and enforceable against the non-Debtor party thereto in accordance with its terms.

T.      Within three days of the Closing Date, the Debtor shall pay in full from the Sale Proceeds (to the extent not previously satisfied or otherwise agreed by the counterparty to such Assumed and Assigned Contract), pursuant to section 365 of the Bankruptcy Code and this Order, the undisputed Cure Costs of or relating to the assumption and assignment of the Assumed and Assigned Contracts with the maximum potential amount of the Cure Costs being **[ ],** and the Debtor will segregate, the disputed portion of any Cure Costs pending the resolution of any such dispute by this Court or mutual agreement of the parties. Any non-Debtor party to any Assumed and Assigned Contract who objected to the Cure Costs (a "**Cure Cost Objection**") is protected by having such disputed portion of such Cure Cost segregated on or before the Closing Date.

U.      The Debtor has, to the extent necessary, satisfied the requirements of sections 365(b)(1) and 365(f) of the Bankruptcy Code in connection with the Sale, the assumption and assignment of the Assumed and Assigned Contracts (except with respect to disputed Cure Costs, which shall be dealt with pursuant to the terms set forth hereinafter), and shall upon assignment thereof on the Closing Date, be relieved from any liability for any breach thereof.

**IT IS HEREBY ORDERED THAT**:

1.      As set forth below, the Motion is **GRANTED** and **APPROVED**, and the Sale contemplated thereby and by the Asset Purchase Agreement is approved as set forth in this Order.

2.      All objections and responses to the Motion that have not been overruled, withdrawn, waived, settled or resolved, and all reservations of rights included therein, are hereby overruled and denied on the merits with prejudice.

3.      The consideration provided by the Purchaser for the Purchased Assets, as embodied in the Asset Purchase Agreement, (i) is fair and reasonable; (ii) is the highest and otherwise best offer for the Purchased Assets; and (iii) constitutes reasonably equivalent value and fair consideration under the Bankruptcy Code and under the laws of the United States, and the laws of any state, territory, possession, and the Central District of California. The Purchaser's consideration for the Purchased Assets is hereby approved.

**Approval of the Asset Purchase Agreement**

4.      Pursuant to sections 105(a) and 363(b) of the Bankruptcy Code, the Sale by the Debtor to the Purchaser of the Purchased Assets and transactions related thereto, upon the closing under the Asset Purchase Agreement, are authorized and approved in all respects.

5.      The Asset Purchase Agreement annexed hereto as **Exhibit 1** is hereby approved pursuant to section 363(b) of the Bankruptcy Code and the Debtor is authorized to consummate and perform all of its obligations under the Asset Purchase Agreement and to execute such other documents and take such other actions as are necessary or appropriate to effectuate the Asset Purchase Agreement. The Purchaser shall not be required to seek or obtain relief from the automatic stay under section 362 of the Bankruptcy Code to enforce any of its remedies under the Asset Purchase Agreement or any other Sale related document. The automatic stay imposed by section 362 of the Bankruptcy Code is modified solely to the extent necessary to implement the preceding sentence.

6.      Pursuant to section 365 of the Bankruptcy Code, the Debtor will be deemed to have assumed the Asset Purchase Agreement as of the Closing Date.

**Transfer of Purchased Assets**

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

7.      Pursuant to section 363(b) and 363(f) of the Bankruptcy Code, the Debtor is authorized and directed to sell the Purchased Assets to the Purchaser pursuant to the Asset Purchase Agreement and all applicable provisions of the Bankruptcy Code, free and clear of all Liens, Claims, and "interests" in the Purchased Assets within the meaning of section 363(f) of the Bankruptcy Code, except as otherwise provided in the Asset Purchase Agreement, with any and all such Liens to attach to proceeds of such sale with the same validity, priority, force and effect such liens had on the Purchased Assets immediately prior to the Sale and subject to the rights, claims, defenses, and objections, if any, of the Debtor and all interested parties with respect to any such asserted Claims.

8.      Except as expressly permitted by the Asset Purchase Agreement, all persons and entities, including, but not limited to, all debt security holders, equity security holders, governmental, tax and regulatory authorities, lenders, trade and other creditors, holding interests or Claims of any kind or nature whatsoever against or in the Debtor or the Purchased Assets (whether legal or equitable, secured or unsecured, matured or unmatured, contingent or non-contingent, liquidated or unliquidated, senior or subordinated), arising under or out of, in connection with, or in any way relating to, the Debtor, the Purchased Assets, the operation of the Debtor's businesses prior to the Closing Date or the transfer of the Purchased Assets to the Purchaser, shall be and hereby are forever barred, estopped and permanently enjoined from asserting, prosecuting or otherwise pursuing against the Purchaser, its property, its successors and assigns, its affiliates or the Purchased Assets, such persons' or entities' interests, Liens or Claims (except as expressly provided in the Asset Purchase Agreement). Following the Closing Date, no holder of a Lien, or an interest in or Claim against the Debtor shall interfere with the Purchaser's title to or use and enjoyment of the Purchased Assets based on or related to such Lien, Claims or interests, and all such Liens, Claims and interests, if any, shall be, and hereby are channeled, transferred and attached solely and exclusively to the Sale Proceeds.

9.      The transfer of the Purchased Assets to the Purchaser pursuant to the Asset Purchase Agreement shall not result in (i) the Purchaser having any liability or responsibility for

any Claim against the Debtor or against an insider of the Debtor, or (ii) the Purchaser having any liability or responsibility to the Debtor except pursuant to the Asset Purchase Agreement and this Order.

10.    The Purchaser shall have no liability or responsibility for any liability or other obligation of the Debtor arising under or related to the Purchased Assets other than as expressly set forth in the Asset Purchase Agreement. Without limiting the effect or scope of the foregoing, the transfer of the Purchased Assets from the Debtor to the Purchaser does not and will not subject the Purchaser or its affiliates, successors or assigns or their respective properties (including the Purchased Assets) to any liability for Claims against the Debtor or the Purchased Assets by reason of such transfer under the laws of the United States or any state, territory or possession thereof applicable to such transactions. Neither the Purchaser nor its affiliates, successors or assigns shall be deemed, as a result of any action taken in connection with the purchase of the Purchased Assets to: (a) be a successor (or other such similarly situated party) to the Debtor (other than as expressly provided in the Asset Purchase Agreement); (b) have, *de facto* or otherwise, merged with or into the Debtor; (c) be an alter ego or a continuation of the Debtor; and/or (d) to have any responsibility for any obligations of the Debtor based on any theory of successor or similar theories of liability. Neither the Purchaser nor its affiliates, successors or assigns is acquiring or assuming any liability, warranty or other obligation of the Debtor, including, without limitation, any tax incurred but unpaid by the Debtor prior to the Closing Date, including, but not limited to, any tax, any fine or penalty relating to a tax, or any addition to tax, whether or not previously assessed, fixed or audited, whether or not paid, and whether or not contested before and adjudicated by a judicial or administrative tribunal of competent jurisdiction, except as otherwise expressly provided in the Asset Purchase Agreement.

11.    On the Closing Date, this Order shall be construed and shall constitute for any and all purposes a full and complete general assignment, conveyance and transfer of the Purchased Assets or a bill of sale transferring good and marketable title in the Purchased Assets to the Purchaser. Each and every federal, state, and local governmental agency or department is hereby

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

directed to accept any and all documents and instruments necessary and appropriate to

consummate the transactions contemplated by the Purchase Agreement.

12.     This Order is and shall be effective as a determination that, all Liens, Claims, and

interests shall be, and are, without further action by any person or entity, released with respect to

the Purchased Assets or Assumed and Assigned Contracts as of the Closing Date (except as

expressly provided in the Asset Purchase Agreement).

13.     This Order shall be binding upon and shall govern the acts of all entities, including

without limitation all filing agents, filing officers, title agents, title companies, recorders of

mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental

departments, secretaries of state, federal, state and local officials, and all other persons and

entities who may be required by operation of law, the duties of their office, or contract, to accept,

file, register or otherwise record or release any documents or instruments, or who may be required

to report or insure any title or state of title in or to any of the Purchased Assets.

**Assumption and Assignment of Assumed and Assigned Contracts**

14.     The Debtor is hereby authorized, in accordance with sections 105(a), 363 and 365

of the Bankruptcy Code, to (a) assume and assign to the Purchaser, effective upon the Closing

Date, the Assumed and Assigned Contracts, and/or to transfer, sell and deliver to the Purchaser all

of the Debtor's right, title and interest in and to the Assumed and Assigned Contracts, free and

clear of all Liens, Claims, and interests of any kind or nature whatsoever, and (b) execute and

deliver to the Purchaser such documents or other instruments as may be necessary to assign and

transfer the Assumed and Assigned Contracts to the Purchaser.

15.     The requirements of sections 365(b)(1) and 365(f)(2) of the Bankruptcy Code are

hereby deemed satisfied with respect to the Assumed and Assigned Contracts.

16.     The Assumed and Assigned Contracts shall be transferred to, and remain in full

force and effect for the benefit of, the Purchaser, in accordance with their respective terms,

notwithstanding any provision in any such Assumed and Assigned Contract (including provisions

of the type described in sections 365(b)(2), (e)(1), (f)(1) and (f)(3) of the Bankruptcy Code)

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

which prohibits, restricts or conditions such assignment or transfer. The non-Debtor party to each Assumed and Assigned Contract shall be deemed to have consented to such assignment under section 365(c)(1)(B) of the Bankruptcy Code, and the Purchaser shall enjoy all of the rights and benefits under each such Assumed and Assigned Contract as of the Closing Date without the necessity of obtaining such non-Debtor party's written consent to the assumption and assignment thereof.

17.     Pursuant to section 365(k) of the Bankruptcy Code, the Debtor and its estates shall be relieved from any liability for any breach of any Assumed and Assigned Contract after such assignment to and assumption by the Purchaser on the Closing Date.

18.     All liquidated monetary defaults, claims or other obligations of the Debtor arising or accruing under each Assumed and Assigned Contract prior to the assumption of such Assumed and Assigned Contract (without giving effect to any acceleration clauses or any default provisions of the kind specified in section 365(b)(2) of the Bankruptcy Code) shall be promptly cured by the Debtor upon assumption and assignment as provided in section 365(b)(1) of the Bankruptcy Code.

19.     If the Debtor receives a Cure Cost Objection, it shall attempt to resolve such disputed Cure Cost with the party asserting the objection. If consensual resolution of the Cure Cost Objection cannot be reached and the Purchaser elects to assume the Assumed and Assigned Contract at Closing, the Debtor will (i) pay in full the undisputed portion of such Cure Cost within three days following the Closing Date and (ii) will segregate, the disputed portion of such Cure Cost (the "**Segregated Amounts**") pending the resolution of the Cure Cost Objection by this Court or by mutual agreement of the parties. In light of these procedures, the fact that any Cure Cost Objection is not resolved shall not prevent or delay the assumption and assignment of any Assumed and Assigned Contracts as of the Closing Date, and the objectors' only recourse after the Closing Date shall be to the Segregated Amounts.

20.     Subject to the terms hereof with respect to the Segregated Amounts, all defaults or other obligations of the Debtor under the Assumed and Assigned Contracts arising or accruing

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

prior to the Closing Date have been cured or shall promptly be cured by the Debtor in accordance with the terms hereof such that the Purchaser shall have no liability or obligation with respect to any default or obligation arising or accruing under any Assumed and Assigned Contract prior to the Closing Date, except to the extent expressly provided in the Asset Purchase Agreement.  Each non-Debtor party to an Assumed and Assigned Contract is forever barred, estopped and permanently enjoined from asserting against the Purchaser, its affiliates, or its and their property, any breach or default under any Assumed or Assigned Contract, any claim of lack of consent relating to the assignment thereof, or any counterclaim, defense, setoff, right of recoupment or any other matter arising prior to the Closing Date or with regard to the assumption and assignment thereof pursuant to the Asset Purchase Agreement or this Order.

21.    Upon assignment of the Assumed and Assigned Contracts to the Purchaser on the Closing Date, no default shall exist under any Assumed and Assigned Contract and no non-Debtor party to any Assumed and Assigned Contract shall be permitted to declare a default by the Purchaser under such Assumed and Assigned Contract or otherwise take action against the Purchaser as a result of any Debtor's financial condition, bankruptcy or failure to perform any of its obligations under the Assumed and Assigned Contract, including any failure to pay any amounts necessary to cure any Debtor's defaults thereunder. Upon entry of this Order and assumption and assignment of the Assumed and Assigned Contracts, the Purchaser shall be deemed in compliance with all terms and provisions of the Assumed and Assigned Contracts.

22.    Nothing contained in any chapter 11 plan confirmed in this case or the order confirming any chapter 11 plan, nor any order dismissing any case or converting it to chapter 7 shall conflict with or derogate from the provisions of the Asset Purchase Agreement, any documents or instrument executed in connection therewith, or the terms of this Order.

23.    Notwithstanding anything to the contrary in this Order, upon assumption of the Assumed and Assigned Contracts, the Purchaser is assuming all liabilities arising under the Assumed and Assigned Contracts arising and accruing on and after the Closing Date.

**Additional Provisions**

24.     The stays provided for in Bankruptcy Rules 6004(h) and 6006(d) are hereby waived and this Order shall be effective immediately upon its entry.

25.     The terms of this Order shall be binding on the Purchaser and its successors, the Debtor, creditors of the Debtor and all other parties in interest in the Bankruptcy Cases, and any successors of the Debtor, including any trustee or examiner appointed in this case or upon a conversion of this case to chapter 7 of the Bankruptcy Code.

26.     The Purchaser is a purchaser without collusion and in good faith, as that term is used in section 363(m) of the Bankruptcy Code and is entitled to the benefits and protections afforded by section 363(m) of the Bankruptcy Code. Accordingly, the reversal or modification on appeal of the authorization provided herein to consummate the Sale shall not affect the validity of the Sale (including, without limitation, the assumption and assignment of any of the Assumed and Assigned Contracts), unless such authorization is duly stayed pending such appeal.

27.     The Asset Purchase Agreement was negotiated, proposed and entered into by the Debtor and the Purchaser without collusion, in good faith and from arms'-length bargaining positions. Neither the Debtor nor the Purchaser have engaged in any conduct that would cause or permit the Asset Purchase Agreement to be avoided under section 363(n) of the Bankruptcy Code.

28.     This Court retains jurisdiction, pursuant to its statutory powers under 28 U.S.C. § 157(b)(2), to interpret, implement and enforce the terms and provisions of, and resolve any disputes arising under or related to, this Order and the Asset Purchase Agreement, all amendments thereto, any waivers and consents thereunder, and each of the agreements and documents executed pursuant to or in connection therewith in all respects.

29.     The failure specifically to include any particular provisions of the Asset Purchase Agreement or any of the documents, agreements or instruments executed in connection therewith in this Order shall not diminish or impair the force of such provision, document, agreement or instrument, it being the intent of the Court that the Asset Purchase Agreement and each document, agreement or instrument be authorized and approved in its entirety.

30.    The Asset Purchase Agreement and any related agreements, documents or other instruments may be modified, amended or supplemented by the parties thereto in accordance with the terms thereof without further order of the Court, provided that any such modification, amendment or supplement does not have a material adverse effect on the Debtor's estate.

Dated: February _____, 2017

_____
United States Bankruptcy Judge

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**<u>Exhibit 1</u>**

**(Asset Purchase Agreement)**

61273514.1

Exh. C-17

**Schedule 1.1(a)**

**Schedule 1.1(a)**
**Intellectual Property Rights**

**Registered Trade Marks**

The following trade mark applications and registrations, together with all unregistered rights and goodwill in and relating to the same:

| Trade mark | Territory | Classes |
|---|---|---|
| (Design only)<br><br>SN: 86917053<br><br> | United States | International class 25, 35 |
| NASTY GAL<br><br>SN: 86955621 | United States | International class 18 |
| NASTY GAL<br><br>SN: 85964637 | United States | International class 03, 09, 14 |
| NASTY GALAXY<br><br>SN: 86912642 | United States | International class 16, 25, 41 |
| SHOE CULT<br><br>RN: 4549130<br>SN: 85964684 | United States | International class 25, 35 |
| AFTER PARTY<br><br>RN: 4728316<br>SN: 86000955 | United States | International class 25 |
| AFTER PARTY BY NASTY GAL<br><br>RN: 4728317<br>SN: 86000962 | United States | International class 25 |
| NASTY GAL<br><br>RN: 3953331<br>SN: 77949164 | United States | International class 35 |
| NASTY GAL<br><br>RN: 4444069<br>SN: 77949179 | United States | International class 25 |
| NASTY GAL (Stylized) | United States | International class 25, 35 |

Active 30022962v2 250512.000001

Schedule 1.1(a) – Intellectual Property Rights

| | | |
|---|---|---|
| *NASTY GAL*<br><br>RN: 4548339<br>SN: 85713556 | | |
| NASTY GALLERY<br><br>RN: 4951612<br>SN: 85746814 | United States | International class 41, 45 |
| SHOE CULT BY NASTY GAL<br><br>RN: 4426477<br>SN: 85692569 | United States | International class 25, 35 |
| SUPER NASTY<br><br>RN: 4422832<br>SN: 85682100 | United States | International class 16, 41 |
| AFTER PARTY<br><br>RN: TMA941763<br>AN: 1635379 | Canada | International class 25 |
| AFTER PARTY BY NASTY GAL<br><br>RN: TMA941754<br>AN: 1635380 | Canada | International class 25 |
| NASTY GAL<br><br>AN: 1635378 | Canada | International class [3, 9, 14]* |
| NASTY GAL<br><br>RN: TMA890413<br>AN: 1553203 | Canada | International class [9, 14, 18,] 25, [26,] 35* |
| NASTY GAL and design<br><br>*NASTY GAL*<br>RN: TMA920989<br>AN: 1594906 | Canada | International class [9, 14, 18,] 25, [26,] 35* |
| SHOE CULT<br><br>RN: TMA941760<br>AN: 1638548 | Canada | International class 25, 35 |
| SHOE CULT BY NASTY GAL<br><br>RN: TMA926023<br>AN: 1610514 | Canada | International class 25, 35 |
| SUPER NASTY<br><br>RN: TMA926024<br>AN: 1610509 | Canada | International class 16, 35, 41 |
| NASTY GAL<br><br>RN: 1312708<br>AN: M1236780 | Mexico | International class 25 |
| NASTY GAL | Mexico | International class 35 |

Active 30022962v2 250512.000001

Schedule 1.1(a) – Intellectual Property Rights

| | | |
|---|---|---|
| RN: 1313215<br>AN: M1236822 | | |
| NASTY GAL<br><br>RN: Z20112174<br>AN: Z20112174A | Croatia | International class 25, 35 |
| NASTY GAL<br><br>RN: 240/2012<br>AN: 3217/2011 | Iceland | International class 25, 35 |
| NASTY GAL<br><br>RN: 265131<br>AN: 201114119 | Norway | International class 14, 25, 35 |
| NASTY GAL<br><br>RN: 627086<br>AN: 63110/2011 | Switzerland | International class 25, 35 |
| Nasty gal<br><br>**NASTY GAL**<br><br>RN: 2012 02369<br>AN: 2012/02369 | Turkey | International class 25, 35 |
| AFTER PARTY<br><br>RN: 011927365<br>AN: 011927365 | EU | International class 18, 25, 35 |
| AFTER PARTY BY NASTY GAL<br><br>RN: 011927571<br>AN: 011927571 | EU | International class 18, 25, 35 |
| NASTY GAL<br><br>RN: 011952421<br>AN: 011952421 | EU | International class 03, 09, 18 |
| NASTY GAL<br><br>RN: 010430189<br>AN: 010430189 | EU | International class 14, 25, 35 |
| NASTY GAL and Design<br><br>*NASTY GAL*<br><br>RN: 011157112<br>AN: 011157112 | EU | International class 14, 25, 35 |
| SHOE CULT<br><br>RN: 012027942<br>AN: 012027942 | EU | International class 14, 25, 35 |

*Active 30022962v2 250512.000001*

Schedule 1.1(a) – Intellectual Property Rights

| | | |
|---|---|---|
| SHOE CULT BY NASTY GAL<br><br>RN: 011500361<br>AN: 011500361 | EU | International class 14, 25, 35 |
| SUPER NASTY<br><br>RN: 011500006<br>AN: 011500006 | EU | International class 09, 16, 41 |
| NASTY GAL<br><br>NASTY GAL<br><br>AN: 90497 | Bahrain | International class 35 |
| NASTY GAL<br><br>NASTY GAL<br><br>AN: 90496 | Bahrain | International class 25 |
| NASTY GAL<br><br>AN: 242232 | Israel | International class 25, 35 |
| NASTY GAL<br><br>NASTY GAL<br><br>AN: 143300351<br>ID number: 175102 | Saudi Arabia | International class 35 |
| NASTY GAL<br><br>NASTY GAL<br><br>An: 143300350<br>ID number: 147180 | Saudi Arabia | International class 25 |
| NASTY GAL<br><br>AN: 2011/30149 | South Africa | International class 25 |
| NASTY GAL<br><br>AN: 2011/30150 | South Africa | International class 35 |
| NASTY GAL<br><br>NASTY GAL | United Arab Emirates | International class 35 |

Active 30022962v2 250512.000001

Schedule 1.1(a) – Intellectual Property Rights

| | | |
|---|---|---|
| AN: 168061 | | |
| NASTY GAL<br><br>**NASTY GAL**<br><br>AN: 168060 | United Arab Emirates | International class 25 |
| AFTER PARTY BY NASTY GAL<br><br>RN: 1566249<br>AN: 1566249 | Australia | International class 25 |
| NASTY GAL<br><br>RN: 1564847<br>AN: 1564847 | Australia | International class 03, 09, 14 |
| NASTY GAL<br><br>RN: 1460581<br>AN: 1460581 | Australia | International class 25, 35 |
| NASTY GAL and Design<br><br>*NASTY GAL*<br><br>RN: 1510890<br>AN: 1510890 | Australia | International class 25, 35 |
| SHOE CULT<br><br>RN: 1571710<br>AN: 1571710 | Australia | International class 25, 35 |
| SHOE CULT BY NASTY GAL<br><br>RN: 1536308<br>AN: 1536308 | Australia | International class 25, 35 |
| SUPER NASTY<br><br>RN: 1536309<br>AN: 1536309 | Australia | International class 16, 41 |
| 纳思蒂戈尔<br>NASTYGAL<br>AN: 11532620 | China | International class 35 |
| 纳思蒂戈尔<br><br>Number: 11532619 | China | International class 25 |
| 纳思蒂戈尔<br><br>Number : 11532618 | China | International class35 |
| SHOE CULT | China | International class 35 |

Schedule 1.1(a) – Intellectual Property Rights

| SHOE CULT | | |
|---|---|---|
| RN: 12700810 | | |

Active 30022962v2 250512.000001

Schedule 1.1(a) – Intellectual Property Rights

| | | |
|---|---|---|
| SHOE CULT<br><br>**SHOE CULT**<br><br>RN: 12700811 | China | International class 25 |
| SHOE CULT BY NASTY GAL<br><br>SHOE CULT<br>BY NASTY GAL<br><br>RN: 12708031 | China | International class 25 |
| SUPER NASTY<br><br>**SUPER NASTY**<br><br>RN: 12788104 | China | International class 41 |
| SUPER NASTY<br><br>SUPER NASTY<br><br>RN: 12708030 | China | International class 16 |
| NASTY GAL<br><br>NASTY GAL<br><br>AN: 302091366 | Hong Kong | International class 25 |
| NASTY GAL<br><br>RN: 5495981<br>AN: 2011-084179 | Japan | International class 25, 35 |
| NASTY GAL (Stylized)<br><br>**NASTY GAL**<br><br>AN: 2011054880 | Malaysia | International class 35 |
| NASTY GAL (Stylized)<br><br>**NASTY GAL**<br><br>AN: 2011054879 | Malaysia | International class 25 |
| NASTY GAL<br><br>RN: 852637<br>AN: 852637 | New Zealand | International class 25, 35 |

Schedule 1.1(a) – Intellectual Property Rights

| NASTY GAL and Design<br><br>**NASTY GAL**<br><br>RN: 14702<br>AN: 4-2011-14702 | Philippines | International class 25, 35 |
|---|---|---|
| NASTY GAL<br><br>**NASTY GAL**<br><br>RN: 4500441510000<br>AN: 4520110005639 | Republic of Korea | International class 25, 35 |
| Nasty gal<br><br>**NASTY GAL**<br><br>RN: T1116460H<br>AN: T1116460H | Singapore | International class 25, 35 |
| NASTY GAL<br><br>NASTY GAL<br><br>RN: 01543271<br>AN: 100064852 | Taiwan | International class 25, 35 |
| NASTY GAL<br><br>RN: 220480<br>AN: 2011-0011699 | Costa Rica | International class 35 |
| NASTY GAL<br><br>RN: 219539<br>AN: 2011-0011700 | Costa Rica | International class 25 |
| NASTY GAL | Argentina | International class 25 |

| | | |
|---|---|---|
| RN: 2554092<br>AN: 3130140 | | |
| NASTY GAL<br><br>RN: 2554093<br>AN: 3130141 | Argentina | International class 35 |
| NASTY GAL<br><br>AN: 831266635 | Brazil | International class 35 |
| NASTY GAL<br><br>AN: 904264475 | Brazil | International class 25 |
| NASTY GAL<br><br>RN: 997486<br>AN: 985505 | Chile | International class 35 |
| NASTY GAL<br><br>RN: 997484<br>AN: 985504 | Chile | International class 25 |
| NASTY GAL<br><br>RN: 488290<br>AN: 11/157816 | Colombia | International class 35 |
| NASTY GAL<br><br>RN: 507288<br>AN: 11/157825 | Colombia | International class 25 |
| NASTY GAL<br><br>RN: P00186441<br>AN: 2011-476907 | Peru | International class 25 |
| NASTY GAL<br><br>RN: S00071140<br>AN: 2011-476906 | Peru | International class 35 |
| NASTY GAL<br><br>RN: 429938<br>AN: 429938 | Uruguay | International class 25, 35 |
| NASTY GAL<br><br>RN: 193676 | Dominican Republic | International class 25, 35 |
| NASTY GAL<br><br>AN: 51564 | Bermuda | International class 25 |
| NASTY GAL<br><br>AN: 51565 | Bermuda | International class 35 |
| NASTY GAL<br><br>AN:35638 | Bahamas | International class 16<br>Local class 39 |
| NASTY GAL | Bahamas | International class 25<br>Local class 25 |

Active 30022962v2 250512.000001
Schedule 1.1(a) – Intellectual Property Rights

| | | |
|---|---|---|
| AN: 35639 | | |
| NASTY GAL<br><br>NASTY GAL<br><br>AN: 267714 | Egypt | International class 35 |
| NASTY GAL<br><br>AN: 267713<br><br><br><br>NASTY GAL | Egypt | International class 25 |

Active 30022962v2 250512.000001

Schedule 1.1(a) – Intellectual Property Rights

| NASTY GAL                         | Thailand | International class 25 |
|-----------------------------------|----------|-----------------------|
| *NASTY GAL*<br>AN: 867141<br>RN: 380894 |          |                       |
| NASTY GAL<br><br>NASTY GAL<br><br>AN: 827796<br>RN: 57194 | Thailand | International class 35 |

*Some classes are provided administrative purposes only.

**Non-Registered Trade Marks**

The following unregistered marks and all rights and goodwill in and relating to the same:

MIRAGE and MIRAGE BY NASTY GAL, all in connection with apparel and online and retail store services in the field of apparel, accessories and jewellery.

**<u>Registered Copyright</u>**

| Title               | Type            | Registration Number |
|---------------------|-----------------|---------------------|
| MercedesLeopardShoes | Visual material | VA0001872765        |

**<u>Domain names</u>**

iheartvintage.com
nasty-gals.com
nastyg.al
nastygal.ae
nastygal.al
nastygal.at
nastygal.be
nastygal.biz
nastygal.ca
nastygal.ch
nastygal.cl
nastygal.clothing
nastygal.co.id
nastygal.co.kr
nastygal.co.nz
nastygal.co.uk
nastygal.com
nastygal.com.au
nastygal.com.br
nastygal.com.co
nastygal.com.do
nastygal.com.ec

Schedule 1.1(a) – Intellectual Property Rights

nastygal.com.hk
nastygal.com.ht
nastygal.com.jm
nastygal.com.mx
nastygal.com.pr
nastygal.com.pt
nastygal.com.ru
nastygal.com.tr
nastygal.com.tt
nastygal.com.tw
nastygal.de
nastygal.dk
nastygal.do
nastygal.ec
nastygal.es
nastygal.fi
nastygal.fr
nastygal.hk
nastygal.ht
nastygal.ie
nastygal.is
nastygal.it
nastygal.jp
nastygal.kr
nastygal.lu
nastygal.mx
nastygal.my
nastygal.net
nastygal.nu
nastygal.org
nastygal.ph
nastygal.pr
nastygal.pt
nastygal.se
nastygal.sg
nastygal.tt
nastygal.tw
nastygal.us
nastygal.xxx
nastygalclothing.com
nastygals.net
nastygals.org
nastygalshop.com
nastygalvintage.com
nastygirl.com
nastygirlclothing.com
ngalcdn.com
nsty.gl
shoe-cult.com
shoecult.com
shopnastygal.cn
shopnastygal.xxx
shopnastygals.com
shopnastygirls.com
shopshoecult.com
supernasty.com
Active 30022962v2 250512.000001

Schedule 1.1(a) – Intellectual Property Rights

theshoecult.com
thevintagestylist.com
wwwnastygal.com

**Website and content**

(i)     In respect of the website and mobile site located at the domain names listed above, and the mobile application "Nasty Gal":

     a.     all the digital assets contained thereon, including (but not limited to) all photographs, images, artwork, graphics, designs, drawings, logos, story content, blog content (including the Nasty Galaxy blog), text, typographical arrangements, and videos, and all such digital assets historically contained on the website, mobile site and mobile application; and

     b.     the design, look and feel and content of the same.

(ii)     The design, look and feel and content of all marketing messages and campaigns used or sent by the Seller, including but not limited to those sent by email and push messages, to customers of the Seller during the twelve (12) months prior to the Closing Date.

**Social media accounts**

Facebook – Nasty Gal
Twitter – Nasty Gal
Instagram – both Nasty Gal and Nasty Gal Melrose
Pinterest – Nasty Gal
Tumblr – Nasty Gal
You Tube – Nasty Gal
Snapchat – Nasty Gal

**Font**

Nasty Gal Grotesque typeface and font.

**Schedule 1.1(c)**

**Schedule 1.1(c)**
**Assumed and Assigned Contracts**

1. License agreement between Sophia Amoruso of 1801 Century Park West, Los Angeles, CA 90067-6406 (Licensor) and Nasty Gal Inc of 523 W. 6th Street, Suite 330, Los Angeles, CA 90014 (Licensee) dated 13 December 2013.

2. End user license agreement between Nasty Gal Inc of 523 W. 6th Street, Suite 330, Los Angeles, CA 90014 (Licensor) and Penguin Random House LLC (Licensee) dated 17 February 2016.

3. Trademark license agreement between Nasty Gal Inc of 523 W. 6th Street, Suite 330, Los Angeles, CA 90014 (Licensor) and Signal Brands LLC of 320 W. 31st Street, Los Angeles, California (Licensee) dated 30 March 2016.

4. Trademark license agreement between Nasty Gal Inc of 523 W. 6th Street, Suite 330, Los Angeles, CA 90014 and Netflix Entertainment LLC dated 10 June 2016.

5. License agreement between  Nasty Gal Inc of 523 W. 6th Street, Suite 330, Los Angeles, CA 90014 (Licensor) and Sophia Amoruso of 1990 South Bundy Drive, Suite 200, Los Angeles, CA 90025 and G.P Putnam's Sons, a division of Penguin Random House LLC, of 375 Hudson Street, New York, NY 10014 (Licensees).

6. Agreement between Nasty Gal Inc. of 523 W. 6th Street, Suite 330, Los Angeles, CA 90014, Native Voice Films Ltd. Of 52 Great Eastern Street, London, United Kingdom EC2A3EP, and Damon Gerard Smith, a U.S. citizen with a business address of c/o 52 Great Eastern Street, London, United Kingdom EC2A3EP dated April 14, 2016.

7. Master Services Agreement between Nasty Gal Inc. of 523 W. 6th Street, Suite 330, Los Angeles, CA 90014 and Mother Industries, LLC with offices at 595 11th Avenue, New York, NY 10036, USA dated April 27, 2015, including the Statement of Work issued by Mother Industries, LLC to Nasty Gal Inc. on May 1, 2015.

**Schedule 1.2**

**Schedule 1.2**
**Excluded Assets**

All right, title, and interest (including, without limitation, copyright) in and to the products known as "Ava Jacket Earring," "Vanessa Mooney Silver Dollar Rosary," and "Claws Out Midi Ring," which are pictured below for reference.

| Product Name | Photograph |
|---|---|
| Ava Jacket Earring |  |
| Vanessa Mooney Silver Dollar Rosary |  |
| Claws Out Midi Ring |  |

**Seller Disclosure Schedule**

## DISCLOSURE SCHEDULE

December 27. 2016

This is the Disclosure Schedule (the "**Disclosure Schedule**") delivered pursuant to Article IV of that certain Purchase Asset Agreement dated December 27, 2016 (the "**Agreement**") by and between BooHoo F I, Limited ("**Purchaser**") and Nasty Gal Inc., a California corporation ("**Seller**"). Any disclosures made under the heading of one section of this Disclosure Schedule may apply to and/or qualify disclosures made under one or more other sections where such disclosures would be reasonably appropriate. Section headings are provided for convenience only. Unless otherwise defined, any capitalized terms in this Disclosure Schedule shall have the same meanings assigned to such terms in the Agreement.

### Section 4.4 – Litigation

None

### Section 4.5 – Intellectual Property

**Section 4.5(a)(1):**

Reference is made to <u>Exhibit 4.5(a)(1)</u> attached hereto which is incorporated herein by reference.

Seller holds an interest in a registered copyright for the design of Mercedes Leopard Shoes, Reg. No. VA1872765.

| | |
|---|---|
| iheartvintage.com | nastygal.ie |
| nasty-gals.com | nastygal.is |
| nastyg.al | nastygal.it |
| nastygal.ae | nastygal.jp |
| nastygal.al | nastygal.kr |
| nastygal.at | nastygal.lu |
| nastygal.be | nastygal.mx |
| nastygal.biz | nastygal.my |
| nastygal.ca | nastygal.net |
| nastygal.ch | nastygal.nu |
| nastygal.cl | nastygal.org |
| nastygal.clothing | nastygal.ph |
| nastygal.co.id | nastygal.pr |
| nastygal.co.kr | nastygal.pt |
| nastygal.co.nz | nastygal.se |
| nastygal.co.uk | nastygal.sg |
| nastygal.com | nastygal.tt |
| nastygal.com.au | nastygal.tw |

Seller Disclosure Schedule
Active 30022962v2 250512.000001

| | |
|---|---|
| nastygal.com.br | nastygal.us |
| nastygal.com.co | nastygal.xxx |
| nastygal.com.do | nastygalclothing.com |
| nastygal.com.ec | nastygals.net |
| nastygal.com.hk | nastygals.org |
| nastygal.com.ht | nastygalshop.com |
| nastygal.com.jm | nastygalvintage.com |
| nastygal.com.mx | nastygirl.com |
| nastygal.com.pr | nastygirlclothing.com |
| nastygal.com.pt | ngalcdn.com |
| nastygal.com.ru | nsty.gl |
| nastygal.com.tr | shoe-cult.com |
| nastygal.com.tt | shoecult.com |
| nastygal.com.tw | shopnastygal.cn |
| nastygal.de | shopnastygal.xxx |
| nastygal.dk | shopnastygals.com |
| nastygal.do | shopnastygirls.com |
| nastygal.ec | shopshoecult.com |
| nastygal.es | supernasty.com |
| nastygal.fi | theshoecult.com |
| nastygal.fr | thevintagestylist.com |
| nastygal.hk | wwwnastygal.com |
| nastygal.ht | |

## Section 4.5(a)(2):



**Unregistered Trademarks**

MIRAGE and MIRAGE BY NASTY GAL, all in connection with apparel and online and retail store services in the field of apparel, accessories and jewellery.

**Website and content**

(iii)    In respect of the website and mobile site located at the domain names listed above, and the mobile application "Nasty Gal":

        a.    all the digital assets contained thereon, including (but not limited to) all photographs, images, artwork, graphics, designs, drawings, logos, story content, blog content (including the Nasty Galaxy blog), text, typographical arrangements, and videos, and all such digital assets historically contained on the website, mobile site and mobile application; and

b.   the design, look and feel and content of the same.

(iv)   The design, look and feel and content of all marketing messages and campaigns used or sent by the Seller, including but not limited to those sent by email and push messages, to customers of the Seller during the twelve (12) months prior to the Closing Date.

**Social media accounts**

Facebook – Nasty Gal
Twitter – Nasty Gal
Instagram – both Nasty Gal and Nasty Gal Melrose
Pinterest – Nasty Gal
Tumblr – Nasty Gal
You Tube – Nasty Gal
Snapchat – Nasty Gal

**Font**

Nasty Gal Grotesque typeface and font.

## Section 4.5(a)(3):

Licensing Agreement by and between the Seller and Courtney Love, dated June 18, 2015, as amended by that First Amendment to License Agreement by and between the Seller and Courtney Love, dated February 17, 2016.

Software License Agreement, by and between the Seller and Island Pacific Systems, Inc., dated September 3, 2014.

Software End User Agreement, by and between the Seller and HighJump, dated May 8, 2014 for a WMS.

Master Services Agreement, by and between the Seller and Hybris Software, dated January 31, 2013.

## Section 4.5(b):

Trademark License Agreement, by and between the Seller and Signal Brands, LLC dated March 30, 2016.

Subscriptions and Services Order Form, by and between the Seller and Salesforce.com, Inc., dated January 30, 2015.

Software License Agreement, by and between the Seller and Island Pacific Systems, Inc., dated September 3, 2014.

Content Delivery Services Contract, by and between Seller and Instart Logic, dated March 2, 2016.

Subscription and Services Order Form, by and between DreamHost, dated March 15, 2016.

Seller Disclosure Schedule
Active 30022962v2 250512.000001

Managed Services/Hosting Agreement, by and between the Seller and Island Pacific Systems, Inc., dated September 3, 2014.

Software Support Agreement, by and between the Seller and Island Pacific Systems, Inc., dated September 3, 2014.

Master Service Agreement, by and between the Seller and Tacit Knowledge, Inc., dated October 14, 2014 for Nasty Gal's Hybris Audit For Managed Commerce.

Agreement, by and between the Seller and Dematic, dated June 13, 2014 for the implementation of a Material Handling Put Wall System.

Master Service Agreement, by and between Seller and Analytics Pro, Inc., dated April 20, 2016;

Addendum to Master Service Agreement, by and between Seller and Analytics Pro, Inc., dated April 20, 2016.

Software End User Agreement, by and between the Seller and HighJump, dated May 8, 2014 for a WMS.

Master Services Agreement, by and between the Seller and Hybris Software, dated January 31, 2013.

License Agreement, by and between the Seller and Jirafe, dated May 16, 2014.


Intellectual Property Security Agreement, by and between the Seller and Hercules Technology Growth Capital, Inc., dated November 6, 2015.

Licensing Agreement by and between the Seller and Courtney Love, dated June 18, 2015, as amended by that First Amendment to License Agreement by and between the Company and Courtney Love, dated February 17, 2016.

Trademark License, by and between the Seller and Netflix Entertainment, LLC dated June 10, 2016.

License by and between the Seller and Sophia Amoruso and G.P. Putnam's Sons, an imprint of Penguin Publishing Group, a division of Penguin Random House LLC.

End User License Agreement, by and between Seller and Penguin Random House LLC, dated February 27, 2016.

Agreement by and between Seller and Native Voice Films Ltd dated April 13, 2016.

**Section 4.5(c):**

None

**Section 4.5(d):**

Pamela Love and Pamela Love Jewelry filed a claim in the United States District Court for the

Southern District of New York alleging the Seller sold jewelry that were copies of Pamela Love Jewelry's copyrighted designs. ***Pamela Love, et al. v. Nasty Gal Inc***., C.A. No. 16-cv-060603 (S.D.N.Y.)

The Seller has received the following communications relating to the intellectual property rights of third parties (the "***Communications***").

- The Seller received a letter dated December 6, 2016 from attorneys representing Britney Spears informing them of the unauthorized use of several registered trademarks in connection with the marketing or sale of a shirt on the Seller's website. The Seller responded by removing the alleged infringing shirt from its website and returned the remaining inventory to the vendor.  No further communication has been received.

- The Seller received a letter dated September 22, 2016 from attorneys representing Levi's Straus & Company informing them of the unauthorized use of one of its registered trademarks in connection with the marketing or sale of jeans on the Seller's website.  The Seller responded by removing the trademark from all marketing and promotional materials.  No further communication has been received.

- The Seller, in the ordinary course of business, receives informal letters, cease and desist letters or complaints from companies who claim that copies of their designs or portions thereof are being sold by the Company.  Except for the Levi's and Britney Spears matter, the Seller has resolved all such claims.  No such letter or complaint received by the Seller is expected to have a material adverse effect on the Seller's business as conducted or as proposed to be conducted.

In the ordinary course of business Seller sends communications, *i.e.*, cease and desist letters, to companies and individuals who it believes has infringed its Intellectual Property Rights.  At the time of this disclosure Seller is not aware of any unresolved actual, alleged or suspected infringement, misappropriation, diluting or any other violation of its Intellectual Property Rights.

## Section 4.5(e):

Intellectual Property Security Agreement, by and between the Seller and Hercules Technology Growth Capital, Inc., dated November 6, 2015.

On November 23, 2016 Seller received written notice from Reinhardt LLP representing a model employed by Seller.  Seller was unable to pay pre-petition fees for the model because of the bankruptcy filing.  The model's attorney has claimed that Seller could not use the model's images on its website because Seller did not pay for her services.

## Section 4.5(f):

The domain names disclosed in Section 4.5(a)(1) are registered in the name of the Seller.

## Section 4.6 – Material Contracts

## Section 4.6(a):

Seller Disclosure Schedule
Active 30022962v2 250512.000001

Subscriptions and Services Order Form, by and between the Seller and Salesforce.com, Inc., dated January 30, 2015.

Software License Agreement, by and between the Seller and Island Pacific Systems, Inc., dated September 3, 2014.

Content Delivery Services Contract, by and between Seller and Instart Logic, dated March 2, 2016.

Subscription and Services Order Form, by and between Seller and DreamHost, dated March 15, 2016.

Managed Services/Hosting Agreement, by and between the Seller and Island Pacific Systems, Inc., dated September 3, 2014.

Software Support Agreement, by and between the Seller and Island Pacific Systems, Inc., dated September 3, 2014.

Master Service Agreement, by and between the Seller and Tacit Knowledge, Inc., dated October 14, 2014 for Nasty Gal's Hybris Audit For Managed Commerce.

Agreement, by and between the Seller and Dematic, dated June 13, 2014 for the implementation of a Material Handling Put Wall System.

Master Service Agreement, by and between Seller and Analytics Pro, Inc., dated April 20, 2016;

Addendum to Master Service Agreement, by and between Seller and Analytics Pro, Inc., dated April 20, 2016.

Software End User Agreement, by and between the Seller and HighJump, dated May 8, 2014 for a WMS.

Master Services Agreement, by and between the Seller and Hybris Software, dated January 31, 2013.

License Agreement, by and between the Seller and Jirafe, dated May 16, 2014.

Intellectual Property Security Agreement, by and between the Seller and Hercules Technology Growth Capital, Inc., dated November 6, 2015.

Trademark License Agreement, by and between the Seller and Signal Brands, LLC dated March 30, 2016.

Licensing Agreement by and between the Seller and Courtney Love, dated June 18, 2015, as amended by that First Amendment to License Agreement by and between the Company and Courtney Love, dated February 17, 2016.

Trademark License, by and between the Seller and Netflix Entertainment, LLC dated June 10, 2016.

Seller Disclosure Schedule
Active 30022962v2 250512.000001

Exh. B-204

License by and between the Seller and Sophia Amoruso and G.P. Putnam's Sons, an imprint of Penguin Publishing Group, a division of Penguin Random House LLC.

End User License Agreement, by and between Seller and Penguin Random House LLC, dated February 27, 2016.

Agreement by and between Seller and Native Voice Films Ltd dated April 13, 2016.

### Section 4.8 – Brokers and Finders

Peter J. Solomon Company has served as Seller's financial and strategic advisor in connection with the transaction contemplated by this Agreement.

### Section 4.9 – Title to Assets

Intellectual Property Security Agreement, by and between the Seller and Hercules Technology Growth Capital, Inc., dated November 6, 2015.

### Section 4.11 – Taxes

Seller owes approximately $116,000 for property taxes to the Commonwealth of Kentucky.

### Section 4.12 – Data Protection and Privacy

While Seller is in material compliance with the U.S – EU Safe Harbor framework, it has not completed the EU-US Privacy Shield application for self-certification.

**Section 4.12(c):**

Seller makes no representation or warranty that the transfer of personal information as a result of the contemplated transaction will not violate any applicable law.  Seller's privacy policy does identify personal information as an asset of the company and may be transferred upon an asset sale.

Seller Disclosure Schedule
Active 30022962v2 250512.000001

Exhibit 4.5(a)(i)

# Nasty Gal Inc.

## Trademark Status Report (by mark)

*Page 1 of 4*

| Trademark | Country | Class | App. Date | App. No. | Reg. Date | Reg. No. | Status |
|---|---|---|---|---|---|---|---|
| AFTER PARTY | Canada | 25 | 7/16/2013 | 1635379 | 6/27/2016 | TMA941763 | Registered |
| AFTER PARTY | European Union | 18;  25;  35 | 6/24/2013 | 011927365 | 11/15/2013 | 011927365 | Registered |
| AFTER PARTY | United States | 25 | 7/2/2013 | 86000955 | 4/28/2015 | 4728316 | Registered |
| AFTER PARTY BY NASTY GAL | Australia | 25 | 7/3/2013 | 1566249 | 2/5/2014 | 1566249 | Registered |
| AFTER PARTY BY NASTY GAL | Canada | 25 | 7/16/2013 | 1635380 | 6/27/2016 | TMA941754 | Registered |
| AFTER PARTY BY NASTY GAL | European Union | 18;  25;  35 | 6/24/2013 | 011927571 | 11/15/2013 | 011927571 | Registered |
| AFTER PARTY BY NASTY GAL | United States | 25 | 7/2/2013 | 86000962 | 4/28/2015 | 4728317 | Registered |
| LIPS AND TONGUE Logo | United States | 25; 35 | 2/23/2016 | 86917053 | | | Allowed |
| NASTY GAL | Argentina | 25 | 11/21/2011 | 3130140 | 1/4/2013 | 2554092 | Registered |
| NASTY GAL | Argentina | 35 | 11/21/2011 | 3130141 | 1/4/2013 | 2554093 | Registered |
| NASTY GAL | Australia | 03;  09;  14 | 6/26/2013 | 1564847 | 1/29/2014 | 1564847 | Registered |
| NASTY GAL | Australia | 25; 35 | 11/21/2011 | 1460581 | 6/18/2012 | 1460581 | Registered |
| NASTY GAL | Bahamas | 38 | 3/13/2012 | 035639 | | | Published |
| NASTY GAL | Bahamas | 39 | 3/13/2012 | 035638 | | | Published |
| NASTY GAL | Bahrain | 25 | 1/31/2012 | 90496 | 1/31/2012 | 90496 | Registered |
| NASTY GAL | Bahrain | 35 | 1/31/2012 | 90497 | 1/31/2012 | 90497 | Registered |
| NASTY GAL | Bermuda | 25 | 3/16/2012 | 51564 | | | Pending |
| NASTY GAL | Bermuda | 35 | 3/16/2012 | 51565 | 4/8/2016 | 51565 | Registered |
| NASTY GAL | Brazil | 25 | 11/18/2011 | 904264475 | 1/21/2015 | 904264475 | Registered |
| NASTY GAL | Brazil | 35 | 11/22/2011 | 831266635 | | | Published |
| NASTY GAL | Canada | 25; 35 | 11/22/2012 | 1553203 | 11/20/2014 | TMA890413 | Registered |
| NASTY GAL | Canada | CG | 7/16/2013 | 1635378 | | | Allowed |
| NASTY GAL | Chile | 25 | 12/27/2011 | 985504 | 3/7/2013 | 997484 | Registered |
| NASTY GAL | Chile | 35 | 12/27/2011 | 985505 | 3/7/2013 | 997486 | Registered |
| NASTY GAL | Colombia | 25 | 11/18/2011 | 11157825 | 1/9/2015 | 507288 | Registered |

*Page 2 of 4*

| Trademark | Country | Class | App. Date | App. No. | Reg. Date | Reg. No. | Status |
|---|---|---|---|---|---|---|---|
| NASTY GAL | Colombia | 35 | 11/18/2011 | 11157816 | 3/17/2014 | 488290 | Registered |
| NASTY GAL | Costa Rica | 25 | 11/25/2011 | 201111700 | 8/13/2012 | 220480 | Registered |
| NASTY GAL | Costa Rica | 35 | 11/25/2011 | 201111699 | 7/20/2012 | 219539 | Registered |
| NASTY GAL | Croatia | 25; 35 | 12/14/2011 | Z20112174A | 9/12/2012 | Z20112174 | Registered |
| NASTY GAL | Dominican Republic | 25; 35 | 12/21/2011 | 201130254 | 3/19/2012 | 193676 | Registered |
| NASTY GAL | Egypt | 25 | 11/24/2011 | 267713 | | | Published |
| NASTY GAL | Egypt | 35 | 11/24/2011 | 267714 | | | Published |
| NASTY GAL | European Union | 03; 09; 18 | 7/3/2013 | 011952421 | 11/28/2013 | 011952421 | Registered |
| NASTY GAL | European Union | 14; 25; 35 | 11/21/2011 | 010430189 | 4/26/2012 | 010430189 | Registered |
| NASTY GAL | Hong Kong | 25; 35 | 11/21/2011 | 302091366 | 9/12/2012 | 302091366 | Registered |
| NASTY GAL | Iceland | 25; 35 | 11/21/2011 | 32172011 | 3/1/2012 | 2402012 | Registered |
| NASTY GAL | Israel | 25; 35 | 11/20/2011 | 242232 | 5/5/2013 | 242232 | Registered |
| NASTY GAL | Japan | 25; 35 | 11/24/2011 | 2011084179 | 5/25/2012 | 5495981 | Registered |
| NASTY GAL | Malaysia | 25 | 11/18/2011 | 2011054879 | 3/9/2013 | 2011054879 | Registered |
| NASTY GAL | Malaysia | 35 | 11/18/2011 | 2011054880 | 2/26/2013 | 2011054880 | Registered |
| NASTY GAL | Mexico | 25 | 12/15/2011 | 1236780 | 9/24/2012 | 1312708 | Registered |
| NASTY GAL | Mexico | 35 | 12/15/2011 | 1236822 | 9/24/2012 | 1313215 | Registered |
| NASTY GAL | New Zealand | 25; 35 | 11/18/2011 | 852637 | 5/19/2012 | 852637 | Registered |
| NASTY GAL | Norway | 14; 25; 35 | 12/8/2011 | 201114119 | 4/24/2012 | 265131 | Registered |
| NASTY GAL | Peru | 25 | 12/14/2011 | 4769072011 | 3/30/2012 | 00186441 | Registered |
| NASTY GAL | Peru | 35 | 12/14/2011 | 4769062011 | 3/30/2012 | 00071140 | Registered |
| NASTY GAL | Philippines | 25; 35 | 12/9/2011 | 42011014702 | 5/11/2012 | 42011014702 | Registered |
| NASTY GAL | Saudi Arabia | 25 | 11/29/2011 | 175103 | 7/9/2013 | 147180 | Registered |
| NASTY GAL | Saudi Arabia | 35 | 11/29/2011 | 175102 | 2/27/2014 | 143300351 | Registered |
| NASTY GAL | Singapore | 25; 35 | 11/23/2011 | T1116460H | 1/4/2013 | T1116460H | Registered |
| NASTY GAL | South Africa | 25 | 11/23/2011 | 201130149 | 1/6/2014 | 201130149 | Registered |
| NASTY GAL | South Africa | 35 | 11/23/2011 | 201130150 | 1/6/2014 | 201130150 | Registered |
| NASTY GAL | South Korea | 25; 35 | 12/8/2011 | 4520110005639 | 3/28/2013 | 450044151 | Registered |
| NASTY GAL | Switzerland | 25; 35 | 11/23/2011 | 631102011 | 3/15/2012 | 627086 | Registered |

*Page 3 of 4*

| Trademark | Country | Class | App. Date | App. No. | Reg. Date | Reg. No. | Status |
|---|---|---|---|---|---|---|---|
| NASTY GAL | Taiwan | 25; 35 | 12/16/2011 | 10006485 | 10/16/2012 | 01543271 | Registered |
| NASTY GAL | Thailand | 35 | 12/1/2011 | 827796 | 3/25/2013 | SM57194 | Registered |
| NASTY GAL | Turkey | 25; 35 | 1/9/2012 | 201202369 | 4/3/2013 | 201202369 | Registered |
| NASTY GAL | United Arab Emirates | 25 | 1/18/2012 | 168060 | 3/25/2013 | 168060 | Registered |
| NASTY GAL | United Arab Emirates | 35 | 1/18/2012 | 168061 | 3/25/2013 | 168061 | Registered |
| NASTY GAL | United States | 03; 09; 14 | 6/19/2013 | 85964637 | | | Allowed |
| NASTY GAL | United States | 18 | 3/28/2016 | 86955621 | | | Allowed |
| NASTY GAL | United States | 25 | 3/3/2010 | 77949179 | 12/3/2013 | 4444069 | Registered |
| NASTY GAL | United States | 35 | 3/3/2010 | 77949164 | 5/3/2011 | 3953331 | Registered |
| NASTY GAL | Uruguay | 25; 35 | 11/30/2011 | 429938 | 4/1/2013 | 429938 | Registered |
| NASTY GAL (stylized) | Australia | 25; 35 | 8/28/2012 | 1510890 | 6/17/2013 | 1510890 | Registered |
| NASTY GAL (stylized) | Canada | 25; 35 | 9/19/2012 | 1594906 | 11/23/2015 | TMA920989 | Registered |
| NASTY GAL (stylized) | European Union | 14; 25; 35 | 9/3/2012 | 011157112 | 1/29/2013 | 011157112 | Registered |
| NASTY GAL (stylized) | Thailand | 25 | 10/17/2012 | 867141 | 6/16/2014 | TM380894 | Registered |
| NASTY GAL (stylized) | United States | 25; 35 | 8/27/2012 | 85713556 | 6/10/2014 | 4548339 | Registered |
| NASTY GALAXY | United States | 16; 25; 41 | 2/18/2016 | 86912642 | | | Pending |
| NASTY GALLERY | United States | 41; 45 | 10/5/2012 | 85746814 | 5/3/2016 | 4951612 | Registered |
| NASTYGAL (and in Chinese characters) | China | 35 | 9/24/2012 | 11532620 | 2/28/2014 | 11532620 | Registered |
| NASTYGAL (in Chinese characters) | China | 25 | 9/24/2012 | 11532619 | 2/28/2014 | 11532619 | Registered |
| NASTYGAL (in Chinese characters) | China | 35 | 9/24/2012 | 11532618 | 2/28/2014 | 11532618 | Registered |
| SHOE CULT | Australia | 25; 35 | 7/31/2013 | 1571710 | 1/15/2014 | 1571710 | Registered |
| SHOE CULT | Canada | CG; CS; 25; 35 | 8/7/2013 | 1638548 | 6/27/2016 | TMA941760 | Registered |
| SHOE CULT | China | 25 | 6/4/2013 | 12700811 | 10/21/2014 | 12700811 | Registered |
| SHOE CULT | China | 35 | 6/4/2013 | 12700810 | 10/21/2014 | 12700810 | Registered |
| SHOE CULT | European Union | 14; 25; 35 | 7/31/2013 | 012027942 | 12/26/2013 | 012027942 | Registered |
| SHOE CULT | United States | 25; 35 | 6/19/2013 | 85964684 | 6/10/2014 | 4549130 | Registered |
| SHOE CULT BY NASTY GAL | Australia | 25; 35 | 1/17/2013 | 1536308 | 5/15/2013 | 1536308 | Registered |
| SHOE CULT BY NASTY GAL | Canada | 25; 35 | 1/18/2013 | 1610514 | 1/14/2016 | TMA926023 | Registered |
| SHOE CULT BY NASTY GAL | European Union | 14; 25; 35 | 1/18/2013 | 011500361 | 6/14/2013 | 011500361 | Registered |

| Trademark | Country | Class | App. Date | App. No. | Reg. Date | Reg. No. | Status |
|---|---|---|---|---|---|---|---|
| SHOE CULT BY NASTY GAL | United States | 25; 35 | 8/1/2012 | 85692569 | 10/29/2013 | 4426477 | Registered |
| SHOE CULT BY NASTY GAL (stylized) | China | 25 | 6/5/2013 | 12708031 | 10/21/2014 | 12708031 | Registered |
| SUPER NASTY | Australia | 16; 41 | 1/17/2013 | 1536309 | 5/29/2013 | 1536309 | Registered |
| SUPER NASTY | Canada | CS; 16; 35; 41 | 1/18/2013 | 1610509 | 1/14/2016 | TMA926024 | Registered |
| SUPER NASTY | China | 16 | 6/5/2013 | 12708030 | 10/21/2014 | 12708030 | Registered |
| SUPER NASTY | China | 41 | 6/21/2013 | 12788104 | 12/28/2014 | 12788104 | Registered |
| SUPER NASTY | European Union | 09; 16; 41 | 1/18/2013 | 011500006 | 6/14/2013 | 011500006 | Registered |
| SUPER NASTY | United States | 16; 41 | 7/19/2012 | 85682100 | 10/22/2013 | 4422832 | Registered |

248

Exh. B-209

Exhibit 4.5 (a)(1)

# Nasty Gal Inc.

## Trademark Actions Report (by due date)

| Date | Action | Trademark | Country | Class | App. Date | App. No. | Reg. Date | Reg. No. | Status |
|------|--------|-----------|---------|-------|-----------|----------|-----------|----------|--------|
| 1/18/2017 | Decl of Use/Reg Fees-ITU Due | NASTY GAL | Canada | CG | 7/16/2013 | 1635378 | | | Allowed |
| 3/8/2017 | Statement of Use 1st Extension | LIPS AND TONGUE Logo | United States | 25; 35 | 2/23/2016 | 86917053 | | | Allowed |
| 5/3/2017 | Aff of Use - 6 Year | NASTY GAL | United States | 35 | 3/3/2010 | 77949164 | 5/3/2011 | 3963331 | Registered |
| 5/15/2017 | Statement of Use 1st Extension | NASTY GAL | United States | 18 | 3/29/2016 | 86955621 | | | Allowed |
| 6/19/2017 | Statement of Use 5th Extension | NASTY GAL | United States | 03; 09; 14 | 6/19/2013 | 85984637 | | | Allowed |
| 9/6/2017 | Statement of Use 2nd Extension | LIPS AND TONGUE Logo | United States | 25; 35 | 2/23/2016 | 86917053 | | | Allowed |
| 11/15/2017 | Statement of Use 2nd Extension | NASTY GAL | United States | 18 | 3/29/2016 | 86955621 | | | Allowed |
| 12/16/2017 | Statement of Use Final | NASTY GAL | United States | 03; 09; 14 | 6/19/2013 | 85984637 | | | Allowed |
| 3/6/2018 | Statement of Use 3rd Extension | LIPS AND TONGUE Logo | United States | 25; 35 | 2/23/2016 | 86917053 | | | Allowed |
| 5/11/2018 | Decl of Use - 6yr Due | NASTY GAL | Philippines | 25; 35 | 12/9/2011 | 42011014702 | 5/11/2012 | 42011014702 | Registered |
| 5/15/2018 | Statement of Use 3rd Extension | NASTY GAL | United States | 18 | 3/28/2016 | 86955621 | | | Allowed |
| 9/6/2018 | Statement of Use 4th Extension | LIPS AND TONGUE Logo | United States | 25; 35 | 2/23/2016 | 86917053 | | | Allowed |
| 11/15/2018 | Statement of Use 4th Extension | NASTY GAL | United States | 18 | 3/28/2016 | 86955621 | | | Allowed |
| 3/6/2019 | Statement of Use 5th Extension | LIPS AND TONGUE Logo | United States | 25; 35 | 2/23/2016 | 86917053 | | | Allowed |
| 3/16/2019 | First Renewal | NASTY GAL | Bermuda | 35 | 3/16/2012 | 51565 | 4/8/2016 | 51565 | Registered |
| 5/15/2019 | Statement of Use 5th Extension | NASTY GAL | United States | 18 | 3/28/2016 | 86955621 | | | Allowed |
| 9/6/2019 | Statement of Use Final | LIPS AND TONGUE Logo | United States | 25; 35 | 2/23/2016 | 86917053 | | | Allowed |
| 10/22/2019 | Aff of Use - 6 Year | SUPER NASTY | United States | 16; 41 | 7/19/2012 | 85682100 | 10/22/2013 | 4422832 | Registered |
| 10/29/2019 | Aff of Use - 6 Year | SHOE CULT BY NASTY GAL | United States | 25; 35 | 8/1/2012 | 85692569 | 10/29/2013 | 4426477 | Registered |
| 11/15/2019 | Statement of Use Final | NASTY GAL | United States | 18 | 3/28/2016 | 86955621 | | | Allowed |
| 12/3/2019 | Aff of Use - 6 Year | NASTY GAL | United States | 25 | 3/3/2010 | 77946179 | 12/3/2013 | 4444069 | Registered |
| 6/10/2020 | Aff of Use - 6 Year | NASTY GAL (stylized) | United States | 25; 35 | 8/27/2012 | 85713556 | 6/10/2014 | 4548339 | Registered |

| Date | Action | Trademark | Country | Class | App. Date | App. No. | Reg. Date | Reg. No. | Status |
|---|---|---|---|---|---|---|---|---|---|
| 6/10/2020 | Aff of Use - 6 Year | SHOE CULT | United States | 25; 35 | 6/19/2013 | 85904684 | 6/10/2014 | 4549130 | Registered |
| 4/28/2021 | Aff of Use - 6 Year | AFTER PARTY | United States | 25 | 7/2/2013 | 86000955 | 4/28/2015 | 4728316 | Registered |
| 4/28/2021 | Aff of Use - 6 Year | AFTER PARTY BY NASTY GAL | United States | 25 | 7/2/2013 | 86000962 | 4/28/2015 | 4728317 | Registered |
| 5/3/2021 | First Renewal | NASTY GAL | United States | 35 | 3/3/2010 | 77949164 | 5/3/2011 | 3953331 | Registered |
| 8/9/2021 | First Renewal | NASTY GAL | Saudi Arabia | 25 | 11/29/2011 | 175103 | 7/9/2013 | 147180 | Registered |
| 8/11/2021 | First Renewal | NASTY GAL | Saudi Arabia | 35 | 11/29/2011 | 175102 | 2/27/2014 | 143300351 | Registered |
| 11/18/2021 | First Renewal | NASTY GAL | Malaysia | 25 | 11/18/2011 | 2011054879 | 3/9/2013 | 2011054879 | Registered |
| 11/18/2021 | First Renewal | NASTY GAL | Malaysia | 35 | 11/18/2011 | 2011054880 | 2/26/2013 | 2011054880 | Registered |
| 11/18/2021 | First Renewal | NASTY GAL | New Zealand | 25; 35 | 11/18/2011 | 852837 | 5/19/2012 | 852837 | Registered |
| 11/20/2021 | First Renewal | NASTY GAL | Hong Kong | 25; 35 | 11/21/2011 | 302091366 | 9/12/2012 | 302091366 | Registered |
| 11/20/2021 | First Renewal | NASTY GAL | Israel | 25; 35 | 11/20/2011 | 242232 | 5/5/2013 | 242232 | Registered |
| 11/21/2021 | First Renewal | NASTY GAL | Australia | 25; 35 | 11/21/2011 | 1460581 | 6/18/2012 | 1460581 | Registered |
| 11/21/2021 | First Renewal | NASTY GAL | European Union | 14; 25; 35 | 11/21/2011 | 010430189 | 4/25/2012 | 010430189 | Registered |
| 11/23/2021 | First Renewal | NASTY GAL | Singapore | 25; 35 | 11/23/2011 | T1116460H | 1/4/2013 | T1115460H | Registered |
| 11/23/2021 | First Renewal | NASTY GAL | South Africa | 25 | 11/23/2011 | 201130149 | 1/8/2014 | 201130149 | Registered |
| 11/23/2021 | First Renewal | NASTY GAL | South Africa | 35 | 11/23/2011 | 201130150 | 1/8/2014 | 201130150 | Registered |
| 11/23/2021 | First Renewal | NASTY GAL | Switzerland | 25; 35 | 11/23/2011 | 631102011 | 3/15/2012 | 627086 | Registered |
| 11/30/2021 | First Renewal | NASTY GAL | Thailand | 35 | 12/12/2011 | 827796 | 3/25/2013 | SM57194 | Registered |
| 12/8/2021 | First Renewal | NASTY GAL | Norway | 14; 25; 35 | 12/8/2011 | 201114119 | 4/24/2012 | 265131 | Registered |
| 12/14/2021 | First Renewal | NASTY GAL | Croatia | 25; 35 | 12/14/2011 | Z20112174A | 9/12/2012 | Z20112174 | Registered |
| 12/15/2021 | First Renewal | NASTY GAL | Mexico | 25 | 12/15/2011 | 1236780 | 9/24/2012 | 1312708 | Registered |
| 12/15/2021 | First Renewal | NASTY GAL | Mexico | 35 | 12/15/2011 | 1236822 | 9/24/2012 | 1313215 | Registered |
| 1/9/2022 | First Renewal | NASTY GAL | Turkey | 25; 35 | 1/9/2012 | 2012/02369 | 4/3/2013 | 2012/02369 | Registered |
| 1/18/2022 | First Renewal | NASTY GAL | United Arab Emirates | 25 | 1/18/2012 | 168060 | 3/25/2013 | 168060 | Registered |
| 1/18/2022 | First Renewal | NASTY GAL | United Arab Emirates | 35 | 1/18/2012 | 169061 | 3/25/2013 | 158061 | Registered |

Page 3 of 5

| Date | Action | Trademark | Country | Class | App. Date | App. No. | Reg. Date | Reg. No. | Status |
|---|---|---|---|---|---|---|---|---|---|
| 1/31/2022 | First Renewal | NASTY GAL | Bahrain | 25 | 1/31/2012 | 90496 | 1/31/2012 | 90496 | Registered |
| 1/31/2022 | First Renewal | NASTY GAL | Bahrain | 35 | 1/31/2012 | 90497 | 1/31/2012 | 90497 | Registered |
| 3/1/2022 | First Renewal | NASTY GAL | Iceland | 25; 35 | 11/21/2011 | 32172011 | 3/1/2012 | 2402012 | Registered |
| 3/19/2022 | First Renewal | NASTY GAL | Dominican Republic | 25; 35 | 12/21/2011 | 201130254 | 3/19/2012 | 193676 | Registered |
| 3/30/2022 | First Renewal | NASTY GAL | Peru | 25 | 12/14/2011 | 476907/2011 | 3/30/2012 | 00186441 | Registered |
| 3/30/2022 | First Renewal | NASTY GAL | Peru | 35 | 12/14/2011 | 476906/2011 | 3/30/2012 | 00071140 | Registered |
| 5/9/2022 | Aff of Use - 6 Year | NASTY GALLERY | United States | 41; 45 | 10/5/2012 | 85746814 | 5/3/2016 | 4951612 | Registered |
| 5/11/2022 | First Renewal | NASTY GAL | Philippines | 25; 35 | 12/9/2011 | 42011014702 | 5/11/2012 | 42011014702 | Registered |
| 5/25/2022 | First Renewal | NASTY GAL | Japan | 25; 35 | 11/24/2011 | 2011084179 | 5/25/2012 | 5495681 | Registered |
| 7/20/2022 | First Renewal | NASTY GAL | Costa Rica | 35 | 11/25/2011 | 201111699 | 7/20/2012 | 219539 | Registered |
| 8/13/2022 | First Renewal | NASTY GAL | Costa Rica | 25 | 11/25/2011 | 201111700 | 8/13/2012 | 220480 | Registered |
| 8/28/2022 | First Renewal | NASTY GAL (stylized) | Australia | 25; 35 | 6/28/2012 | 1510890 | 6/17/2013 | 1510890 | Registered |
| 9/3/2022 | First Renewal | NASTY GAL (stylized) | European Union | 14; 25; 35 | 9/3/2012 | 011157112 | 1/29/2013 | 011157112 | Registered |
| 10/15/2022 | First Renewal | NASTY GAL | Taiwan | 25; 35 | 12/18/2011 | 100064852 | 10/16/2012 | 01543271 | Registered |
| 10/16/2022 | First Renewal | NASTY GAL (stylized) | Thailand | 25 | 10/17/2012 | 867141 | 6/16/2014 | TM380894 | Registered |
| 11/28/2022 | First Renewal | NASTY GAL | Uruguay | 25; 35 | 11/30/2011 | 429938 | 4/1/2013 | 429938 | Registered |
| 1/4/2023 | Affidavit of Use | NASTY GAL | Argentina | 25 | 11/21/2011 | 3130140 | 1/4/2013 | 2554092 | Registered |
| 1/4/2023 | First Renewal | NASTY GAL | Argentina | 25 | 11/21/2011 | 3130140 | 1/4/2013 | 2554092 | Registered |
| 1/4/2023 | Affidavit of Use | NASTY GAL | Argentina | 35 | 11/21/2011 | 3130141 | 1/4/2013 | 2554093 | Registered |
| 1/4/2023 | First Renewal | NASTY GAL | Argentina | 35 | 11/21/2011 | 3130141 | 1/4/2013 | 2554093 | Registered |
| 1/17/2023 | First Renewal | SHOE CULT BY NASTY GAL | Australia | 25; 35 | 1/17/2013 | 1536308 | 5/15/2013 | 1536308 | Registered |
| 1/17/2023 | First Renewal | SUPER NASTY | Australia | 16; 41 | 1/17/2013 | 1536309 | 5/29/2013 | 1536309 | Registered |
| 1/18/2023 | First Renewal | SHOE CULT BY NASTY GAL | European Union | 14; 25; 35 | 1/18/2013 | 011500361 | 6/14/2013 | 011500361 | Registered |
| 1/18/2023 | First Renewal | SUPER NASTY | European Union | 09; 16; 41 | 1/18/2013 | 011500006 | 6/14/2013 | 011500006 | Registered |
| 3/7/2023 | First Renewal | NASTY GAL | Chile | 25 | 12/27/2011 | 985504 | 3/7/2013 | 997484 | Registered |

| Date | Action | Trademark | Country | Class | App. Date | App. No. | Reg. Date | Reg. No. | Status |
|---|---|---|---|---|---|---|---|---|---|
| 3/7/2023 | First Renewal | NASTY GAL | Chile | 35 | 12/27/2011 | 986505 | 3/7/2013 | 967486 | Registered |
| 3/28/2023 | First Renewal | NASTY GAL | South Korea | 25; 35 | 12/8/2011 | 4520110005639 | 3/28/2013 | 450044151 | Registered |
| 6/24/2023 | First Renewal | AFTER PARTY | European Union | 18; 25; 35 | 6/24/2013 | 011927385 | 11/15/2013 | 011927385 | Registered |
| 6/24/2023 | First Renewal | AFTER PARTY BY NASTY GAL | European Union | 18; 25; 35 | 6/24/2013 | 011927571 | 11/15/2013 | 011927571 | Registered |
| 6/26/2023 | First Renewal | NASTY GAL | Australia | 03; 09; 14 | 6/26/2013 | 1564847 | 1/29/2014 | 1564847 | Registered |
| 7/3/2023 | First Renewal | AFTER PARTY BY NASTY GAL | Australia | 25 | 7/3/2013 | 1566249 | 2/5/2014 | 1566249 | Registered |
| 7/3/2023 | First Renewal | NASTY GAL | European Union | 03; 09; 18 | 7/3/2013 | 011952421 | 11/28/2013 | 011952421 | Registered |
| 7/31/2023 | First Renewal | SHOE CULT | Australia | 25; 35 | 7/31/2013 | 1571710 | 1/15/2014 | 1571710 | Registered |
| 7/31/2023 | First Renewal | SHOE CULT | European Union | 14; 25; 35 | 7/31/2013 | 012027942 | 12/26/2013 | 012027942 | Registered |
| 10/22/2023 | First Renewal | SUPER NASTY | United States | 16; 41 | 7/19/2012 | 85682100 | 10/22/2013 | 4422832 | Registered |
| 10/29/2023 | First Renewal | SHOE CULT BY NASTY GAL | United States | 25; 35 | 8/1/2012 | 85692599 | 10/29/2013 | 4426477 | Registered |
| 12/3/2023 | First Renewal | NASTY GAL | United States | 25 | 3/3/2010 | 77949179 | 12/3/2013 | 4441069 | Registered |
| 2/27/2024 | First Renewal | NASTY GAL (and in Chinese characters) | China | 35 | 9/24/2012 | 11532620 | 2/28/2014 | 11532620 | Registered |
| 2/27/2024 | First Renewal | NASTY GAL (in Chinese characters) | China | 25 | 9/24/2012 | 11532619 | 2/28/2014 | 11532619 | Registered |
| 2/27/2024 | First Renewal | NASTY GAL (in Chinese characters) | China | 35 | 9/24/2012 | 11532618 | 2/28/2014 | 11532618 | Registered |
| 3/17/2024 | First Renewal | NASTY GAL | Colombia | 35 | 11/18/2011 | 11157816 | 3/17/2014 | 488200 | Registered |
| 6/10/2024 | First Renewal | NASTY GAL (stylized) | United States | 25; 35 | 8/27/2012 | 85713556 | 6/10/2014 | 4548339 | Registered |
| 6/10/2024 | First Renewal | SHOE CULT | United States | 25; 35 | 6/19/2013 | 85964684 | 6/10/2014 | 4546130 | Registered |
| 10/20/2024 | First Renewal | SHOE CULT | China | 25 | 6/4/2013 | 12700811 | 10/21/2014 | 12700811 | Registered |
| 10/20/2024 | First Renewal | SHOE CULT | China | 35 | 6/4/2013 | 12700810 | 10/21/2014 | 12700310 | Registered |
| 10/20/2024 | First Renewal | SHOE CULT BY NASTY GAL (stylized) | China | 25 | 6/5/2013 | 12708031 | 10/21/2014 | 12708031 | Registered |
| 10/20/2024 | First Renewal | SUPER NASTY | China | 16 | 6/5/2013 | 12708030 | 10/21/2014 | 12708030 | Registered |
| 12/27/2024 | First Renewal | SUPER NASTY | China | 41 | 6/21/2013 | 12788104 | 12/25/2014 | 12788104 | Registered |

| Date | Action | Trademark | Country | Class | App. Date | App. No. | Reg. Date | Reg. No. | Status |
|------|--------|-----------|---------|-------|-----------|----------|-----------|----------|--------|
| 1/9/2025 | First Renewal | NASTY GAL | Colombia | 25 | 11/18/2011 | 11157825 | 1/9/2015 | 507288 | Registered |
| 1/21/2025 | First Renewal | NASTY GAL | Brazil | 25 | 11/18/2011 | 904264475 | 1/21/2015 | 904264475 | Registered |
| 4/28/2025 | First Renewal | AFTER PARTY | United States | 25 | 7/2/2013 | 86000655 | 4/28/2015 | 4728310 | Registered |
| 4/28/2025 | First Renewal | AFTER PARTY BY NASTY GAL | United States | 25 | 7/2/2013 | 86000662 | 4/28/2015 | 4728317 | Registered |
| 5/3/2026 | First Renewal | NASTY GALLERY | United States | 41; 45 | 10/5/2012 | 85746814 | 5/3/2016 | 4951612 | Registered |
| 11/20/2029 | First Renewal | NASTY GAL | Canada | 25; 35 | 11/22/2011 | 1553203 | 11/20/2014 | TMA890413 | Registered |
| 11/23/2030 | First Renewal | NASTY GAL (stylized) | Canada | 25; 35 | 9/19/2012 | 1594906 | 11/23/2015 | TMA920589 | Registered |
| 1/14/2031 | First Renewal | SHOE CULT BY NASTY GAL | Canada | 25; 35 | 1/18/2013 | 1610514 | 1/14/2016 | TMA926023 | Registered |
| 1/14/2031 | First Renewal | SUPER NASTY | Canada | CS; 16; 35; 41 | 1/18/2013 | 1610509 | 1/14/2016 | TMA926024 | Registered |
| 6/27/2031 | First Renewal | AFTER PARTY | Canada | 25 | 7/16/2013 | 1635379 | 6/27/2016 | TMA941763 | Registered |
| 6/27/2031 | First Renewal | AFTER PARTY BY NASTY GAL | Canada | 25 | 7/16/2013 | 1635380 | 6/27/2016 | TMA941754 | Registered |
| 6/27/2031 | First Renewal | SHOE CULT | Canada | CG; CS; 25; 35 | 8/7/2013 | 1638548 | 6/27/2016 | TMA941760 | Registered |

**Purchaser Disclosure Schedule**

## PURCHASER DISCLOSURE SCHEDULE

**Section 5.3(a)**

None

**Section 5.3(b)**

None

**Section 5.6**

None